# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION and DR. ADAM CORLEY, <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, DEPARTMENT OF LABOR, DEPARTMENT OF THE TREASURY, OFFICE OF PERSONNEL MANAGEMENT, and the CURRENT HEADS OF THOSE AGENCIES IN THEIR OFFICIAL CAPACITIES, <br><br> *Defendants.* | Civil Action No. 6:21-cv-00425-JDK |

## *AMICUS CURIAE* BRIEF OF ACTION FOR HEALTH, INC. IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Action for Health, Inc. respectfully submits this *amicus curiae* brief in support of Plaintiffs' Motion for Summary Judgment (Dkt. 25).

## INTRODUCTION AND INTERESTS OF *AMICUS CURIAE*

Action for Health is a national, non-profit patient advocacy organization whose members include a diverse array of patient, consumer, and taxpayer advocates representing millions of patients.[1] Action for Health's work focuses on educating policymakers, the media, and concerned citizens about critical healthcare issues from the patient perspective, including most recently the fair implementation of the federal surprise medical billing law: the No Surprises Act, Pub. L. 116-260 (2020).[2]

The NSA is one of the most important patient-protection bills in American history.  Among other things, it prohibits certain surprise medical bills and takes patients out of the middle of payment disputes between healthcare providers and health insurers.  Many surprise medical bills occur when a patient with private health insurance receives emergency care from an "out of network" physician or facility: one that does not have a contract with the patient's insurer.  Prior to the NSA, insurers would typically require patients to pay most or all of the charges for these services, leaving them with unexpectedly high out-of-pocket costs.  Now, patients will pay the same cost-sharing charges they would for similar in-network services.  Then healthcare providers and insurers can turn to the NSA's dispute-resolution process to determine the amount the insurer pays to the provider.

The IDR process is arguably the most important piece of the NSA and one that was intensely debated in Congress.  For roughly two years, legislators went back and forth on the very question at issue here: some proposed an IDR process like the one adopted in the NSA, which equally weighs a

---

[1] [www.action4health.org.](http://www.action4health.org.)

[2] For ease of reference, this brief uses the same abbreviations, definitions, and statutory references as Plaintiffs' summary-judgment brief unless otherwise noted.  (*See* Dkt. 25 at 10, n.2.)

number of factors in selecting the proper out-of-network payment amount;[3] others proposed to set a default or "benchmark" payment amount based on median in-network contract rates—an artificially low number controlled by insurers.[4] Congressional compromise negotiations in December 2020 produced the language that ultimately passed in the NSA, which allows the IDR entity to consider the benchmark payment amount (now known as the QPA) but *does not* make it the default.[5] Under the plain text of the NSA, the IDR entity "shall" consider the QPA, just as it "shall" consider the other factors in determining the appropriate payment. 42 U.S.C. § 300gg-111(c)(5)(C)(i).

The September IFR rewrites the statute by creating a "rebuttable presumption" that the QPA is the appropriate payment amount, thus putting a heavy administrative thumb on the scales in favor of insurers. 86 Fed. Reg. 55,980, 56,060 (Oct. 7, 2021). This approach violates the text of the NSA and the procedural requirements of the APA, as Plaintiffs explain well in their summary-judgment brief. But it's also bad policy for other reasons that strike at the core of the NSA. Stated simply, this insurer-friendly payment standard will harm healthcare providers and patients in the long run by dragging down payments to providers, forcing many out of business, increasing consolidation and healthcare costs, and reducing patient access to care. These impacts are particularly damaging to inner

---

[3] *See, e.g.,* S. 1531, 116th Cong. (2019).

[4] *See, e.g.,* S. 1895, 116th Cong. (2019); H.R. 3630, 116th Cong. (2019).

[5] House Committees on Ways and Means, Energy and Commerce, Education and Labor, *Protecting Patients from Surprise Medical Bills* (Dec. 21, 2020) (noting that the text of the compromise proposal "includes NO benchmarking or rate-setting"), https://gop-waysandmeans.house.gov/protecting-patients-from-surprise-medical-bills/; House Committee on Ways and Means, *Congressional Committee Leaders Announce Surprise Billing Agreement* (Dec. 11, 2020) (announcing compromise proposal, including IDR process where the arbiter "is required to consider the median in-network rate" along with other information submitted by the parties), https://gop-waysandmeans.house.gov/congressional-committee-leaders-announce-surprise-billing-agreement/; Letter from 152 Members of Congress to Departments (Nov. 5, 2021) ("Nov. 5 Letter") ("Following a comprehensive process that included hearings, markups, and extensive negotiations, Congress rejected a benchmark rate and determined the best path forward for patients was to authorize an open negotiation period coupled with a balanced IDR process."), https://wenstrup.house.gov/uploadedfiles/2021.11.05_no_surprises_act_letter.pdf.

cities and rural communities.  As a patient advocacy organization, Action for Health is uniquely situated to speak to this perspective, which is not represented by the parties.  While providers lose under the unlawful September IFR, patients do too.  The only winners are health insurers.

Action for Health and others communicated these patient-focused concerns to the Departments as they worked to develop the NSA's implementing regulations.[6]  But because the Departments skipped notice-and-comment rulemaking, they were not compelled to address these concerns.[7]  There was no "good cause" for this unnecessarily expedited rulemaking, and it was certainly not in the "public interest."  5 U.S.C. § 553(b)(B).  Action for Health therefore submits this *amicus curiae* brief to highlight the patient impacts that the Departments should have been required to confront—impacts that further demonstrate how the September IFR undermines congressional intent as expressed in the NSA.  No party or party's counsel authored this brief in whole or in part, and no person other than Action for Health contributed money that was intended to fund preparing or submitting this brief.

## ARGUMENT

Plaintiffs' summary-judgment brief lays out the fundamental legal deficiencies with the September IFR, and Action for Health joins in those concerns. (Dkt. 25 at 13-30.)  In particular, the September IFR exceeds the Departments' authority under the text of the NSA and was improperly passed without notice-and-comment rulemaking.  These shortcomings are sufficient to vacate the

---

[6] *See, e.g.,* Action for Health, *Comments on the Regulatory Implementation of the No Surprises Act* (June 30, 2021) ("Action for Health Comments"), https://www.action4health.org/letters/nsa-regulatory-recommendations.

[7] *See, e.g., Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 211 (D.C. Cir. 2011) (notice-and-comment rulemaking "includes a requirement that the agency adequately explain its result and respond to relevant and significant public comments") (internal citations and quotations omitted).

September IFR, and the Court should do just that.[8] Action for Health files this brief to provide additional statutory and regulatory context about the ways that patients will suffer under these unlawful regulations. Patient protection was a significant issue at the heart of the NSA, and the September IFR undermines that goal. At a minimum, the Departments should have been required to consider and address these patient-focused concerns through notice-and-comment rulemaking.

To be sure, healthcare providers suffer most directly in an IDR process that defaults to the QPA. This standard drags down payment rates for out-of-network services and leaves insurers with no reason to negotiate alternative rates in good faith.[9] After all, if the insurer-friendly QPA is presumptively the proper payment, what does an insurer have to lose from arbitrating? With the QPA as the baseline, more healthcare providers will struggle financially and fail, especially the independent medical practices and smaller hospitals that make up a large part of the healthcare industry.[10] In 2020 alone, hospitals reportedly lost an estimated $323 billion and more than 47 closed.[11] The September IFR only makes this worse by giving insurers greater leverage to pay providers less.

---

[8] This is not the only challenge to the September IFR. The American Medical Association has filed a similar lawsuit in the U.S. District Court for the District of Columbia. *Am. Med. Ass'n v. U.S. Dept. of Health and Human Servs.*, No. 1:21-CV-03231, Dkt. 1 (D.D.C. Dec. 9, 2021) ("AMA Complaint").

[9] *See* NDP Analytics, *An Assessment of the CBO Cost Estimate of S. 1895: The Unintended Economic Consequences of the Proposed Healthcare Price Control System* ("NDP Analytics Report") at 2 (Sept. 2019), https://ndpanalytics.com/wp-content/uploads/Report-13.pdf; Erin L. Duffy, *Influence of Out-of-Network Payment Standards on Insurer-Provider Bargaining: California's Experience* ("Duffy Study"), AMERICAN JOURNAL OF MANAGED CARE (August 2019), https://www.ajmc.com/view/influence-of-outofnetwork-payment-standards-on-insurer-provider-bargaining-californias-experience?p=1.

[10] *See* California Medical Association, *Comments on No Surprises Act: Interim Final Rule: Part I* ("CMA Regulatory Comments") at 10-13 (Sept. 7, 2021), https://www.cmadocs.org/Portals/CMA/files/public/CMA%20Letter%20on%20Federal%20Surprise%20Billing%20Regs%20(080721).pdf?ver=2021-09-16-125208-947; NDP Analytics Report at 9-10; *see also id.* at 10 (citing AMA estimate that 45.9% of physicians are self-employed).

[11] Ayla Ellison, *47 Hospitals closed, filed for bankruptcy this year*, Becker's Hospital Review (Oct. 16, 2020), https://www.beckershospitalreview.com/finance/47-hospitals-closed-filed-for-bankruptcy-this-year.html.

But the unfair IDR process will harm patients too. Although the NSA frees patients from the short-term harm of certain surprise medical bills, patients will suffer in the long run. As more healthcare providers are forced to close their practices or join larger healthcare systems, patients will have a harder time getting the medical care they need *and* will pay more for the care they can get. Market consolidation can reduce competition, which often increases healthcare costs and insurance premiums.[12] For these reasons, and as 152 members of Congress explained in a letter to the Departments, setting the QPA as the default harms patients by "narrow[ing] provider networks and jeopardiz[ing] patient access to care—the exact opposite of the goal of the law."[13]

These impacts are not just theoretical. Some states have had their own surprise-billing laws for years, thus serving as the paradigmatic "laboratories" for the impact of various approaches on the healthcare system. California, most notably, passed a surprise-billing law in 2016 that required out-of-network rates to be set at a similarly low benchmark: the higher of the median in-network rate or 125% of Medicare rates.[14] After just a couple years, it was already clear that this approach was harming providers and patients alike. So in 2019, when Congress was negotiating the language of what would become the NSA, the California Medical Association submitted a letter to members of Congress outlining the unintended consequences of the California surprise-billing law and urging Congress not

---

[12] *See* NDP Analytics Report at 9-10; CMA Regulatory Comments at 12-13.

[13] Nov. 5 Letter, *supra* n.5, at 2; *see also* NDP Analytics Report at 1 ("The number of available physicians will drop" and "[p]atient quality will be reduced" under benchmarking approach.).

[14] CAL. HEALTH & SAFETY CODE § 1371.31; CMA Regulatory Comments at 10.

to repeat the same errors.[15]  Then earlier this year, CMA submitted regulatory comments to the Departments along the same lines.[16]

As CMA outlined in these documents, health insurance premiums in California have continued to rise even while the insurer-friendly payment standard in the California law has drastically reduced payments to healthcare providers.[17]  At the same time, patient access to care has suffered.  The California Department of Managed Care reported a 193% increase in patient complaints regarding access to healthcare from 2016 to 2019.[18]  Reduced access to care can take many forms.

The most immediate impact comes from insurers effectively forcing more healthcare providers out of their networks.  Since the passage of California's surprise-billing law, CMA and others have documented countless cases of insurers refusing to renew longstanding contracts with providers, initiating sudden terminations, or demanding significant reductions in provider reimbursement rates.[19]  With below-market rates as the default, "insurers have decided that they can just pay the low benchmark payment rate in the law and forego contracts with physicians."[20]  The result will be the same under the September IFR: the AMA has already documented examples of insurers threatening termination of provider contracts if they don't accept drastically reduced rates.[21]

---

[15] Letter from David H. Aizuss, M.D., President of the California Medical Association, to Members of Congress ("CMA Letter to Congress") at 3 (July 10, 2019), https://www.cmadocs.org/Portals/CMA/files/public/CMA%20Surprise%20Billing%20Letter%20to%20Congress%20July%202019.pdf.

[16] CMA Regulatory Comments, *supra* n.10.

[17] *Id.* at 2, 12-13.

[18] *Id.* at 2, 12.

[19] *Id.* at 2-3; CMA Letter to Congress at 2-7; Duffy Study, *supra* n.9, at e245.

[20] CMA Letter to Congress at 2; *see also* CMA Regulatory Comments at 9-10.

[21] *See* AMA Complaint, *supra* n.8, at 8 (citing letter from BlueCross BlueShield of North Carolina to redacted provider requiring reduction in contracted rates—and otherwise threatening termination of their contract—based on payment methodology in September IFR).

As more healthcare providers are forced out of network—or out of business—by reduced rates, patients encounter greater difficulty finding in-network providers to care for them.[22] And "[a]s patients wait to see their physicians, they may be forced to seek care in emergency departments when their conditions have worsened and become more expensive."[23] At the same time, though, fewer out-of-network providers can afford to provide emergency care at the artificially-low default rates, especially hospital-based physicians like surgeons, obstetricians, and anesthesiologists.[24] So, in other words, the unlawful approach in the September IFR could destroy access to "on call" safety net physicians for patients facing life-or-death emergencies or delivering a baby in the middle of the night—emergency services that were the primary concern of the NSA. *See* 42 U.S.C. § 300gg-111(a).

Rural areas and underserved communities are particularly hard hit.[25] Patients in these areas are disproportionately enrolled in Medicaid and Medicare. If these areas lose their market-rate private insurer payments, they may not be able to sustain community physician practices and a hospital.[26] Rural providers may also be forced to transfer emergency patients to other communities if they can't get enough in-network, on-call panels of specialists, which can be life-threatening for some patients.[27] For these reasons, and as Members of Congress warned in their November 5 Letter, the September IFR "could exacerbate existing health disparities and patient access in rural and urban underserved communities."[28]

---

[22] CMA Letter to Congress at 2; CMA Regulatory Comments at 10-11.

[23] CMA Letter to Congress at 4-5.

[24] Duffy Study, *supra* n.9, at e245; CMA Regulatory Comments at 1-2, 10-11.

[25] *See id.*

[26] Duffy Study, *supra* n.9, at e245; CMA Letter to Congress at 5; CMA Regulatory Comments at 2, 10.

[27] CMA Letter to Congress at 5.

[28] Nov. 5 Letter at 2.

These are obviously complex issues, and there may be room for good-faith debate about the extent of these patient-focused consequences. But Congress weighed these issues and opted for a balanced IDR process. The Departments avoided the debate by issuing the September IFR without notice and comment. And it's not as if these concerns are a surprise. Action for Health, CMA, and others submitted regulatory comments outlining these points.[29] Hundreds of lawmakers submitted comments explaining that a QPA presumption directly contradicts congressional intent.[30] But because the Departments eschewed the notice-and-comment process, they were not compelled to respond to these concerns. Myopic, non-transparent rulemaking like this that contradicts congressional intent is not in the public interest.[31] Neither is the September IFR.

## PRAYER

For all these reasons, Action for Health joins in Plaintiffs' request to grant summary judgment invalidating the provisions of the September IFR requiring IDR entities to employ a rebuttable presumption in favor of the QPA. (Dkt. 25 at 30.)

---

[29] *See* Action for Health Comments, *supra* n.6; CMA Regulatory Comments.

[30] Nov. 5 Letter; Letter from Reps. Neal (D-MA) and Brady (R-TX) (Oct. 4, 2021), https://www.mcdermottplus.com/wp-content/uploads/2021/10/surprise-billing-regs-Neal-Brady-letter.pdf; Letter from Sens. Cassidy (R-LA) and Hassan (D-NH) (Apr. 29, 2021), https://www.cassidy.senate.gov/imo/media/doc/SMB%20Letter%20Final_4_29_21.pdf; Letter from 97 Members of Congress (June 17, 2021), https://www.hanys.org/communications/elerts/attachments/38f08db7-b002-4d3b-a7592d5338652369-11464-1077-surprise-medical-billing-letter.pdf.

[31] *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018) ("[I]t was not in the public interest to suspend notice and comment. Notice and comment are not mere formalities. They are basic to our system of administrative law. They serve the public interest by providing a forum for the robust debate of competing and frequently complicated policy considerations having far-reaching implications and, in so doing, foster reasoned decisionmaking.").

Dated:  December 17, 2021

Respectfully submitted,

/s/ *Andrew W. Guthrie*
Andrew W. Guthrie
State Bar No. 24078606
andrew.guthrie@haynesboone.com
**HAYNES AND BOONE LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2021, a true and correct copy of the foregoing document has been served on all counsel of record via the Court's electronic filing system.

/s/ *Andrew W. Guthrie*
Andrew W. Guthrie