## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION and DR. ADAM CORLEY, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, DEPARTMENT OF LABOR, DEPARTMENT OF THE TREASURY, OFFICE OF PERSONNEL MANAGEMENT, and the CURRENT HEADS OF THOSE AGENCIES IN THEIR OFFICIAL CAPACITIES, <br><br> Defendants. | Civil Action No.: 6:21-cv-00425-JDK |

**BRIEF OF AMICI CURIAE THE MEDICAL ASSOCIATION OF GEORGIA, APOLLOMD BUSINESS SERVICES, LLC., WELLSTAR HEALTH SYSTEM, AND THE GEORGIA COLLEGE OF EMERGENCY PHYSICIANS IN SUPPORT OF <u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................................................ 1

BACKGROUND .......................................................................................................................... 2

ARGUMENT ................................................................................................................................. 7

I.   Nothing in the No Surprises Act authorizes the federal agencies here to re-write the clear statutory text and impose a rebuttable presumption in favor of the qualifying payment amount.................................................................................................................................. 7

    A.   The No Surprises Act is clear on its face and provides no authority for the agencies to amend the statute by reading in a presumption found nowhere in the text. .......... 8

    B.   Neither the statutory structure nor vague "policy considerations" supply the agencies with the authority to legislate a rebuttable presumption in favor of the qualifying payment amount................................................................................... 11

II.  Agencies may not delay rulemaking to manufacture their own exigency in order to avoid notice and comment. ....................................................................................................... 12

    A.   The agencies have not established "good cause" that notice and comment is "impracticable, unnecessary, or contrary to the public interest."............................ 12

    B.   Notice and comment would have revealed the opportunities for abuse by payors and the subsequent negative consequences to physicians, healthcare practitioners, hospitals/healthcare systems, and patients alike. ................................................... 14

CONCLUSION............................................................................................................................ 15

## INTEREST OF AMICI CURIAE

Amicus curiae the Medical Association of Georgia (MAG) has been the leading voice for physicians in Georgia since 1849. With more than 8,400 members, MAG represents physicians in every medical specialty and practice setting. MAG shares many of the goals of the Federal No Surprises Act, particularly protecting patients from surprise medical bills. But the Requirements Related to Surprise Billing; Part II Interim Final Rule—published October 7, 2021, by the U.S. Departments of Health and Human Services, Treasury, and Labor along with the Office of Personnel Management—contravenes the plain language of the No Surprises Act. This rule would harm MAG's members by, among other things, reducing their reimbursement for out-of-network care and impairing their ability to conduct fair contract negotiations with insurers. MAG therefore submits the following amicus brief in support of Plaintiffs' challenge to the Interim Final Rule. Amicus curiae has no parent corporation and no publicly held company owns 10% or more of its stock.

Amicus curiae ApolloMD Business Services, LLC is a clinician-operated multispecialty practice partnering with hospitals, teaching facilities and health systems across the country, and manages several hospital-based physician groups providing care at some of the largest health care facilities in Georgia. The Interim Final Rule will harm ApolloMD's clinicians by, among other things, reducing out-of-network reimbursement rates for the care they provide and will incentivize health insurers to cut existing in-network reimbursement rates or remove ApolloMD's clinicians from their networks all together.

Amicus curiae Wellstar Health System is one of Georgia's leading integrated health care systems, including 11 hospitals and over 300 sites of care. It provides a full continuum of health care services for the family including inpatient care, ambulatory care, urgent care, post-acute care,

diagnostic and imaging services, and more. It employs more than 1,000 physicians in more than 40 specialties in the Wellstar Medical Group. Wellstar works collaboratively to improve patient care through its clinically integrated network that includes approximately 1,000 community physicians. The Interim Final Rule presents a substantial threat to Wellstar and other community health systems by significantly reducing reimbursement for all out-of-network health care services, including both hospital services and physician services. In addition, the Interim Final Rule weakens Wellstar's ability to negotiate with payors for fair and reasonable payment for the services Wellstar and its physicians provide.

The Georgia College of Emergency Physicians is the leading advocate for emergency physicians in Georgia and represents thousands of physicians across the state. Its members practice in a wide variety of settings, such as academic and community practices, and locations, from urban to rural. The College maintains a focus on quality, leadership, advocacy, and access to care. Access to care for patients experiencing an emergency is a critical issue, particularly in rural Georgia where eight hospitals have closed over the past ten years. Most hospitals in the state subsidize emergency care through payments to physician groups. Any rule or policy that strongly favors payors and reduces the ability for physician groups to fairly negotiate rates will ultimately be transmitted to the hospitals, many of which are unable to bear an added expense.

## BACKGROUND

**1.** The No Surprises Act was enacted on December 27, 2020, and it amended numerous federal statutes to address the problem of surprise medical billing. The statute limits the costs that may be borne by the patient for out-of-network medical services. 42 U.S.C. § 300gg-111(a)(1)(C)(ii), (b)(1)(A). The cost sharing by the patient is calculated using a "recognized amount." *Id.* § 300gg-111(a)(1)(C)(iii), (b)(1)(B).

There are three statutorily provided mechanisms for determining the "recognized amount": (1) an applicable "All-Payer Model Agreement"; (2) "specified State law"; or (3) the "qualifying payment amount" ("QPA") for that item or service. *Id.* § 300gg-111(a)(3)(H). The QPA is defined by the statute as "the median of the contracted rates recognized by the plan or issuer. . . for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item[s] or service is furnished, consistent with the methodology established by the Secretary under paragraph 2(B)." *Id.* § 300gg-111(a)(3)(E).

As particularly relevant here, the No Surprises Act also requires payors to reimburse out-of-network physicians, healthcare practitioners, and hospitals/healthcare systems at the "out-of-network rate" as defined by the statute. Similar to the provision defining the "recognized amount" that a patient may bear, the "out-of-network rate" for physician or other healthcare provider reimbursement may be determined in one of three ways: (1) any applicable "All-Payer Model Agreement"; (2) "specified state law"; or (3) the payor may make an initial payment in an amount of their choice and then disputes with the physician or other healthcare provider may proceed to arbitration before a certified independent dispute resolution (IDR) entity. *Id.* § 300gg-111(c). Unlike for the "recognized amount," the statute does not permit determination of the out-of-network reimbursement rate solely by reference to the QPA. In fact, Congress considered and rejected proposed legislation that would have determined the out-of-network reimbursement rate for physicians, healthcare practitioners, and hospitals/healthcare systems by reference to the QPA. *See* H.R. 3630, 116th Cong. (2019); S. 1895, 116th Cong. (2019).

The No Surprises Act outlined in great detail the IDR process for resolving disputes between payors and healthcare practitioners. This includes the process for certifying and selecting

3

the IDR entities, paying the IDR entities' fees, a timeline for the IDR process, and importantly here, the factors that IDR entities "shall" and "shall not" consider in determining the proper reimbursement amount. 42 U.S.C. § 300gg-111(c)(4), (c)(5)(f), (c)(1)(B), (c)(4)(F), (c)(5)(A)-(B), (c)(5)(C)-(D).

Specifically, Congress provided that after the physician or other healthcare provider receives payment or denial of payment from the payor, in the event of a dispute, the parties have 30 days to negotiate an appropriate payment amount. *Id.* § 300gg-111(c)(1)(A). If they cannot reach agreement, either may initiate the IDR process. *Id.* § 300gg-111(c)(1)(B). Following the selection process for the IDR entity, each party must submit an offer for a payment amount and any additional information either requested by the IDR entity or relevant to the statutory factors to be considered by the IDR. *Id.* § 300gg-111(c)(5)(B). The IDR must then weigh the statutory factors (discussed in more detail below) and determine the IDR amount. The decision is binding unless there is fraud or factual misrepresentation. *Id.* § 300gg-111(c)(5)(E)(i).

The No Surprises Act provides that IDR entities will determine the proper reimbursement amount "in accordance with the succeeding provisions of this subsection." *Id.* § 300gg-111(c)(2)(A). The IDR entity must choose one of the parties' offers after "taking into account the considerations specified in subparagraph (C)." *Id.* § 300gg-111(c)(5)(A)(i). Subparagraph (C) states that the IDR entity "shall consider" the QPA for comparable items or services in the same geographic area plus five additional factors provided in the following subparagraph. *Id.* § 300gg-111(c)(5)(C)(i)(I)-(II). Those five factors are: (1) the level of training and experience and quality of outcomes; (2) the market share of the provider or payor; (3) the acuity of the patient or complexity of the care provided; (4) the teaching status, case mix, and scope of services at the

4

facility; (5) evidence of good faith efforts made by the provider or payor to enter network agreements or contracted rates during the previous four years. *Id.* § 300gg-111(c)(5)(C)(ii)(I)-(V).

The No Surprises Act directs the Department of Health and Human Services, the Department of Labor, the Department of Treasury, and the Office of Personnel Management to promulgate rules implementing the IDR process by December 27, 2021. *Id.* § 300gg-111(c)(2)(A). Notably, the statute nowhere directs those agencies to implement any rules whatsoever regarding the statutorily defined factors the IDR entity is to weigh or how it is to weigh them in determining the proper reimbursement amount.

**2.** The agencies published the Interim Final Rule at issue here on October 7, 2021. 86 Fed. Reg. at 55,980. The Rule purports to implement the IDR process. It became immediately effective on the date of publication—roughly 10 months after passage of the No Surprises Act and roughly 2 months before the statutory deadline for its promulgation.

Without reference to any specific statutory text, the Rule direct that the IDR entity "must . . . select the offer closest to the [QPA]" with two exceptions: (1) the IDR entity "determines that credible information submitted by either party . . . clearly demonstrates that the [QPA] is materially different from the appropriate out-of-network rate," or (2) "the offers are equally distant from the [QPA] but in opposing directions." *Id.* at 56,128. In other words, the IDR entity "must begin with the presumption that the QPA is the appropriate out-of-network rate" unless "credible information" "rebuts that presumption." *Id.* at 55,996. The presumption may be rebutted only where credible information "clearly demonstrates" that "there is substantial likelihood that a reasonable person with the training and qualifications of a certified IDR entity making a payment determination would consider the information important in determining the

5

out-of-network rate and view the information as showing that the QPA is not the appropriate out-of-network rate." *Id.* at 55,995. And where the IDR entity selects the offer further from the QPA, it must provide a detailed explanation for its decision. *Id.* at 56,000.

This agency-created preference for a reimbursement amount closest to the QPA inures to the economic benefit of the payors and to the detriment of physicians, other healthcare practitioners, and hospitals/healthcare systems. This is because the QPA will often be lower than the fair market value of the services provided, as evidenced by comparison to the reimbursement amounts actually paid in the marketplace.

This is in part because the relevant agencies (HHS, Labor, Treasury, and OPM) have already interpreted the statutory phrase "median contracted rates" to mean that, for purposes of calculating the QPA, each contract is a data point instead of each payment made pursuant to a contract. 86 Fed. Reg. at 56,889. The latter more accurately captures the actual market for each item or service because contracted rates do not always reflect vigorous negotiation of a rate that will actually be paid. For example, as explained in the Complaint, "insurers may require primary care doctors to include rates for emergency room services in their contracts, even though they do not provide those services and thus lack the incentive to negotiate a true market rate." Dkt. No. 1, Compl. ¶ 69. These artificially low contractual rates operate to drag down the QPA.

The methodology for calculating the QPA also excludes other important factors including risk-sharing, bonus, and incentive payments—even though those factors may constitute 10-15% of the total payment to physicians, other healthcare practitioners, and hospitals/healthcare systems. *See id.* at ¶ 70. Not to mention that in relying only on contracted rates, the QPA excludes payments made for services with no contract at all. Failure to capture these payments further depresses the

QPA. And to make matters worse for physicians, other medical practitioners, and hospitals/health systems they have been given little insight into how the QPA is actually calculated in each instance by the payor, and they have no mechanism for challenging it.

## ARGUMENT

**I.  Nothing in the No Surprises Act authorizes the federal agencies here to re-write the clear statutory text and impose a rebuttable presumption in favor of the qualifying payment amount.**

What the payors could not obtain through the legislative process they have now been granted by administrative fiat. The agencies, through promulgation of the Interim Final Rule, have read into the No Surprises Act a presumption that the QPA supplies the proper reimbursement rate for out-of-network care provided by physicians, other healthcare practitioners, and hospitals/healthcare systems. The economic benefit to payors from this rule is staggering. But just as staggering is the dubious legal ground for the rule itself, as it finds no home in the plain language of the statute.

Nor do the agencies claim otherwise. In fact, they point to not a single word, phrase, or sentence in the statute as the source for their authority to require the IDR entity to "select the offer closest to the [QPA]unless the certified IDR entity determines that credible information submitted by either party. . . clearly demonstrates that the [QPA] is materially different from the appropriate out-of-network rate." 86 Fed. Reg. at 56,128. Instead, the agencies have simply declared that the statute is "best interpret[ed]" as requiring a rebuttable presumption in favor the QPA. The statute is "best interpret[ed]," they claim, not because of the language in the statute or even some statutory ambiguity, but instead because of the order of the enumerated factors, the paragraph structure of the factors, and the agencies' own assessment of "policy considerations." *Id.* at 55,996.

This bold and novel approach to rulemaking is a blatant violation of the separation of powers and the Administrative Procedure Act. Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). This Court should grant Plaintiffs' motion for summary judgment.

> **A.    The No Surprises Act is clear on its face and provides no authority for the agencies to amend the statute by reading in a presumption found nowhere in the text.**

An agency does not have broad authority to promulgate rules because those rules simply relate to the subject matter of their congressionally delegated authority. Authority for agency action must have been delegated and that the agency's action must be within the scope of the delegation. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); *see Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) ("In the absence of statutory authorization for its act, an agency's action is plainly contrary to law and cannot stand." (internal quotation marks and citations omitted)). "The question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority*.*" *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (emphasis omitted).

Here, Congress expressly delegated the agencies authority to implement the IDR process, but Congress said nothing about rulemaking related to the substantive factors to be considered by the IDR entity itself. The statute already expressly enumerated what the IDR entity must consider and did not provide for weighting of any one factor over another. In other words, there was no "gap" or "ambiguity" left for the agency to fill. *Lamie v. U. S. Tr.*, 540 U.S. 526, 534 (2004) ("It

8

is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (internal quotation marks omitted)). It is a well-established principle of statutory construction that where Congress does not assign the weight to be given to a list of factors, the entity weighing those factors chooses the weight to assign them. *See, e.g.*, Dkt. No. 25, Plaintiffs' Motion for Summary Judgment at 16 (citing cases). And Congress legislated against the backdrop of this established principle. *See McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013) (observing the commonplace rule of statutory interpretation that "Congress legislates against the backdrop of existing law").

Having established the factors to be considered and weighed by the IDR entity, Congress was not then required to expressly outline what Congress was not doing. In other words, agency power is still limited here even if the statute does not expressly say that Congress was not requiring the IDR entity to apply a rebuttable presumption in favor of the QPA. Agencies cannot rewrite statutes, purportedly in the name of "interpretation," through hyper-technical arguments. And the presumption that the authority for an agency to act is given if not excluded is completely backwards. *See Gulf Fishermens Assoc. v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020) ("This nothing-equals-something argument is barred by our precedent."). There must be evidence of "legislative intent to delegate" before an agency may "advance its own statutory construction." *Ethyl Corp. v. E.P.A.*, 51 F.3d 1053, 1060 (D.C. Cir. 1995) (emphasis omitted) (internal quotation marks omitted).

The facts of this case are remarkably similar to, and arguably more egregious than, those in *MCI Telecomms. Corp. v. American Tel. and Tele. Co.*, 512 U.S. 218 (1994). The Supreme

Court in MCI invalidated an FCC action for violating the agency's authorizing statute. In that case, Congress enacted a statute requiring common carriers to file tariffs with the FCC. The statute also authorized the FCC to "modify any requirement made by or under . . . this section." 47 U.S.C. § 203(b)(2). Relying on the express authority to "modify," the FCC issued an order determining that it could make tariff filing optional for all long-distance telephone carriers except one. *MCI Telecomm. Corp.*, 512 U.S. at 220, 225. The Court held that such an interpretation went "beyond the meaning that the statute can bear," because it would transform the regulatory scheme Congress had expressly enacted. *Id.* at 229. So too here. Here, Congress enumerated in great detail the substantive factors to be considered during the IDR process. It did not list any one factor as receiving priority over another nor did it set up a presumption of any kind. It is highly unlikely, to say the least, that Congress would enumerate the substantive factors to be considered by the IDR entity—with no priority for one factor over another—only to then delegate agencies authority to undo that scheme by re-writing the statute and assigning the QPA priority. The agencies violated the No Surprises Act by concocting a rebuttable presumption favoring the QPA.

Nor could agency deference save the agencies' Interim Final Rule (and perhaps the agencies know this given that to date they have not asserted the doctrine as a basis for their authority). Deference is only possibly appropriate where a statutory provision is "genuinely ambiguous" and after "all the standard tools of interpretation" have been exhausted. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). This is because statutory ambiguity amounts to a delegation of authority from Congress, and courts must first ensure that the statute itself does not alone answer the question. Here, the agencies would never reach the second step of any agency deference argument (whether the agency's interpretation is reasonable) because there is no evidence in the

statute itself that Congress delegated them authority to rule-make regarding the factors the IDR entity considers. The statue is clear on its face in establishing what substantive factors the IDR entity considers.

> **B.** **Neither the statutory structure nor vague "policy considerations" supply the agencies with the authority to legislate a rebuttable presumption in favor of the qualifying payment amount.**

If Congress had intended to create a presumption in favor of the QPA it would have said so. But it didn't. The agencies nevertheless attempt to derive authority for their Interim Final Rule from the order of the listed factors, the structure of the paragraphs delineating the factors, and from broad unspecified "policy considerations." 86 Fed. Reg. at 55,996 (observing that "the statutory text lists the QPA as the first factor" and that "[t]he 'additional circumstances' . . . are described in a separate paragraph"). None of these justifications find support in the law.

Counsel for amicus has not located a single case or other authority standing for the proposition that the first factor in an enumerated list must be weighted more heavily or be afforded a rebuttable presumption in favor of its dominance. Nor is there any support for the contention that offsetting the remaining factors in a separate paragraph somehow mandates a presumption in favor of the first factor listed in its own separate paragraph.

Finally, the agencies may not amend the statute to pursue their own "policy considerations"—such as making the IDR process more efficient and predictable, for example, or "encouraging the parties to reach an agreement." *Id.* As Plaintiffs have noted in their motion, "[i]t is 'a core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.'" Dkt. No. 25, Plaintiffs' Motion for Summary Judgment at 20 (quoting *Util Air Regul. Grp. v. EPA,* 573 U.S. 302, 328 (2014)).

Here, the Interim Final Rule is an act of legislation, not interpretation. It must be set aside.

**II.     Agencies may not delay rulemaking to manufacture their own exigency in order to avoid notice and comment.**

The APA requires notice and comment rulemaking to "give interested persons an opportunity to participate in the rule making." 5 U.S.C. § 553(c). This provides process to those affected and gives the agencies an opportunity to hear from those likely to have knowledge about the impact of any agency action. The agency may bypass notice and comment only "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 533(b)(B). This exception is to be "narrowly construed." *Mid-Elec. Coop., Inc. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987).

**A.     The agencies have not established "good cause" that notice and comment is "impracticable, unnecessary, or contrary to the public interest."**

Congress set out a detailed and workable schedule for implementation of the No Surprises Act. For example, Congress gave the agencies a full year to promulgate the regulation implementing the IDR process. *See* 42 U.S.C. § 300gg-111(c)(2)(A). And with an effective date of January 1, 2022, there would be additional time following implementation until the first IDR could occur. *See* Dkt. No. 25, Plaintiffs' Motion for Summary Judgment at 27 (explaining that the first IDR will not occur until March 2022). A year is more than enough time for the agencies to complete proposed rulemaking, consider comments, and issue final rules, while giving the affected parties sufficient time to digest and prepare for the new procedure. The agencies nevertheless waited almost 9 months before issuing a rule—without notice and comment—but still three months before the statutory deadline of December 27, 2021. *Compare* 86 Fed. Reg. 55,980 (Oct. 7, 2021), *with* 42 U.S.C. § 300gg-111(c)(2)(A) (statutory deadline of December 17, 2021, for rule).

An agency cannot forgo notice and comment under the APA "good cause" exception, 5 U.S.C. § 533(b)(B), when it has enough time but chooses instead to wait and invoke the exception.

12

For example, the D.C. Circuit refused to allow the FAA to rely on the good cause exception where "[t]he agency waited almost nine months before taking action." *Air Transp. Ass'n. of Am. v. Dep't. of Transp.*, 900 F.2d 369, 379 (D.C. Cir. 1990), *vacated on other grounds*, 498 U.S. 1077 (1991); *see Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 622 (D.C. Cir. 1980) ("[W]e cannot sustain the suspension of notice and comment to the general public" where "[t]he Department waited nearly seven months" and therefore "found it quite possible to consult with the interested parties it selected").

In an attempt to justify their contention that notice and comment "would be impracticable and contrary to the public interest," 86 Fed. Reg. at 56,043, the agencies gave a series of "reasons" unrelated to "good cause"; the agencies instead asserted why the rule in general was necessary. *See, e.g.*, *id.* at 56,044. Additionally, they stated, without evidence or explanation, that rules following notice and comment would not provide sufficient time for implementation. But this contravenes the express timeline laid out by Congress, which determined this timing was sufficient. And it also fails to account for the agencies' own delay. The HHS Secretary himself even acknowledged the importance of "tak[ing] input" and "get[ting] this arbitration right," and he promised the agencies would take the comments necessary, hear from all the stakeholders to make sure what we're doing is based on the facts, the science, the law. Confirmation hearing of Xavier Becerra before the Senate Health Committee (Feb. 23, 2021), https://www.c-span.org/video/?c4980098/user-clip-becerra-confirmation-comment-surprisebilling. But the agencies' evasion of notice-and-comment rulemaking means they never received this benefit of hearing from all relevant stakeholders before publishing the Interim Final Rule.

13

Because the agencies failed to comply with the APA and have not satisfied the good cause exception, the Interim Final Rule should be set aside as procedurally unlawful. 5 U.S.C. § 706(2)(D).

**B.      Notice and comment would have revealed the opportunities for abuse by payors and the subsequent negative consequences to physicians, healthcare practitioners, hospitals/healthcare systems, and patients alike.**

Numerous groups, including some of the most prominent medical industry associations in the Country have publicly opposed the Interim Final Rule. Stacey Hughes, the American Hospital Association's executive vice president said recently that although "hospitals and health systems strongly support [the protections provided by the No Surprises Act] and the balanced approach Congress chose to resolve disputes . . . disappointingly, the Administration's rule has moved away from Congressional intent and brought new life to harmful proposals that Congress deliberately rejected. Today's rule is a windfall for insurers. The rule unfairly favors insurers to the detriment of hospitals and physicians who actually care for patients." Joyce Frieden, *Doc Groups Unhappy With HHS Rule on No Surprises Act*, MedPage Today (Oct. 1, 2021), https://www.medpagetoday.com/practicemanagement/reimbursement/94822.

The American Medical Association for its part has recognized the potential abuse by payors and has advocated for "statutorily required audits on qualifying payment amount [QPA] calculations."[1]

---

[1] Letter from James L. Madrara, Executive Vice President, American Medical Association, to The Honorable Chiquita Brooks-LaSure, Administrator, Health and Human Services (Oct. 18, 2021), available at https://searchlf.ama-assn.org/letter/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2021-10-18-Letter-to-Brooks-LaSure-re-CMS-v2.pdf

Certain regions of the country are already seeing the impact of the Interim Final Rule even though the No Surprises Act is not yet effective. Insurers are using the law and its accompanying regulations to reduce physician, healthcare provider, and hospitals'/health system's future reimbursement rates by as much as 30%—backed by the threat of contract cancellation. Blue Cross BlueShield of North Carolina Abuses No Surprises Act Regulations to Manipulate the Market Before Law Takes Effect, American Society of Anesthesiologists (Nov. 22, 2021), https://www.asahq.org/about-asa/newsroom/news-releases/2021/11/bcbs-abuses-no-surprises-act-regulations (emphasis added). The goal of the insurers, according to the American Society of Anesthesiologists, is to "improve [their] negotiating position against community physician practices *in the dispute resolution process outlined in the recently released Interim Final Rule* implementing the legislation." *Id.* The President of the American Society of Anesthesiologists, Randall M. Clark, M.D., FASA, said that "insurance companies will use their overwhelming market power and the No Surprises Act's flawed rules to push more physicians out of insurance networks and fatten their own bottom line." *Id.* This "threaten[s] the ability of anesthesiologists [as one example] to fully staff hospitals and other health care facilities . . . ultimately compromis[ing] timely access to care for patients across the country." *Id.*

These incentives and attendant consequence are the precise reason Congress *rejected* proposed legislation favoring the QPA as the out-of-network rate. The agencies cannot now do what Congress refused to when it enacted the No Surprises Act.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and set aside the interim final rule.

Dated: December 17, 2021

                                    Respectfully submitted,

                                    */s/ Scott A. Keller*
                                    Scott A. Keller
                                    Texas Bar No. 24062822
                                    LEHOTSKY KELLER LLP
                                    919 Congress Ave.
                                    Austin, TX 78701
                                    scott@lehotskykeller.com
                                    tel: (512) 693-8350
                                    fax: (833) 232-2202

## **CERTIFICATE OF SERVICE**

    I hereby certify that on December 17, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.

                                                 */s/ Scott A. Keller*
                                                 Scott A. Keller