## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| TEXAS MEDICAL ASSOCIATION and DR. ADAM CORLEY, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Case No. 6:21-cv-00425-JDK |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, DEPARTMENT OF LABOR, DEPARTMENT OF THE TREASURY, OFFICE OF PERSONNEL MANAGEMENT, and the CURRENT HEADS OF THOSE AGENCIES IN THEIR OFFICIAL CAPACITIES, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## BRIEF *AMICI CURIAE* OF
## THE EMERGENCY DEPARTMENT PRACTICE MANAGEMENT ASSOCIATION,
## THE TEXAS COLLEGE OF EMERGENCY PHYSICIANS,
## AND THE VIRGINIA COLLEGE OF EMERGENCY PHYSICIANS
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**JACK R. BIERIG**
(Admitted *Pro Hac Vice*)
Illinois State Bar No. 0207039
**SCHIFF HARDIN LLP**
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Phone: (312) 258-5511
Fax: (312) 258-5600
jbierig@schiffhardin.com
*LEAD COUNSEL FOR AMICI CURIAE*

**CATHERINE BARTLES**
State Bar No. 24104849
**STAFFORD DAVIS**
State Bar No. 24054605
**THE STAFFORD DAVIS FIRM, PC**
815 S Broadway Ave.
Tyler, Texas 75701
(903) 593-7000 (Office)
(903) 705-7369 (Fax)
sdavis@stafforddavisfirm.com
cbartles@stafforddavisfirm.com
*COUNSEL FOR AMICI CURIAE*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND INTERESTS OF AMICI CURIAE.................................................... 1

ARGUMENT.................................................................................................................. 4

    I.      The Rule Directly Conflicts with the NSA's Clear and Unambiguous Language. ................................................................................................ 4

          A.     The NSA Does Not Create a Benchmark Rate for Provider Reimbursement, But Instead Provides for a Robust Arbitration Process in Which All Statutory Factors Must Be Considered in Determining the Out-of-Network Rate. .................................................... 4

          B.     The Rule Rewrites the NSA Under the Guise of "Interpretation." ............ 7

    II.     The Legislative History Confirms that the Rule Is Contrary to the NSA. ............. 8

    III.    The Rule Will Have Serious Adverse Consequences for Healthcare in This Nation. ................................................................................................ 13

CONCLUSION............................................................................................................. 15

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

**<u>Statutes</u>**

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II) ............................................................. 5

42 U.S.C. § 300gg-111(a)(3)(H) ....................................................................... 6

42 U.S.C. § 300gg-111(a)(3)(K) ....................................................................... 5

42 U.S.C. § 300gg-111(b)(1)(D) ....................................................................... 5

42 U.S.C. § 300gg-111(c) ................................................................................. 1

42 U.S.C. § 300gg-111(c)(1)(A) ....................................................................... 5

42 U.S.C. § 300gg-111(c)(1)(B) ....................................................................... 5

42 U.S.C. § 300gg-111(c)(5)(A) ....................................................................... 5

42 U.S.C. § 300gg-111(c)(5)(B) ....................................................................... 5

42 U.S.C. § 300gg-111(c)(5)(C)(i)(I) ............................................................... 5

42 U.S.C. § 300gg-111(c)(5)(C)(i)(II) .............................................................. 6

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(I) .............................................................. 5

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(II) ............................................................. 5

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(III) ............................................................ 5

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(IV) ........................................................... 5

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(V) ............................................................ 6

42 U.S.C. § 300gg-111(c)(5)(D) ....................................................................... 6

Administrative Procedure Act, 5 U.S.C. § 553(b) ............................................ 1

Emergency Medical Treatment and Labor Act,
   42 U.S.C. § 1395dd ...................................................................................... 3, 14

No Surprises Act, Pub. L. 116-260, div. BB, tit. I, 134 Stat. 1182, 2757-890 (2020) ................... 1

**<u>Other Authorities</u>**

https://www.shepscenter.unc.edu/programs-projects/rural-health/rural-hospital-closures/ ........... 4

**<u>Rules</u>**

Fed. R. App. P. 29 ............................................................................................. 1

**<u>Regulations</u>**

45 C.F.R. § 149.510 .......................................................................................... 1

86 Fed. Reg. 36,872 (July 13, 2021) ................................................................ 13

86 Fed. Reg. 55,980 (Oct. 7, 2021) .................................................. 2, 3, 4, 1, 2, 4, 7, 15

**<u>Legislative Materials</u>**

166 Cong. Rec. H7290 (Dec. 21, 2020) ........................................................................ 9

H.R. 2328, 116th Cong. tit. IV, § 402(b) (2019) ...................................................... 10

H.R. 3630, 116th Cong. § 2 (2019) ............................................................................ 9

H.R. 5800, 116th Cong. § 2 (2020) .......................................................................... 10

H.R. 5826, 116th Cong. § 7 (2020) .......................................................................... 11

S. 1895, 116th Cong. tit. I, §103 (2019) ................................................................. 10

## EXHIBITS

1. *The Evolving Role of Emergency Departments in the United States* (RAND Corp. 2013) (excerpt).
   Full report available at https://www.rand.org/pubs/research_reports/RR280.html.

2. "Nevada Jury:  Health Insurers Owe ER doctors $60M in Damages," Wash. Post. (Dec. 7, 2021), available at https://www.washingtonpost.com/business/nevada-jury-health-insurers-owe-er-doctors-60m-in-damages/2021/12/07/62b99f54-57c8-11ec-8396-5552bef55c3c_story.html

3. Letter from 152 Members of Congress to Defendant Departments (Nov. 5, 2021), available at https://wenstrup.house.gov/uploadedfiles/2021.11.05_no_surprises_act_letter.pdf.

4. Letter from House Ways and Means Committee Chairman Neal and Ranking Member Brady to Defendant Departments (Oct. 4, 2021), available at https://www.mcdermottplus.com/wp-content/uploads/2021/10/surprise-billing-regs-Neal-Brady-letter.pdf

5. "Neal Opening Statement at Markup of Surprise Medical Billing, Hospice, and Health Care Investment *Transparency* Legislation" (Feb. 12, 2020) (as prepared for delivery), available at https://waysandmeans.house.gov/media-center/press-releases/neal-opening-statement-markup-surprise-medical-billing-hospice-and

6. Joint Statement of the Committees on Ways and Means, Energy and Commerce, and Education and Labor, "Protecting Patients from Surprise Medical Bills" (Dec. 21, 2020) (pdf version).  Native-format version available at https://gop-waysandmeans.house.gov/protecting-patients-from-surprise-medical-bills/.

7. Letter from Members of Congress with Health Care Expertise to Defendant Departments (Nov. 5, 2021), available at https://burgess.house.gov/uploadedfiles/2021.11.02_doc_caucus_surprise_billing_letter.pdf

8. "Physicians Decry Unintended Consequences of California's Surprise Billing Laws" (Cal. Med. Ass'n Nov. 1, 2019), available at https://www.cmadocs.org/Portals/CMA/files/public/CMA%20Suprise%20Billing%20Survey%20Results%202019.pdf

9. American Society of Anesthesiologists, "BlueCross BlueShield of North Carolina Abuses No Surprises Act Regulations to Manipulate the Market Before Law Takes Effect"(Nov. 22, 2021) (including sample letter), available at https://www.asahq.org/about-asa/newsroom/news-releases/2021/11/bcbs-abuses-no-surprises-act-regulations#/

10. Becker's, "4 Disputes Involving UnitedHealth, Physician Staffing Firms" (July 22, 2020), available at https://www.beckershospitalreview.com/payer-issues/4-disputes-involving-unitedhealth-physician-staffing-firms.html

11. Percentage Growth in Marketplace Average Benchmark Premiums Since 2015, available at https://www.edpma.org/downloads/EDPMA_one-pager_CT-NYMarketplace.pdf

## INTRODUCTION AND INTERESTS OF *AMICI CURIAE*[1]

*Amici Curiae* the Emergency Department Practice Management Association ("EDPMA"), the Texas College of Emergency Physicians ("TCEP"), and the Virginia College of Emergency Physicians ("VACEP") submit this Brief in support of Plaintiffs' Motion for Summary Judgment. EDPMA is the nation's largest professional physician trade association focused on the delivery of high-quality, cost-effective care in the emergency department. EDPMA members include emergency medicine physician groups and the businesses that support them. EDPMA's members handle more than half of the emergency department visits in the United States each year. TCEP exists to promote quality emergency care for all patients and to represent the professional interests of its members. With more than 2,100 members, TCEP is the third largest emergency medicine state association. VACEP is a professional organization representing emergency physicians in Virginia. VACEP promotes high-quality emergency care by ensuring unrestricted access to care regardless of ability to pay, protecting the professional interests of emergency physicians, and representing Virginia patients and physicians on state and federal legislative and regulatory issues.

*Amici* submit this Brief because the Interim Final Rule ("Rule") challenged by Plaintiffs is contrary to the language and legislative history of the No Surprises Act, Pub. L. 116-260, div. BB, tit. I, 134 Stat. 1182, 2757-890 (2020) ("NSA"), and was published without the notice and comment required by the Administrative Procedure Act, 5 U.S.C. § 553(b). *See* 42 U.S.C. § 300gg-111(c); 45 C.F.R. § 149.510; 86 Fed. Reg. 55,980 (Oct. 7, 2021). If allowed to stand, the Rule will severely undermine the quality and availability of emergency care for the American people.

---

[1]All parties provided written consent to the filing of this Brief. No counsel for a party authored this Brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this Brief. No person or entity other than *Amici*, their members, or their counsel made such a monetary contribution. *Cf.* Fed. R. App. P. 29.

*Amici* strongly support the NSA's goal of protecting patients from "surprise" healthcare bills—that is, bills for emergency services furnished by an out-of-network provider, or non-emergency services furnished by an out-of-network provider at an in-network facility.  The NSA accomplishes this goal by prohibiting group health plans and commercial health insurance issuers ("insurers" or "payors") and out-of-network  providers from charging patients more than what they would have paid had those services been furnished by an in-network provider.  At the same time, the NSA recognizes the importance of ensuring fair compensation for healthcare providers.

Accordingly, the NSA establishes a process whereby patients are removed from billing disputes, and providers and payors negotiate among themselves to arrive at a reasonable payment for the unreimbursed amounts.  Should those negotiations fail, the parties may invoke a "baseball-style" arbitration process called Independent Dispute Resolution ("IDR").  The IDR process is, as the name suggests, supposed to be "independent," and not biased in favor of insurers or providers. The IDR entity must consider each of a series of statutory factors and examine the particular facts and circumstances of the claim to determine the appropriate out-of-network rate.  The NSA does not constrain the discretion of the IDR entity in weighing the required statutory factors.  Nor does it assign primacy to, or create a presumption in favor of, any of the factors.

The Rule is directly contrary to the NSA's unambiguous language.  Under the Rule, one of the many statutory factors is given primacy in determining the out-of-network rate:  the "qualifying payment amount" ("QPA").  The QPA is the insurer's median contracted (*i.e.*, *in*-network) amount for the service.  It is calculated exclusively by the insurer and is not subject to scrutiny by the IDR entity.  86 Fed. Reg. at 55,996 ("[I]t is not the role of the certified IDR entity to determine whether the QPA has been calculated by the [insurer] correctly.").  The IDR entity is *required* to choose the offer closer to the QPA absent exceptional circumstances. Contrary to the NSA, which requires

2

the IDR entity to consider all statutory factors, under the Rule the IDR entity is *precluded* from considering any factor other than the QPA unless the provider "clearly demonstrates" that the QPA is "materially different from the appropriate out-of-network rate." *Id.* at 55,984.  And if the IDR entity believes that the offer farther from the QPA better reflects the actual value of the services, it must provide a "detailed explanation" justifying the departure from the QPA. *Id.* at 56,000.

The Rule's one-sided procedure tilts the IDR process decidedly in favor of insurers and, necessarily, toward out-of-network reimbursement rates that are inadequate and below market.  All healthcare providers will be materially and adversely affected by the Rule, but *Amici* and their emergency physician members particularly so.   Under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, emergency physicians and facilities are required to treat and stabilize all emergency room patients, regardless of their insurance status or ability to pay.  Indeed, more than two-thirds of uncompensated medical care in this country is provided in emergency rooms.  (Ex. 1 at 2.)[2]  The situation has long since passed a crisis point.  The burden of uncompensated care is growing, closing many emergency departments and hospitals, and threatening the ability of emergency departments to care for all patients, including the indigent and rural populations, who rely on our nation's emergency departments as an important safety net.

The NSA was enacted in part to address these problems, but the Rule will serve only to exacerbate this already bleak picture.  Fair reimbursement of providers by commercial payors is critical to the viability of our healthcare system, particularly the delivery of emergency medical care.  But implementation of the Rule's IDR process will drive physician reimbursement down to artificially low, below-market rates—not only for out-of-network services, but ultimately for in-

---

[2]Some health insurers consistently underpay emergency providers.  One of the largest insurers recently was found liable for $60 million in punitive damages for cutting reimbursements to out-of-network emergency providers by more than 50% over the course of several years. (Ex. 2.)

network services as well—all to the detriment of patients.

Key congressional architects of the NSA have warned the Departments that the Rule's IDR process "could incentivize insurance companies to set artificially low payment rates, which could narrow provider networks and jeopardize patient access to care—the exact opposite of the goal of the law.  It could also have a broad impact on reimbursement for in-network services, which could exacerbate existing health disparities and patient access issues in rural and urban underserved communities." (Ex. 3 at 2.)[3] Indeed, the Departments themselves recognized the perils of physician undercompensation:  "[U]ndercompensation could threaten the viability of these providers [and] facilities . . . . This, in turn, could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the No Surprises Act."  86 Fed. Reg. at 56,044.

What members of Congress feared has already come true.  *Amici*'s members have received notices from insurers threatening to terminate their contracts (and in some cases terminating their contracts) unless they agree to substantial discounts to their contracted rates.  Those notices specifically cite the primacy the Rule accords to QPAs as the legal justification for their actions.

*Amici* respectfully request that the Court grant Plaintiffs' summary judgment motion.

## ARGUMENT

**I.     The Rule Directly Conflicts with the NSA's Clear and Unambiguous Language.**

**A.     The NSA Does Not Create a Benchmark Rate for Provider Reimbursement, But Instead Provides for a Robust Arbitration Process in Which All Statutory Factors Must Be Considered in Determining the Out-of-Network Rate.**

Given the NSA's prohibition against balance-billing patients in excess of their in-network cost-sharing, out-of-network providers must turn to the patient's insurer for payment of

---

[3]For example, approximately 60 million people—nearly 1 in 5 Americans—live in rural areas. More than 70 of those rural hospitals have ended all services since 2011. *See* https://www.shepscenter.unc.edu/programs-projects/rural-health/rural-hospital-closures/.

unreimbursed amounts.  Under the NSA, insurers are obligated to pay providers the "out-of-network rate."   42 U.S.C. §§ 300gg-111(a)(1)(C)(iv)(II),(b)(1)(D).  The out-of-network rate is (1) the amount determined by an All-Payer Model Agreement under the Social Security Act; (2) if there is no such Agreement, by a "specified state law"; or (3) if there is no applicable Agreement or state law, by the amount determined through a 30-day open negotiation process culminating, if necessary, in IDR.  *Id.* § 300gg-111(a)(3)(K).  The third method is at issue in this lawsuit.

Under the open negotiation process, the insurer first pays an amount of its choosing.  The provider and insurer then engage in a 30-day negotiation process to attempt to resolve any reimbursement disputes.  If the parties cannot reach agreement, either party may initiate IDR.  Each party submits an offer for a payment amount.  The IDR entity must choose one of the two offers as the "out-of-network rate."  *Id.* §§ 300gg-111(c)(1)(A), (c)(1)(B), (c)(5)(B), (c)(5)(A).

The NSA does not set a benchmark for determining the out-of-network rate.  Indeed, Congress rejected bills that would have done just that.  *See infra* pp. 8-13.  Instead, the NSA provides a detailed list of factors that the IDR entity "*shall* consider" in its determination:

1. The QPA for comparable services furnished in the same geographic area.  *See* 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I).

2. Five "additional circumstances":

   - The "level of training, experience, and quality and outcomes measurements" of the provider.  *Id.* § 300gg-111(c)(5)(C)(ii)(I).

   - The "market share" of the provider or payor in the relevant geographic area.  *Id.* § 300gg-111(c)(5)(C)(ii)(II).

   - The "acuity of the individual receiving such item or service" or the "complexity of furnishing such item or service to such individual."  *Id.* § 300gg-111(c)(5)(C)(ii)(III).

   - The "teaching status, case mix, and scope of services" of the facility.  *Id.* § 300gg-111(c)(5)(C)(ii)(IV).

   - "Demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or . . . the plan . . . to enter into network agreements and, if applicable, contracted rates between [those entities]

during the previous 4 plan years." *Id.* § 300gg-111(c)(5)(C)(ii)(V).

3.        Any information the IDR requests from the parties. *Id.* § 300gg-111(c)(5)(C)(i)(II).

4.        Any additional information submitted by the parties. *Id.*

The NSA also states what the IDR entity "*shall not* consider":  (i) usual and customary charges; (ii) amounts the provider would have billed absent the NSA's ban against balance-billing; and (iii) reimbursement rates by a public payor, such as Medicare. *Id.* § 300gg-111(c)(5)(D).

Thus, Congress identified with precision the factors that IDR entities "shall" and "shall not" consider in determining the out-of-network reimbursement rate.  Congress left to the discretion of the IDR entity how to balance each of those factors to arrive at the appropriate reimbursement.  The NSA does not instruct IDR entities how to weigh the statutory factors, give primacy to the QPA, or create a "presumption" that the QPA is the proper reimbursement.  Nor does the NSA place the burden on providers to "clearly demonstrate" that the QPA is "materially different from the appropriate out-of-network rate."  There is simply no support in the NSA for making QPA the proxy for, or even the predominant factor in calculating, the out-of-network rate.

Indeed, when Congress wanted to make the QPA the applicable standard, it knew how to do so.  The NSA limits patient cost-sharing to the statutory "recognized amount." *Id.* § 300gg-111(a)(3)(H).  Like the "out-of-network rate" applicable to provider reimbursement, the "recognized amount" is determined by reference to three standards.  The first two standards are the same:  (1) the amount in any All-Payer Model Agreement or (2) the amount determined by a "specified state law." *Id.*  But in sharp contrast to the third standard applicable to the "out-of-network rate" for providers (the amount determined through IDR), the third standard for determining the "recognized amount" for patient obligations is the QPA. *Id.* If Congress had intended to make the QPA the determinative factor for the provider reimbursement rate as well, it easily could have done so.  That it did not demonstrates that Congress did not intend the QPA to

6

be the predominant determinant of provider reimbursement.

### B.     The Rule Rewrites the NSA Under the Guise of "Interpretation."

The Rule proceeds from one basic assumption:  that the "best interpretation" of the NSA is that the IDR entity *must* accept the offer closer to the QPA, unless the provider satisfies the burden of "clearly demonstrat[ing]" that the QPA is "materially different from the appropriate out-of-network rate."  86 Fed. Reg. at 55,984, 55,996.  The Rule does not merely "interpret" the NSA. It materially alters the IDR contemplated by the NSA.

Rather than a robust arbitration process in which the IDR entity is *required* to evaluate *all* the factors Congress believed were relevant to determining a proper reimbursement rate, the Rule turns the IDR process into a truncated, meaningless exercise—one in which the IDR entity is *prohibited* from considering the required statutory factors absent special circumstances, and in which the foregone conclusion is that the QPA will be selected as the reimbursement amount.

The NSA's detailed, carefully balanced, and comprehensive requirements for the IDR process further demonstrate that Congress did not intend additional "interpretation" of the NSA through administrative action.  Indeed, while the NSA specifies numerous instances expressly requiring action by an administrative agency (Cmplt. ¶ 42 & n.8), the statute did not do so with respect to the IDR entity's discretion in applying the statutory factors to determine a fair out-of-network reimbursement rate.  There is no statutory authority for administrative "gap-filling" here.

Finally, the Rule provides no support for the Departments' conclusion that "the statute contemplates that typically the QPA will be a reasonable out-of-network rate."  86 Fed. Reg. at 55,996.  Again, had Congress believed that the QPA—the *in*-network rate calculated solely by the payor—would "typically" be the appropriate amount for *out*-of-network reimbursements, it would have said so.  The fact that Congress specified many factors—*in addition* to the QPA—that the IDR entity is required to consider demonstrates that Congress did not believe that the QPA would

"typically" be an adequate and fair reimbursement rate.  Indeed, as demonstrated below, the QPA will in fact be lower than the reasonable market value of the services.  *See infra* pp. 13-14.

## II.  The Legislative History Confirms that the Rule Is Contrary to the NSA.

The conclusion that the Rule is contrary to the intent of Congress is confirmed by a review of the NSA's legislative history.  Congress rejected all attempts to do what the Rule does:  create a benchmark for provider reimbursement, limit the discretion of the IDR entity in applying the statutorily mandated factors, and otherwise skew the IDR process heavily in favor of insurers, granting them a material advantage that they were unable to obtain during the legislative process.

The NSA was the product of more than two years of intense legislative activity to address surprise billing.  *See* 166 Cong. Rec. H7290, H7291 (Dec. 21, 2020) (NSA was result of "long-fought and negotiated bipartisan and bicameral compromise").  During that time, health insurers and other payors vigorously lobbied Congress to make median in-network rates the benchmark for provider reimbursement.  Other proposals added a form of arbitration, but because the median in-network rate would have been the benchmark, the arbitration process would have been merely "a backstop [that], at most, [would] result in a mere adjustment to the benchmark rate."  (Ex. 4 at 2.)

Congress rejected these proposals.  Instead, it enacted the NSA's IDR process, under which (a) all disputes over reimbursement, regardless of the amount at issue, may be submitted for resolution to the IDR entity, and (b) the IDR entity is required to take into account all relevant statutory factors to determine the appropriate out-of-network rate.

For example, on July 9, 2019, House Energy and Commerce Committee Chairman Pallone and Ranking Member Walden introduced H.R. 3630. The bill would have set the reimbursement rate at the insurer's median contracted rate for such services.  H.R. 3630, 116th Cong. § 2 (2019). Patient-protection provisions such as the ban on balance billing received unanimous support, but the benchmarks tying provider reimbursement to median in-network rates generated stiff

opposition.  An amendment provided for an IDR-like process, but it would have applied only to services above a $1,250 threshold.  *See* H.R. 2328, 116th Cong. tit. IV, § 402(b) (2019).  That threshold would have put IDR out of reach for more than 99% of emergency physician services.

Likewise, in July 2019, Senator Lamar Alexander introduced S. 1895 (Senate Health, Education, Labor and Pensions ("HELP") Committee). That bill would have set a "benchmark for payment" for out-of-network services at "the median in-network rate for such services provided to [health plan] enrollees." S. 1895, 116th Cong. tit. I, §103 (2019).   On December 8, 2019, Senator Alexander and Representatives Pallone and Walden announced a proposed compromise that would have required provider bills under $750 to be paid at the median in-network rate, with bills above $750 being eligible for baseball-style arbitration.

Then, in February 2020, leadership in the House Ways and Means Committee and the House Education and Labor Committee released two pieces of proposed legislation, which reflected the two major competing approaches to provider reimbursement:  H.R. 5800 (Education and Labor) and H.R. 5826 (Ways and Means).  H.R. 5800 was similar to the HELP/Energy and Commerce compromise bill in that it would have required insurers to make a minimum payment of the median contracted rate; if that rate was at least $750, either party could initiate an IDR process.  H.R. 5800, 116th Cong. § 2 (2020).  H.R. 5826, on the other hand, did not establish any payment standard, but instead provided for an open negotiation process, with a dispute-resolution process if negotiations failed.  H.R. 5826, 116th Cong. § 7 (2020).

In his opening statement, Chairman Neal noted that the sponsors of H.R. 5826 had "worked to craft a process where both the provider's offer and the plan's offer receive equal weight"; the resolution entity "considers, but isn't bound by, the plan's median in-network rate"; and "the provider is not left in a position to disprove the adequacy of such a rate."  Neal noted his concern

9

with "giving too much weight to such a benchmark rate":

> [W]e already know insurers are looking for any way they can pay the least amount possible. They will work to push those rates down, regardless of what it means for community providers like physicians, hospitals, and our constituents who they employ. With no federal network adequacy standards, plans can push rates down and drop providers from networks with no consequences, leaving patients holding the bag. . . . Surprise bills would be much less common if insurer networks were more robust.

(Ex. 5.)

In enacting the NSA, Congress ultimately adopted the Ways and Means approach to determining provider reimbursement rates.  Congress considered, but rejected, the approach embodied in the Rule, which effectively sets the median in-network rate/QPA as the presumptive reimbursement amount and constrains the IDR process so that it decidedly favors insurers over providers.  Indeed, on the day the NSA was passed, the three major House Committees addressing these issues issued a Joint Statement noting that the NSA provides a "free-market solution that takes patients out of the middle and fairly resolves payment disputes between plans and providers." (Ex. 6.)  The NSA "[p]rotects patients from surprise bills"; "[e]nsures physicians and other health workers don't face economic harm and uncertainty"; and "[p]rotects all stakeholders, most importantly patients, while also ensuring a pathway for resolution of payment disputes for health care services that are consistent with private market practices."  *Id.*  The Joint Statement also identifies what the NSA "does not do":  "This text includes NO benchmarking or rate-setting."

The Joint Statement goes on to emphasize the individualized nature of the IDR, including the fact that the IDR entity "must equally consider" the many statutory factors:

> • If a health care provider is not satisfied with the payment they receive, they can initiate an open negotiation period and, if no resolution is reached, can pursue a dispute resolution process where an independent arbitrator considers relevant factors and determines a fair payment.
>
> • This independent dispute resolution process fairly decides an appropriate payment for services based on the facts and relevant data of each case. This results in savings by stopping bad actors from driving up costs across the health care system . . . .

10

- There is no dollar amount threshold to enter the open negotiation and independent dispute resolution processes– all claims will be eligible.

- The arbitrator must equally consider many factors, including:
  ◦ Median contracted rates;
  ◦ Education and experience of providers and severity of individual cases;
  ◦ Previously contracted rates going back four years;
  ◦ Good faith efforts to negotiate – bad actors will be held accountable;
  ◦ Market share of both parties – this will help prevent any stakeholder that dominates a region from trying to set rates at an untenable level; and
  ◦ Any other factors brought forward by providers and plans, except for billed charges or government-set rates.

Since promulgation of the Rule, congressional leaders have made clear that the Rule violates the NSA.  For example, the principal architects of the legislation, Ways and Means Chairman Neal and Ranking Member Brady, wrote to the Departments expressing their concern that the Rule "do[es] not reflect the law that Congress passed":

> Congress stepped in to protect patients by ending the practice of surprise medical billing. In so doing, Congress sought to promote fairness in payment disputes between insurers and providers--carefully specifying all the various factors that should be considered during the independent dispute resolution (IDR) process. . . .
>
> . . . <u>Despite the careful balance that Congress designed for the independent dispute resolution process, the [Rule] strays from the No Surprises Act in favor of an approach that Congress did *not* enact in the final law and does so in a very concerning manner.</u>

(Ex. 4 at 2.)  The NSA "directs the arbiter to consider all of the factors without giving preference or priority to any one factor—that is the express result of substantial negotiation and deliberation among those Committees of jurisdiction, and reflects Congress's intent to design an IDR process that does not become a de facto benchmark." But the Rule "crafts a process that essentially tips the scale for the median contracted rate being the default appropriate payment amount" (*id.*):

> Under the interim final rule, the IDR entity is only allowed to deviate from the median amount where the parties present "credible information about additional circumstances [that] clearly demonstrates that the [median in-network rate] is materially different from the appropriate out-of-network rate." Such a standard affronts the provisions enacted into law, and we are concerned that this approach biases the IDR entity toward one factor (a median rate) as opposed to evaluating all factors equally as Congress intended.

11

A group of congressional members with healthcare expertise also objected to the Rule, stating that it "does not reflect legislation that could have passed Congress or the law as written":

> Over the last several years, the medical professionals in Congress received copious expert input from providers and physician groups.  They repeatedly cited the importance of ensuring a balanced IDR process in determining a payment rate in order to prevent adverse outcomes such as artificially-low payments, the narrowing of provider networks, and reduced patient access.  While the QPA was originally intended to be applied as a baseline consideration among other factors during the arbitration process, the [Rule] places a disproportionate emphasis on the QPA, which necessarily undervalues other factors brought to the arbiter, including quality and outcomes data.

(Ex. 7.) As a result, the QPA "is unlikely to reflect actual market-based payment rates for all circumstances."  (*Id.*)  This failure to reimburse at a fair market rate would adversely affect providers and, consequently, the availability of healthcare, particularly in underserved areas:

> By instructing the IDR entity to rely upon the QPA as the primary factor in determining payment rates, the [Rule] will limit providers' ability to utilize other statutorily required and relevant factors when negotiating with the payor.  Under this [Rule], we are concerned that the IDR process will lead to narrower networks and decreased access to medical care for millions of American patients, which would have a disproportionate impact on access to care in rural and underserved areas.  If this [Rule] is finalized as written, *providers may no longer be able to afford to serve these communities given the downward pressure on commercial rates coupled with the already delicate payor mix.*

(*Id.* (emphasis added).)

Finally, a letter from 152 members of Congress expressed these same concerns, noting that while the NSA "was one of the most important patient protection bills in American history, . . . its success will depend on your departments following the letter of law in its implementation."  (Ex. 3 at 1.) The letter reiterated that "Congress rejected a benchmark rate and determined the best path forward for patients was to authorize an open negotiation period coupled with a balanced IDR process." (*Id.*)  The NSA "expressly directs the certified IDR entity to consider each of [the] listed factors should they be submitted, capturing the unique circumstance of each billing dispute without causing any single piece of information to be the default one considered."  (*Id.*)  The Rule, on the other hand, "do[es] not reflect the way the law was written, do[es] not reflect a policy that could

have passed Congress, and do[es] not create a balanced process to settle payment disputes." (*Id.*) By making the median in-network rate "the default factor considered in the IDR process," the Rule threatens grave consequences for patients, including jeopardizing patient access to care and exacerbating existing health disparities in underserved communities. (*Id.*)

## III.    The Rule Will Have Serious Adverse Consequences for Healthcare in This Nation.

The Rule is not only contrary to the NSA and its legislative history.  If upheld, it will result in a host of adverse consequences for healthcare providers and their patients.

First, there is no basis for the Departments' assumption that the QPA/in-network rate will "typically" be a reasonable out-of-network rate.  By requiring the IDR entity to consider a number of factors *in addition to* the QPA, the NSA makes clear that the QPA alone does not accurately represent prevailing market rates. *See supra* pp. 4-6.

The real world of health insurance markets bears this out.  Market rates are fairly represented by *actual payments* to providers for actual services rendered, not by a median of *contracted* rates irrespective of the actual utilization of those contracts in the marketplace. Contracted rates are affected by any number of factors, including the market share of the plan and provider, the unique economic and clinical environment in the communities, and penalty and bonus structures.[4]  Providers often agree to lower contracted rates in exchange for reimbursement certainty and administrative efficiencies that attend being in a network.  In fact, the Departments' first interim rule provides that when insurers calculate median contracted rates, they must exclude risk sharing, bonuses, or penalties, and other incentive-based and retrospective payments or payment adjustments.  86 Fed. Reg. 36,872, 36,894 (July 13, 2021).  That, too, artificially reflects

---

[4] In some contracts, risk-sharing amounts can total 10-15% of the total payments; the contracted rates are adjusted *downward* to reflect the potential for earning such an incentive.

lower rates of actual payment.   In short, using contracted rates as the QPA, and the QPA as a proxy for out-of-network rates, will deviate drastically from any representation of the actual prevailing market rate.

Second, as demonstrated above, there is no serious dispute that "benchmarks" result in underpayments to providers and in turn cause the contraction of provider networks and the narrowing of healthcare choices for patients.  The California experience is illustrative.  California enacted a benchmark payment rate, but that benchmark ultimately became the default payment rate for out-of-network and even some in-network services.  California insurers recognized that they could force providers out of network by paying the artificially low benchmark rate and then offering take-it-or-leave it contracts.  These narrowed networks jeopardized patient access to care.  Small, independent providers could not remain financially viable and were forced to consolidate with larger systems to continue to care for the patients in their communities.  This consolidation, in turn, substantially increased healthcare costs.  (Ex. 8.)

For emergency physicians, the problem is even more acute.  In the experience of *Amici*, the EMTALA requirements cause health plans to be even less inclined to maintain emergency providers in-network.   Insurers recognize that that their policyholders are able to receive emergency care regardless of their insurance status or ability to pay.  Insurers therefore have no incentive to enter into fair contracted rates with emergency physicians.

Third, the experience in California and elsewhere is already starting to play out nationwide as a result of the Rule.  The Rule has had the effect of narrowing provider networks and thereby reducing the availability of healthcare to patients.  In the few weeks since publication of the Rule, numerous physician practices have received termination notices from insurers of longstanding network agreements (including agreements that currently protect patients in rural and underserved

communities), or threats to terminate existing agreements unless the providers agree to substantial discounts from their contracted rates.  Some of those termination letters even cite the Rule as justification. (*See* Ex.  9; *see also* Ex. 10 (describing other contract terminations).)

Finally, the Departments' assumption that lower provider reimbursement rates will translate into lower costs to patients is without any basis.  The Departments state that the Rule will "help limit the indirect impact on patients that would occur from higher out-of-network rates if plans and issuers were to pass higher costs on to individuals in the form of increases in premiums." 86 Fed. Reg. at 55,996.  There is no evidence that insurers pass their savings from lower reimbursement rates onto their insureds.  In fact, when states provide for fair reimbursement (like New York and Connecticut), the resulting insurance premiums are actually *lower* than the national average.  One study examined premiums in New York, Connecticut, and nationwide from 2015-2019.  In 2019, the percentage growth in premiums was 73% nationwide, but only 50% in New York and 35% in Connecticut. (Ex. 11.)  In other words, there is no evidence of a relationship between higher insurance premiums and laws that improve emergency physician reimbursement.

In short, implementation of the Rule will result in a host of negative consequences for providers and their patients, without any of the hoped-for positives in the form of lower insurance premiums.  The Departments should be enjoined from enforcing the Rule.  At a minimum, the consequences of the Rule underscore the importance of requiring the Departments to follow the APA notice and comment provisions so that the Departments can be adequately informed of the errors in their assumptions and the adverse effects of the Rule on physicians and patients.

## **CONCLUSION**

*Amici* respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment.

DATED:   December 17, 2021                     Respectfully submitted,

*/s/Jack R. Bierig*

**JACK R. BIERIG (lead attorney)**
(Admitted *Pro Hac Vice*)
Illinois State Bar No. 0207039
**SCHIFF HARDIN LLP**
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Phone: (312) 258-5511
jbierig@schiffhardin.com

**CATHERINE BARTLES**
State Bar No. 24104849
**STAFFORD DAVIS**
State Bar No. 24054605
**THE STAFFORD DAVIS FIRM, PC**
815 S Broadway Ave.
Tyler, Texas 75701
(903) 593-7000 (Office)
(903) 705-7369 (Fax)
sdavis@stafforddavisfirm.com
cbartles@stafforddavisfirm.com


*Attorneys for Amici*

*The Emergency Department Practice Management Association, the Texas College of Emergency Physicians, and the Virginia College of Emergency Physicians.*

16

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2021, a true and correct copy of the foregoing document was served on all counsel of record through this Court's CM/ECF filing system.

*/s/ Jack R. Bierig*
Jack R. Bierig