IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| TEXAS MEDICAL ASSOCIATION and DR. ADAM CORLEY, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, DEPARTMENT OF LABOR, DEPARTMENT OF THE TREASURY, OFFICE OF PERSONNEL MANAGEMENT, and the CURRENT HEADS OF THOSE AGENCIES IN THEIR OFFICIAL CAPACITIES, | § § § § § § § § § § § § | Civil Action No. 6:21-CV-00425 |
| *Defendants*. | | |

**BRIEF OF MEMBERS OF CONGRESS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS**

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................................ 1

INTRODUCTION ........................................................................................................ 2

I.   CONGRESS REJECTED THE AGENCIES' APPROACH TO SETTING PAYMENT RATES. ..... 4

II.  CONGRESS'S REJECTION OF BENCHMARK RATES REFLECTS CRITICAL POLICY CONSIDERATIONS. ........................................................................................ 11

CONCLUSION .......................................................................................................... 14

CERTIFICATE OF SERVICE .................................................................................. 15

# TABLE OF AUTHORITIES

Page

**CASES**

*Azar v. Allina Health Servs.*,
   139 S. Ct. 1804 (2019) .................................................................................................. 10

*Baldwin v. United States*,
   __ U.S. __, 140 S. Ct. 690 (2020) ................................................................................ 11

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002) .................................................................................................. 9, 10

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ....................................................................................................... 4

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ....................................................................................................... 9

*Conn. Nat'l Bank v. Germain*,
   503 U.S. 249 (1992) ....................................................................................................... 9

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
   968 F.3d 454 (5th Cir. 2020) ......................................................................................... 4

*I.N.S. v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ..................................................................................................... 10

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ................................................................................................... 4

*Marshall v. Daniel Const. Co.*,
   563 F.2d 707 (5th Cir. 1977) ....................................................................................... 11

*Rainbow Gun Club, Inc. v. Denbury Onshore, L.L.C.*,
   760 F.3d 405 (5th Cir. 2014) ....................................................................................... 10

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ..................................................................................................... 11

**STATUTES**

42 U.S.C. § 300gg-111(a)(1) ................................................................................................ 9

42 U.S.C. § 300gg-111(a)(1)(C)(iv).................................................................................... 2

42 U.S.C. § 300gg-111(a)(3)(K) .................................................................................. 2, 9

42 U.S.C. § 300gg-111(c) .................................................................................................. 2

42 U.S.C. § 300gg-111(c)(1) ............................................................................................. 9

42 U.S.C. § 300gg-111(c)(5) ............................................................................................. 9

No Surprises Act, § 102(a) (Dec. 11, 2020) ........................................................... 7, 8, 9

**REGULATIONS**

45 C.F.R. § 149.510(c)(4)(ii)(A) ....................................................................................... 2

86 Fed. Reg. 55980-01 (Oct. 7, 2021) ............................................................................ 10

86 Fed. Reg. 55996 .......................................................................................................... 10

**OTHER AUTHORITIES**

166 Cong. Rec. H7290-09 (2020) ..................................................................................... 9

166 Cong. Rec. H7301-02 (2020) ..................................................................................... 9

Cedric M. Smith, M.D., Origin and Uses of *Primum Non Nocere*—Above All, Do No Harm!, J. of Clinical Pharmacology (Mar. 7, 2013) .................................................. 6

Cong. Budget Office Cost Est., S. 1895 Lower Health Care Costs Act at 7 (June 26, 2019), https://www.cbo.gov/system/files/2019-07/s1895_0.pdf ............................ 13

H.R. 2328, 116th Cong. §§ 402(b), (2d Sess. 2020) ...................................................... 5

H.R. 3630, 116th Cong. § 2(b) (1st Sess. 2019) ................................................... 4, 5, 10

H.R. 5800, 116th Cong. §§ 2(a), 4(b) (2d Sess. 2020) ............................................. 5, 10

H.R. 5826 116th Cong. § 7(a) (2d Sess. 2020) ........................................................... 6, 7

H.R. Rep. No. 116-615 Pt. 1 (2020) .............................................................................. 5, 9

*Influence of Out-of-Network Payment Standards on Insurer-Provider Bargaining: California's Experience*, American Journal of Managed Care (Aug. 5, 2019), https://www.ajmc.com/view/influence-of-outofnetwork-payment-standards-on-insurer-provider-bargaining-californias-experience?p=1 ..................................... 13

Letter of Am. College of Emergency Physicians to Departments at 22 (Dec. 6, 2021), https://www.regulations.gov/comment/CMS-2021-0156-1046 ............................. 12

Letter of Am. Med. Ass'n to Departments at 5 (Dec. 6, 2021),
    https://www.regulations.gov/comment/CMS-2021-0156-5178 ............................. 12

Michael McAuliff, *Doctors Are Mad About Surprise Billing Rules*, NPR (Nov. 22,
    2021), https://www.npr.org/sections/health-
    shots/2021/11/22/1057985191/becerra-defends-hhs-rulesaimed-at-reining-in-
    surprise-medical-bills ................................................................................................ 3

*New York's 2014 Law to Protect Consumers from Surprise Out-of-Network Bills
    Mostly Working as Intended: Results of a Case Study*, Georgetown University
    Health Policy Institute (May 2019),
    https://georgetown.app.box.com/s/6onkj1jaiy3f1618iy7j0gpzdoew2zu9 ............... 14

Press Release, House Committee on Energy & Commerce, Congressional Committee
    Leaders Announce Surprise Billing Agreement (Dec. 11, 2020),
    https://energycommerce.house.gov/newsroom/press-releases/congressional-
    committee-leaders-announce-surprise-billing-agreement ...................................... 7

Press Release, Rep. Richard Neal, Neal and Brady Release Legislative Text of
    Surprise Medical Billing Proposal (Feb. 7, 2020),
    https://neal.house.gov/news/documentsingle.aspx?DocumentID=2014 ................. 6

S. 1531, 116th Cong. §§ 3(a) (1st Sess. 2019) ............................................................. 6

S. 1895, 116th Cong. § 103(a) (1st Sess. 2019) ........................................................... 4

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are members of Congress, as well as healthcare providers, who are devoted to crafting policies that lower healthcare costs and improve access to quality care. Although *amici* reflect a variety of healthcare backgrounds, they are united as lawmakers in their view that the challenged interim final rule in this case defies the policy choices Congress expressly made in the No Surprises Act. The rule instead adopts an approach that Congress *rejected*. *Amici* are particularly concerned about the negative repercussions on access to quality healthcare as a result of the rule.

As elected officials who both possess insight into the intent of the No Surprises Act—most of whom had intimate involvement in crafting and negotiating the bill—and who also bring a wealth of healthcare experience to the table, *amici* are uniquely positioned to explain how and why Congress came to pass the No Surprises Act as written. *Amici* have a strong interest in guarding the prerogatives of the legislative branch and ensuring that administrative agencies respect the limits of their delegated authority.

*Amici* are: Andy Harris, M.D. (MD-01), Michael C. Burgess M.D. (TX-26), Roger Marshall M.D. (R-KS), Brian Babin, D.D.S. (TX-36), Larry Bucshon, M.D. (IN-08), Earl L. "Buddy" Carter, R.Ph. (GA-01), Scott DesJarlais, M.D. (TN-04), Neal P. Dunn, M.D. (FL-02), Ronny L. Jackson, M.D. (TX-13), John Joyce, M.D. (PA-13), Mariannette J. Miller-Meeks, M.D. (IA-02), Gregory F. Murphy M.D. (NC-03), Jefferson Van Drew, D.M.D. (NJ-02).

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

## INTRODUCTION

In the No Surprises Act, Congress set forth a precise methodology for resolving disputes between insurers and healthcare providers over the price of out-of-network medical services. 42 U.S.C. § 300gg-111(c). These disputes arise when patients unexpectedly receive healthcare from outside of their insurance networks, such as in emergencies or where patients choose their hospital but not ancillary providers (e.g., anesthesiologists). Before the No Surprises Act, insurers paid a portion of the out-of-network costs or rejected the bill entirely, and then patients received a bill for the rest.

The No Surprises Act provides that instead of patients receiving such bills, insurers and providers negotiate a price that insurers will pay.[2] *Id.* § 300gg-111(c)(1)(A). If negotiations fail, they can ask an independent arbiter to choose between the insurer's proposed price and the provider's proposed price. *Id.* § 300gg-111(c)(1)(B). The arbiter must determine the price based on a list of multiple, statutorily enumerated factors. *Id.* § 300gg-111(c)(5)(C).

Despite Congress's unambiguous statutory directives, the administrative agencies in this case[3] singled out *one* factor—the "median" in-network rate calculated by insurers—as the benchmark against which arbiters must pick what price insurers pay. *Id.* § 300gg-111(a)(3)(E); 45 C.F.R. § 149.510(c)(4)(ii)(A). That interpretation of the No Surprises Act effectively predetermines the outcome of nearly all such

---

[2] The exception is that, where states have mandated out-of-network rates, then state law determines the amount paid. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(iv), (a)(3)(K).

[3] These agencies are the Department of Health and Human Services, Department of Labor, Department of the Treasury and Office of Personnel Management.

disputes. The effect is to thwart Congress's expressly enacted policy of requiring arbiters to impartially weigh multiple economic and situational factors in choosing the appropriate price. Indeed, Congress repeatedly *rejected* proposals to mandate payment at the median in-network rate.

Congress did so for important policy reasons, and its policy judgment is entitled to respect. Mandating a presumption in favor of median in-network rates significantly undermines the only tool a provider has to negotiate a fair price, which risks distorting private market dynamics by artificially setting prices. The nation's already stressed healthcare system could become over-strained, leading to fewer providers and services. Congress thus favored a "first, do no harm" approach that incentivizes insurers and providers to settle their own disputes through reasonable negotiations and does not incentivize insurers to lower in network rates and narrow networks.

Ignoring these concerns, the agencies apparently take the blinkered view that providers "are overcharging," and "either have to tighten their belt . . . or they don't last in the business." *See* Michael McAuliff, *Doctors Are Mad About Surprise Billing Rules*, NPR (Nov. 22, 2021) (quoting Health and Human Services Secretary Xavier Becerra), https://www.npr.org/sections/health-shots/2021/11/22/1057985191/becerra-defends-hhs-rulesaimed-at-reining-in-surprise-medical-bills.

The agencies' actions in this case reflect a bold usurpation of legislative power. Congress took care, in bipartisan legislation, to balance competing interests. The agencies have now reworked Congress's statutory scheme based on their own policy

3

preferences. The agencies' actions offend the separation of powers and should be set aside.

I. **CONGRESS REJECTED THE AGENCIES' APPROACH TO SETTING PAYMENT RATES.**

The legislative history of the No Surprises Act confirms the statute's plain meaning: Congress did not enact—and instead rejected—a presumption favoring median in-network rates in price disputes between insurers and out-of-network providers. *See Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 459–60 (5th Cir. 2020) (confirming that where "text, structure, history, and purpose" shows "Congress has directly spoken to the precise question at issue," then courts "must give effect to the unambiguously expressed intent of Congress" (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) and *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843 & n.9 (1984))).

Before Congress passed the No Surprises Act, lawmakers proposed various bills that mandated payment of the median in-network rate in price disputes between insurers and out-of-network providers. Each of these proposals failed to become law.

For example, the "Lower Health Care Costs Act" expressly required the "[e]stablishment of [a] [b]enchmark," such that insurers "shall pay providers . . . the median in-network rate." *See* S. 1895, 116th Cong. § 103(a) (1st Sess. 2019). The bill contemplated no negotiation between insurers and providers. *Id.*

Similarly, the initial version of the "No Surprises Act" proposed that insurers pay "the recognized amount," less patient copay or coinsurance. *See* H.R. 3630, 116th Cong. § 2(b) (1st Sess. 2019). The bill defined "recognized amount" as either no more

4

than the state-mandated amount plus patient copay or coinsurance or, for states without mandates, "at least the median contracted rate." *Id.* § 2(a).

Other proposals mandated payment of median in-network rates, unless those rates met a minimum threshold amount for the disputed service. *See* H.R. 5800, 116th Cong. §§ 2(a), 4(b) (2d Sess. 2020) ("Ban Surprise Billing Act") (allowing mediation where median in-network rate for disputed service was at least $750); H.R. 2328, 116th Cong. §§ 402(b), (2d Sess. 2020) ("No Surprises Act," as included in the "Reauthorizing and Extending America's Community Health Act") (allowing mediation where median contracted rate was at least $1250). In those situations, the parties could seek independent dispute resolution, wherein arbiters had to pick one party's offered price based on consideration of multiple factors, including median in-network rates, providers' training and experience, and the patient's acuity or complexity of services provided. *See id.*

These bills rested on the view that mandating insurers to pay, and out-of-network providers to accept, median in-network rates will lower healthcare costs. *See* H.R. Rep. No. 116-615 Pt. 1, at 57 (2020) (arguing that as between independent dispute resolution and "benchmark" rate-setting, "benchmark rates will . . . slow the rapid growth of health care costs . . . by . . . reducing providers' bargaining power").

Other lawmakers proposed competing bills in stark contrast to those that favored using median in-network rates as the benchmark for out-of-network rates. These bills allowed insurers and providers to negotiate their own prices or to pursue independent dispute resolution, regardless of the amounts of disputed claims. The

idea was to incentivize insurers and providers to take reasonable positions in pricing disputes, resulting in a relatively fair process that would "first, do no harm." *E.g.*, Press Release, Rep. Richard Neal, Neal and Brady Release Legislative Text of Surprise Medical Billing Proposal (Feb. 7, 2020), https://neal.house.gov/news/documentsingle.aspx?DocumentID=2014).[4]

One proposal was the "STOP Surprise Medical Bills Act of 2019," which provided that insurers would initially pay providers "the median in-network rate," but either party could negotiate an alternative amount or seek independent dispute resolution. *See* S. 1531, 116th Cong. §§ 3(a) (1st Sess. 2019). In choosing between the parties' offered prices, the bill required arbiters to treat "in-network rates" as just one factor for consideration, alongside the providers' training and experience, the parties' relative market share, the circumstances and complexity of the services, any good faith efforts by the parties to contract (or lack thereof), and "other relevant economic aspects." *Id.*

Another proposal was the "Consumer Protections Against Surprise Medical Bills Act of 2020," which essentially unpegged the payment in such disputes from median in-network rates. Instead, it allowed "open negotiation" between insurers and providers. *See* H.R. 5826 116th Cong. § 7(a) (2d Sess. 2020). If negotiations failed, either party could initiate a "mediated dispute process." *Id.* To determine whose offered price to select, the bill required arbiters to consider any "information

---

[4] *See also* Cedric M. Smith, M.D., Origin and Uses of *Primum Non Nocere*—Above All, Do No Harm!, J. of Clinical Pharmacology (Mar. 7, 2013) (exploring origins of ancient axiom).

6

relating to such offer[s]" that the parties submitted, as well as information the arbiters requested and the "median contract rate." *Id.*

Ultimately, the various factions of Congress came together in December 2020 and announced a bipartisan, bicameral agreement "to protect patients from surprise medical bills and establish a fair framework to resolve payment disputes between health care providers and health insurance companies." *See* Press Release, House Committee on Energy & Commerce, Congressional Committee Leaders Announce Surprise Billing Agreement (Dec. 11, 2020), https://energycommerce.house.gov/newsroom/press-releases/congressional-committee-leaders-announce-surprise-billing-agreement.

This compromise legislation rejected the "benchmark" approach and, instead, adopted independent dispute resolution as the way to resolve these pricing disputes. It provided that insurers would pay an "out-of-network rate," defined as either the state-mandated rate, an agreed upon amount, or an amount chosen by independent arbiters. *See id.* (providing link to compromise bill); No Surprises Act, §102(a) (as agreed to by various committees on Dec. 11, 2020). If the parties pursued independent dispute resolution, the compromise bill set forth a specific method for arbiters to choose between their offered prices. Specifically, the bill said arbiters "shall consider"

> the qualifying payment amounts . . . for the applicable year for items or services that are comparable . . . *and* . . .
>
> (I)  The level of training, experience, and quality and outcomes measurements of the provider or facility . . .

7

> (II) The market share held by the out-of-network health care provider or facility or that of the plan or issuer . . .
> (III) The acuity of the individual receiving such item or service or the complexity of furnishing such item or service . . .
> (IV) The teaching status, case mix, and scope of services of the [out-of-network] facility . . . [and]
> (V) Demonstrations of good faith efforts (or lack of good faith efforts) made by . . . to enter into network agreements . . .

*See id.* The bill defined "qualifying payment amount" ("QPA") as "the median of the contracted rates" recognized by insurers. *Id.*

This compromise legislation won support from key House and Senate committee leaders who previously sponsored competing bills, including Senators Lamar Alexander and Patty Murray ("Lower Health Care Costs Act," S. 1895); Rep. Frank Pallone and Rep. Greg Walden ("No Surprises Act," H.R. 3630); Rep. Robert Scott and Rep. Virginia Foxx ("Ban Surprise Billing Act," H.R. 5800); and Rep. Richard Neal and Rep. Kevin Brady ("Consumer Protections Against Surprise Medical Bills Act," H.R. 5826). *See id.*

Indeed, a press release announcing the agreement quoted "the bipartisan, bicameral Committee leaders" as describing the No Surprises Act as a deal to, *inter alia*, "promote fairness in payment disputes between insurers and providers." *Id.* These leaders confirmed that the No Surprises Act "means . . . what it says":

> If the parties choose to utilize the IDR process, both parties would each submit an offer to the independent arbiter. When choosing between the two offers the arbiter is required to consider the median in-network rate, information related to the training and experience of the provider, the market share of the parties, previous

8

> contracting history between the parties, complexity of the services provided, and any other information submitted by the parties.

*See id.*; *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461–62 (2002) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))).

Consistent with the Committee leaders' joint statement, various lawmakers praised the No Surprise Act's inclusion in the 2021 Consolidated Appropriations Act as a culmination of efforts to reach a compromise for the benefit of patients. *See* 166 Cong. Rec. H7290-09 (2020) (statement of Rep. Shalala praising "long-fought and negotiated bipartisan and bicameral compromise" and statement of Rep. Cole "applaud[ing]" committees "for coming to this important compromise"); 166 Cong. Rec. H7301-02 (2020) (statement of Rep. Hoyer noting inclusion of "legislation that protects patients from surprise bills by removing them from the fight between insurers and providers and implanting a fairer process for resolving disputes").

This history confirms what the No Surprises Act's text makes plain: "Congress has directly spoken to the precise question at issue.'" *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). Congress had before it a binary decision. It could pick the benchmark-rate approach, or the independent dispute resolution approach. *See* H.R. Rep. No. 116-615 Pt. 1, at 56 ("Two payment rate options have emerged as the predominant contenders . . ."). Congress plainly chose the latter. *See* 42 U.S.C. § 300gg-111(a)(1), (a)(3)(K), (c)(1), (c)(5).

9

In direct contravention of Congress's policy choice, the agencies wrote post-hoc rules requiring arbiters to "begin with the presumption that the QPA is the appropriate out-of-network rate" and "select the offer closest to the QPA unless . . . credible information submitted by either party clearly demonstrates that the QPA is materially different from the appropriate out-of-network rate." *See* "Requirements Related to Surprise Billing; Part II," 86 Fed. Reg. 55980-01 (Oct. 7, 2021).

Apparently dissatisfied with the No Surprises Act's text, the agencies advance implausible readings and even their own "policy considerations." *See* 86 Fed. Reg. at 55996. "Dissatisfaction, however, is often the cost of legislative compromise. And negotiations surrounding enactment of this bill tell a typical story of legislative battle," wherein the statute's "delicate crafting reflected a compromise among highly interested parties." *Barnhart*, 534 U.S. at 461.

The record shows that "Congress had before it—and rejected—a much more direct path to th[e] destination" that the agencies ascribe to the statute. *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019). Congress clearly knew how to write legislation mandating that insurers pay out-of-network providers the median in-network rate—and it chose not to do so. *See* S. 1895; H.R. 3630, H.R. 5800.

"Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987); *cf. Rainbow Gun Club, Inc. v. Denbury Onshore, L.L.C.*, 760 F.3d 405, 410 (5th Cir. 2014) (reasoning that history supported statute's ordinary

10

meaning where Congress already rejected bill reflecting proposed alternative reading); *Marshall v. Daniel Const. Co.*, 563 F.2d 707, 714–15 (5th Cir. 1977) (similar).

Whatever the agencies' "bureaucratic policy goals," they had no power to "rewrit[e] unambiguous statutory terms." *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325–26 (2014). "This . . . usurpation by the Executive is not a harmless transfer of power." *Baldwin v. United States*, __ U.S. __, 140 S. Ct. 690, 691 (2020) (Thomas, J., dissenting from denial of certiorari). As the history of the No Surprises Act exemplifies, our Constitution purposely restricts Congress's "legislative power by dividing it between two Houses that check each other." *Id.* By contrast, "[w]hen the Executive exercises . . . legislative power, . . . it does so largely free of these safeguards." *Id.* (internal citation omitted). The agencies' actions are an affront to these bedrock principles and must not stand.

## II. CONGRESS'S REJECTION OF BENCHMARK RATES REFLECTS CRITICAL POLICY CONSIDERATIONS.

Congress's decision to reject mandating payment of median in-network rates rests on its judgment that any policy addressing "surprise medical billing" should put providers and insurers on equal footing when settling payment disputes. Alternative approaches mandating payment of median in-network rate were rejected largely because a benchmark system provides a structural advantage to insurers when negotiating out of network payments. Over time, that inures to the detriment of providers, patients, and the American healthcare system as a whole.

11

Practically speaking, the dispute resolution scheme now contemplated by the agencies poses at least two problems that Congress expressly sought to avoid when creating a payment negotiation process of open negotiations between insurers and providers. First, creating a presumption that the appropriate payment amount is the median in-network rate risks distorting already complex market dynamics in our healthcare system in a way that will likely lead to systematic underpayment of in-network and out-of-network providers. Second, and relatedly, those distortions will create unforetold harms to patients culminating in reduced access to affordable care—the very type of harm the No Surprises Act was supposed to help cure.

First, mandating payment of median in-network rates risk market distortions because such rates do not necessarily account for the costs of providing care in the unique circumstances of each billing dispute. *See* Letter of Am. Med. Ass'n to Departments at 5 (Dec. 6, 2021), https://www.regulations.gov/comment/CMS-2021-0156-5178. Rather, they reflect the outcomes of intricate contract negotiations that involve many factors. For example, some providers might trade higher rates for increased payment certainty and patient volumes. *See* Letter of Am. College of Emergency Physicians to Departments at 22 (Dec. 6, 2021), https://www.regulations.gov/comment/CMS-2021-0156-1046.

Under a benchmark system where insurers only pay in network rates to out of network providers, providers lose leverage to negotiate in network rates, leaving insurers incentivized to lower those rates or drop higher cost providers from their

12

network. This would in turn lead to inadequate payment to in-network and out-of-network providers.

Congress was aware that such mandated rates risked systematic underpayment, including to those providing front-line emergency care in life-and-death situations. *See* Cong. Budget Office Cost Est., S. 1895 Lower Health Care Costs Act at 7 (June 26, 2019) (estimating average payment rates dropping by 15 percent to 20 percent below current average), https://www.cbo.gov/system/files/2019-07/s1895_0.pdf. Congress's decision to eschew a benchmark system—and instead enact an open dispute resolution process with multiple criteria considerations—clearly indicates an intent to avoid the risks that the agencies' interpretation would now invite.

Second, the predictable market distortions that will take place here risk creating a system of chronic underpayment to providers for services; this will, of course, lead to reduced access to care. Systematic underpayment would result in significant financial strain for some providers, which may result in closures, consolidation, or sales to private equity. Further, this system would likely have the effect of narrowing networks as there will be little incentive to insurers to entice providers to join their network since the payment to out of network providers is likely to be the same or nearly the same as those to in network providers. Congress was also concerned that such mandated rates risked narrowed networks, which would also decrease patient access to care. *See Influence of Out-of-Network Payment Standards on Insurer-Provider Bargaining: California's Experience*, American

13

Journal of Managed Care (Aug. 5, 2019), https://www.ajmc.com/view/influence-of-outofnetwork-payment-standards-on-insurer-provider-bargaining-californias-experience?p=1.

The agency's action here is extraordinarily consequential. It reworks the statutory scheme that Congress designed, which aimed to create a fair process that encourages reasonable negotiations. *See, e.g.*, *New York's 2014 Law to Protect Consumers from Surprise Out-of-Network Bills Mostly Working as Intended: Results of a Case Study*, Georgetown University Health Policy Institute (May 2019), https://georgetown.app.box.com/s/6onkj1jaiy3f1618iy7j0gpzdoew2zu9. Given the potential unforetold harms to patients, it is implausible that Congress would use "such a subtle device" as to authorize the agency to remake the out-of-network payment markets. *See MCI*, 512 U.S. at 231.

## CONCLUSION

The agencies' actions should be set aside.

Dated: January 3, 2022               Respectfully submitted,

                                     /s/ *John C. Sullivan*
                                     John C. Sullivan
                                     Texas Bar No. 24083920
                                     S|L LAW PLLC
                                     610 Uptown Blvd., Suite 2000
                                     Cedar Hill, TX 75104
                                     T: (469) 523-1351
                                     F: (469) 613-0891
                                     john.sullivan@the-sl-lawfirm.com

                                     ***Counsel for Members of Congress as Amici Curiae***

14

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who have consented to electronic service on January 3, 2022.

/s/ *John C. Sullivan*
John C. Sullivan
