IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| TEXAS MEDICAL ASSOCATION, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No.:  6:21-cv-425-JDK |
| | ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | ) |
| | ) |
| Defendants. | ) |

**BRIEF OF AMERICA'S HEALTH INSURANCE PLANS AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION**

Hyland Hunt (*pro hac vice*)
Ruthanne M. Deutsch (*pro hac vice*)
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 868-6915
Fax: (202) 609-8410
hhunt@deutschhunt.com

Counsel for *Amicus Curiae* America's Health Insurance Plans

**TABLE OF CONTENTS**

INTEREST OF *AMICUS CURIAE*.................................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...............................................................2

ARGUMENT ...................................................................................................................................4

I.     TIMELY IMPLEMENTATION OF THE ACT WOULD HAVE BEEN IMPOSSIBLE WITHOUT FINALIZATION OF THE IDR RULE MONTHS BEFORE JANUARY 1. ......................................................................................................4

II.    PREDICTABLE RULES FOR INDEPENDENT DISPUTE RESOLUTION BENEFIT CONSUMERS. ..........................................................................................................7

        A.     The No Surprises Act Seeks to Remedy Dysfunction in Health Care Markets Where Patients Cannot Choose Providers. ...............................................7

        B.     Centering The QPA Is Essential for IDR Predictability, Which Reduces Administrative Costs and Makes Health Care More Affordable. ............................9

              1.    Rulemaking Was Required to Guide IDR Decision-Making, and the Departments Reasonably Interpreted the Act to Favor Predictability. .......................................... 9

              2.    IDR Predictability and Efficiency Reduce Administrative Costs. ........................ 10

              3.    Predictability Makes Health Care More Affordable, While Ensuring Fair Reimbursement. ................................................................................. 12

        C.     Predictable Out-of-Network Costs Foster, Rather than Impair, Patients' Access to Quality Networks.................................................................................13

CONCLUSION..............................................................................................................................15

## TABLE OF AUTHORITIES

Page(s)

**Statutes**

42 U.S.C. § 300gg-18(b) ........................................................................................................... 12

42 U.S.C. § 300gg-111(a) .................................................................................................. 5, 8, 9

42 U.S.C. § 300gg-111(b) ........................................................................................................... 8

42 U.S.C. § 300gg-111(c) .................................................................................................. 4, 9, 10

42 U.S.C. § 300gg-131 ................................................................................................................ 9

42 U.S.C. § 300gg-132 ................................................................................................................ 9

42 U.S.C. § 18031 ..................................................................................................................... 14

Tex. Ins. Code § 1467.083 ........................................................................................................ 10

**Regulations**

45 C.F.R. § 149.510 ............................................................................................................. 6, 13

86 Fed. Reg. 36,872 (July 31, 2021) ....................................................................................... 7, 8

86 Fed. Reg. 55,980 (Oct. 7, 2021) .................................................................................... *passim*

**Other Authorities**

AHIP, Center for Policy and Research, *Charges Billed by Out-of-Network
  Providers: Implications for Affordability* (Sept. 2015),
  https://tinyurl.com/ba2v83er ................................................................................................. 7

AHIP, Comment Letter, https://tinyurl.com/2crxsv52 ............................................................. 13

AHIP, *What's the Role of Networks in Providing High-Quality Affordable Care?*,
  https://tinyurl.com/2p94p4xz ................................................................................................ 7

Ctrs. for Medicare & Medicaid Servs., *List of certified independent dispute
  resolution entities*, https://tinyurl.com/2p9d7t72 ................................................................ 12

Benjamin Chartock et al., *Arbitration Over Out-Of-Network Medical Bills: Evidence From New Jersey Payment Disputes*, 40 Health Affairs 130, 131 (Jan. 2021) ..............................................................................10, 12

Gary Claxton et al., *An analysis of out-of-network claims in large employer health plan*s, Peterson-KFF Health System Tracker (Aug. 13, 2018), https://tinyurl.com/3fp5psf9..................................................8

Gary Claxton, et al., *Employer strategies to reduce health costs and improve quality through network configuration*, Peterson-KFF Health System Tracker (Sept. 25, 2019), https://tinyurl.com/ydzxn6ux ................................14

Cong. Budget Office, Estimate for Divisions O Through FF, H.R. 133, https://tinyurl.com/3eec2a4n.....................................................................................................13

Zack Cooper et al., *Out-Of-Network Billing and Negotiated Payments for Hospital-Based Physicians*, 39 Health Affairs 24, 26 (Jan. 2020)......................................................................................8, 12

Justin Giovanelli et al., *Implementing the Affordable Care Act: State Regulation of Marketplace Plan Provider Netw*orks, Commonwealth Fund (May 2015), https://tinyurl.com/pkwkybs2 .....................................................................................................14

Nat'l Conf. of State Legislators, *Insurance Carriers and Access to Healthcare Providers: Network Adequacy* (Feb. 2018), https://tinyurl.com/ym824jvb .....................................................................................................14

N.J. Dep't of Banking & Ins., 2019 Report, https://tinyurl.com/4dfeevnf ....................................11

N.J. Dep't of Banking & Ins., 2020 report, https://tinyurl.com/2p9dmvp7..................................11

Letter from Rep. Frank Pallone, Jr. & Sen. Patty Murray to Secretary Becerra (Jan. 7, 2022) ........................................................................................13

Tex. Dep't of Ins., *Senate Bill 1264: 2021 midyear report* (July 2021), https://tinyurl.com/yc34f3r5 ....................................................................8, 11, 13

## INTEREST OF *AMICUS CURIAE*[1]

America's Health Insurance Plans, Inc. ("AHIP") is the national trade association representing the health insurance community. AHIP advocates for public policies that expand access to affordable health care coverage to all Americans through a competitive marketplace that fosters choice, quality, and innovation. AHIP's members have broad experience working with virtually all health care stakeholders to ensure that patients have affordable access to needed treatments and medical services. That experience gives AHIP extensive first-hand and historical knowledge about the nation's health care and health insurance systems, and a unique understanding of how those systems work.

AHIP's members strive to reach agreements with health care providers to offer consumers affordable networks that provide them with choices in the delivery of quality medical care. When unable to secure network agreements before treatment is rendered, health insurance providers have long worked to negotiate out-of-network payments to prevent surprise medical bills and reduce costs for patients. This approach was no solution to the growing problem of providers refusing to participate in health insurance networks. Invariably, the result was that out-of-network providers were paid well above typical market rates and consumers faced excessive costs when providers demanded to be paid the balance of unreasonable billed charges.

AHIP strongly supports Congress's decision in the No Surprises Act to fix the market dysfunction that saddled patients with exorbitant medical bills for services they had no opportunity to turn down. AHIP also agrees with Defendants' legal arguments that the Act's fix hinges on anchoring disputed out-of-network rates to the "qualifying payment amount" (QPA), absent

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than the amicus, its members, or its counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief.

1

credible information otherwise. The QPA reflects competitive, fair market rates, and Plaintiffs' unbounded alternatives would create the very problems the Act aims to remedy.

AHIP writes to focus on two distinct issues within its expertise. The first is operational: To protect all patients as intended, dispute resolution rules had to be finalized before completion of formal comments, given the numerous operational measures that health insurance providers needed to undertake well before the Act's January 1, 2022 effective date—measures that depended on final rules. Second, centering dispute resolution guidance on the QPA improves cost predictability and promotes fairness, which is critical to providing affordable access to quality coverage for everyone.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress gave the governing Departments, health care providers, and health insurance providers only a single year to implement the No Surprises Act, given the urgency of protecting Americans from surprise medical bills and addressing spiraling out-of-network costs. Accordingly, the Departments issued rules in phases, starting with a rule implementing the methodology for calculating the QPA—generally based on median competitive contracted rates—per Congress's July 1, 2021 statutory deadline. Rightly recognizing that the Act is not turn-key, and that clarity in Independent Dispute Resolution (IDR) rules was a precondition for timely implementation, the Departments then moved to provide guidance on the IDR process, where the QPA (defined in phase one) plays a central role.

To allow for an operational IDR process by January 1, 2022, health plans needed clear guidance. Requiring the IDR process to begin with the QPA, rather than an open-ended multi-factor weighing with no structure, provided much-needed certainty. Finalizing the rules allowed health insurance providers to finalize benefit designs; obtain regulatory approvals; set up staffing, systems, and vendor contracts to handle claims and disputes; and, when acting as third-party

administrators on behalf of employers that pay for their employees' health care services, accurately predict those employers' anticipated costs, administer their claims, and handle any disputes.

Moving forward with an interim final rule facilitated health plans' readiness to implement these protections for patients on day one—including protections against out-of-control health care costs. The Departments rightly interpreted the Act to require certified IDR entities to select the reimbursement amount closest to the QPA, absent credible and material information otherwise. And they correctly found that this QPA-centric approach makes out-of-network costs more predictable, and health coverage more affordable for everyone, due to lower administrative costs and more reasonable payments for out-of-network services. This directly translates to lower premiums for consumers and employers, as well as lower federal health care expenditures (in the form of reduced premium tax credits that help Americans buy coverage).

Predictability lowers administrative costs in two ways. First, it reduces the number of IDRs, as providers and health plans are more likely to settle disputes when they can predict an IDR's likely result. Second, predictability lowers costs of the IDRs that do occur, by limiting the possibility of extended open-ended inquiries about immaterial factors, as most cases can be resolved by reference to the QPA alone. The resulting reduced administrative costs directly benefit consumers and advance a key policy goal of limiting the share of premium dollars spent on administrative costs. A QPA anchor also works directly to reduce out-of-network costs, while recognizing that IDR entities may select higher payment amounts when warranted by credible information that makes a material difference. This results in more affordable health coverage and fair reimbursement, all while ensuring patients' access to quality networks. Contrary to the dire predictions of Plaintiffs' *amici*, health insurance providers have every reason to broaden their networks under the rule, not narrow them, given regulatory requirements and business imperatives.

# ARGUMENT

I. **Timely Implementation Of The Act Would Have Been Impossible Without Finalization Of The IDR Rule Months Before January 1.**

The Departments' staged rulemaking process—issuing the QPA rule first, then issuing the IDR rule after comments were received on the first—was necessary, given the centrality of the QPA in the overall statutory scheme, including the IDR process. *See* 86 Fed. Reg. 55,980, 55,982 (Oct. 7, 2021) (describing phased approach and explaining how second "interim final rules build upon the protections in the July 2021 interim final rules"). The Departments reasonably determined that it was impracticable and contrary to public interest to delay finalizing the rules pending the completion of a formal public comment period for the IDR rule. 86 Fed. Reg. at 56,044. The IDR procedures needed to be finalized sufficiently early to allow regulated entities, including health insurance providers, time to implement necessary changes to their operations so that consumers would have the full protections contemplated by the Act on its January 1, 2022 effective date.

As the Departments explained, health insurance providers had "to account for these changes [made in the IDR rule] in establishing premium or contribution rates and in making other changes to benefit designs," and needed to do so *before* January 1. 86 Fed. Reg. at 56,044. For instance, out-of-network payments are a key aspect of benefit design. Knowing the IDR rules enabled plans to better calibrate their out-of-network benefits and thereby avoid either over-paying or prompting a high volume of IDR requests through too-low initial out-of-network payments. And related plan amendments to out-of-network processes sometimes required regulatory approval, which also "need[ed] time." 86 Fed. Reg. at 56,044.

Beyond finalizing benefit designs and plan documents, health insurance providers had to stand up dispute resolution systems by January 1, 2022. Finalizing the rule only at the last-minute deadline of December 27, 2021, 42 U.S.C. § 300gg-111(c)(2)(A)—just four days before the Act's

effective date—would have been far too late. The dispute resolution system required by the Act encompasses many steps that depend on how IDR factors will be weighed, yet occur well before an IDR ever takes place. Plans must make a payment for an out-of-network service covered by the Act no later than 30 days after the claim is submitted, 42 U.S.C. § 300gg-111(a)(1)(C), and as mentioned above, the structure of IDR decision-making affects the benefit design governing those payments. Thereafter, the plan and provider may begin a 30-day open negotiation period, which could occur as soon as February 2022. It would be impossible to craft reasonable offers in negotiation, and to make decisions regarding whether to settle, without rules in place specifying how IDR decisions would be made. Not having the rules of the IDR process in place before negotiation begins is akin to asking litigants to settle their cases without knowing the governing law—a futile exercise.

Many core aspects of developing and operationalizing health plans' dispute processing systems—central to providing affordable coverage—could also not be finalized without the IDR rules already in hand. Set rules for IDR decision-making were essential for plans to estimate the number of IDRs and therefore appropriately size their dispute-processing operations. Health insurance providers needed to hire teams at the end of 2021 to be ready to implement an entirely new, complex system where a vast number of providers could invoke IDR to seek higher out-of-network payments. It takes time to recruit, hire, and train staff, especially in today's labor market. Data management systems, essential to health plans' capability to process a potentially immense number of open negotiation and IDR requests in a very short timeframe, needed to be designed and built. Developing these systems could include building automated processes to facilitate gathering, compiling, and submitting information. Any automation requires knowing in advance the necessary inputs to be considered and relied upon in an IDR proceeding (e.g. the contours of

information to be gathered and submitted). Such system requirements became clear only after the IDR rule was finalized. *See* 45 C.F.R. § 149.510(c)(4)(iv) (qualifying credible information). Finally, health insurance providers sometimes need to contract with vendors to handle parts of their dispute resolution process. Those contracts could not be negotiated until the IDR rule was final because their terms depend on, among other things, what information the vendor would need to submit in the IDRs, as well as the projected volume and complexity of IDR proceedings. An open-ended IDR process could require a vastly different set of contract terms than a more structured process.

In addition to these operational issues, health insurance providers that provide administrative services for self-funded employer-sponsored health plans faced an additional set of tasks. In this role, health insurance providers are often referred to as third-party administrators (TPA). TPAs needed clarity on the IDR rule to finalize arrangements with those employers *before* January 1, which for many plans is the beginning of a new plan year. TPAs needed to understand the IDR rules to better model employers' projected benefit costs for employers to use in designing benefits and financial planning. In addition, because employers often rely on TPAs to resolve out-of-network payment disputes, TPAs and employers needed to adjust their contracts to reflect the new IDR process, including delineating the TPA's authority to resolve disputes that go to IDR. Until IDR rules were finalized there was scant information available to craft agreements that would accurately reflect anticipated roles. Yet those agreements, too, in many cases needed to be in place by January 1, 2022.

In sum, IDR regulations needed to be final *at least* a few months before January 1, 2022, to give health insurance providers (including those acting as TPAs) time to undertake the multitude of steps necessary to comply with the federal regulatory requirement to implement a new dispute

resolution process that would ensure Americans would be protected on day one of the Act as Congress contemplated. Timely implementation of the Act would have been impossible if the rules had not been finalized until after the 60-day comment period.

## II. Predictable Rules For Independent Dispute Resolution Benefit Consumers.

### A. The No Surprises Act Seeks to Remedy Dysfunction in Health Care Markets Where Patients Cannot Choose Providers.

For most medical services, payments are set in advance by negotiation of rates between health insurance providers and health care providers. Health plans work with providers to offer networks that provide Americans access to affordable, high-quality care. *See* AHIP, Center for Policy and Research, *Charges Billed by Out-of-Network Providers: Implications for Affordability*, at 3 (Sept. 2015), https://tinyurl.com/ba2v83er. Such networks benefit patients, health plan sponsors like employers, and the entire health care system by reducing costs, promoting access to and utilization of care, and providing high-quality choices for enrollees. *See* AHIP, *What's the Role of Networks in Providing High-Quality Affordable Care?*, https://tinyurl.com/2p94p4xz. Networks reduce costs because health insurance providers verify the credentials of the providers, negotiate payment rates up front, and avoid the inefficiencies of negotiating every bill. The resulting contracts typically limit the provider to the agreed payment from the plan and prohibit surprise bills to patients. *See* 86 Fed. Reg. 36,872, 36,874 (July 13, 2021). Out-of-network providers, in contrast, often charge higher rates, and before the Act, sometimes sent patients surprise bills for any part of their billed charges that was not paid by insurance. *Id*.

For services where patients are unable to choose an in-network provider in advance, providers lack the same incentives to join networks, resulting in lower network participation rates for certain providers, like those that provide emergency care, or are assigned by the hospital without patient direction, such as anesthesiologists and pathologists. *See* 86 Fed. Reg. at 56,046;

7

Gary Claxton et al., *An analysis of out-of-network claims in large employer health plan*s, Peterson-KFF Health System Tracker (Aug. 13, 2018), https://tinyurl.com/3fp5psf9; *see also* 86 Fed. Reg. at 36,874. A list of medical specialties that most often invoke out-of-network dispute resolution illustrates the breadth of the problem, and how easy it is for patients to do everything they can to seek out an in-network facility and still be saddled with out-of-network bills. For example, the top five in Texas are emergency department physicians, anesthesiologists, certified registered nurse anesthetists, radiologists, and surgical assistants. *See* Tex. Dep't of Ins., *Senate Bill 1264: 2021 midyear report*, at 6 (July 2021) ("Texas IDR Report"), https://tinyurl.com/yc34f3r5.[2]

When these providers could "balance bill" the patient the difference between what they charged and how much the health plan paid, they were able to leverage higher payments—whether in exchange for agreeing to join networks, or in out-of-network negotiations. *See* 86 Fed. Reg. at 36,874; *see also* Zack Cooper et al., *Out-Of-Network Billing and Negotiated Payments for Hospital-Based Physicians*, 39 Health Affairs 24, 26 (Jan. 2020), https://tinyurl.com/bddeyrfj (finding in-network rates of 343% and 367% of Medicare rates for pathologists and anesthesiologists compared to 164% of Medicare rates for orthopedists).

The No Surprises Act replaced balance billing with a structured dispute resolution process for out-of-network charges, protecting patients from receiving surprise bills and enhancing predictability of out-of-network costs. For a covered service, a patient's cost-share is typically a set percentage of the QPA. 42 U.S.C. §§ 300gg-111(a)(1)(C)(iii), (a)(3)(H)(ii), (b)(1)(B). The QPA is generally the health plan's median contract rate for the same service, provided by the same medical specialty, in the same area. *Id.* § 300gg-111(a)(3)(E). It must be calculated according to

---

[2] Hospitals could, but generally do not, require the providers that practice in their hospitals to participate in the same networks that the hospital participates in.

detailed rules and is subject to audit. *Id.* §§ 300gg-111(a)(2), (a)(3)(E). Providers are barred from billing patients more than their cost share. *Id.* §§ 300gg-131, 300gg-132.

If the provider and health plan do not agree on the remainder of the payment for the service, Congress charged the Departments with "establish[ing] by regulation one independent resolution process … in accordance with" the Act. *Id.* § 300gg-111(c)(2)(A). When selecting between the parties' offers, the certified independent dispute resolution (IDR) entity must consider the QPA, and any relevant "additional circumstances." *Id.* § 300gg-111(c)(5)(C).

### B. Centering The QPA Is Essential for IDR Predictability, Which Reduces Administrative Costs and Makes Health Care More Affordable.

#### 1. Rulemaking Was Required to Guide IDR Decision-Making, and the Departments Reasonably Interpreted the Act to Favor Predictability.

Congress listed the QPA first among the "[c]onsiderations" for IDR entities, followed by "additional circumstances" in a separate paragraph. 42 U.S.C. § 300gg-111(c)(5)(C). It also centered the QPA in the IDR reporting requirements. *Id.* §§ 300gg-111(c)(7)(A)(v), (B)(iii)-(iv). But it did not explicitly direct *how* IDR entities were to consider the QPA and additional factors.

The Departments reasonably determined that it was most "in accord[]" with the Act, *id.* § 300gg-111(c)(2)(A) for the QPA to be considered first, requiring selection of the offer closest to the QPA absent credible information dictating a materially different rate. *See* Defs. Cross-Mot. for Summ. J. at 18-29. By expressly frontloading a congressionally defined numerical factor that is central to the statutory scheme, and then listing a variety of other potential considerations, Congress did not issue a self-executing command to weigh each consideration equally—particularly the open-ended possibility of "such information as requested by the certified IDR entity," 42 U.S.C. § 300gg-111(c)(5)(B)(i)(II). Nor did Congress authorize weighing the various factors however a particular IDR entity might choose from day to day, with no consistency even for the same decision-maker, much less across scores of decision-makers nationwide. Rather,

9

Congress ensured consistency and predictability by focusing IDR on the QPA and charging the Departments with discretion to dictate how the factors would be weighed.

Absent clear guidance on how the different factors should be weighed to choose between the parties' offers, the IDR process would be subjective and unpredictable. In contrast, the rule as written enables predictable and uniform decisions while permitting IDR awards to align with credible, material information—including when such information dictates payments higher than the QPA. By clarifying how the Act ties IDR outcomes to the QPA cornerstone in most (but not all) cases, the IDR rule makes out-of-network costs more predictable. *See* 86 Fed. Reg. at 55,996 ("Anchoring the determination of the out-of-network rate to the QPA will increase the predictability of IDR outcomes."). That predictability, in turn, generates a host of beneficial effects for health care markets and, ultimately, patients and consumers.

2. *IDR Predictability and Efficiency Reduce Administrative Costs.*

IDR administrative costs are driven by the volume and efficiency of proceedings. On both counts, enhanced predictability helps reduce costs. As to volume, enhanced predictability reduces the number of disputes to resolve. As the Departments explained, predictable outcomes "may encourage parties to reach an agreement outside of the Federal IDR process." 86 Fed. Reg. at 55,996. The Act is designed to encourage voluntary dispute resolution and minimal use of IDR: It bars a party from taking a dispute about the same service to IDR within 90 days of a decision in an earlier IDR invoked by that party and involving the same health plan, provider, and service. 42 U.S.C. § 300gg-111(c)(5)(E)(ii). The rule works toward that the same goal; an unpredictable IDR process would work at cross-purposes. State experience confirms that the more predictable the dispute resolution results, the less likely that parties will need to invoke IDR.

In Texas, arbitrators are required to consider 10 disparate factors with no guidance on how to weight them. Tex. Ins. Code § 1467.083(b). New Jersey has a similar system. Benjamin

10

Chartock et al., *Arbitration Over Out-Of-Network Medical Bills: Evidence From New Jersey Payment Disputes*, 40 Health Affairs 130, 131 (Jan. 2021). In both states, unpredictable decision-making has led to a high volume of dispute resolution proceedings for contested out-of-network charges, with numbers increasing over time. *See* Texas IDR Report, at 4 (50,230 in first half of 2021, compared to 44,910 in 2020); *compare* N.J. Dep't of Banking & Ins., 2019 Report, https://tinyurl.com/4dfeevnf, *with* 2020 report, https://tinyurl.com/2p9dmvp7 (arbitrations nearly doubled from 2019 to 2020). This ever-increasing volume of arbitrations—for Texas depicted below—inevitably leads to higher administrative costs and thus higher premiums.



*See* Texas IDR Report, at 6.

    Without anchoring arbitration to reasonable rates, costs rise. Cost experience from Texas puts the median arbitration fee at $1,000, *higher* than the average single-claim award of $883 for an actual medical service. Texas IDR Report, at 8. The highest fee was $5,000, *id.*, and fee amounts don't include the parties' administrative costs to gather and present information to the arbitrator—which only increase with the number of factors to be considered. Such administrative costs that exceed the amount of the actual disputed out-of-network charges make no sense. In contrast to such high arbitration fees in Texas, federal certified IDR entities, after considering the IDR rule,

11

have set fees ranging from $285 to $500 for single proceedings. *See* Ctrs. for Medicare & Medicaid Servs., *List of certified independent dispute resolution entities*, https://tinyurl.com/2p9d7t72. Texas's experience shows that unbounded arbitrations are likely to be more costly, a result that cannot be squared with legal, commercial, and regulatory imperatives for health plans to limit the share of premium dollars they spend on administrative costs. *See, e.g.*, 42 U.S.C. § 300gg-18(b).

### 3. Predictability Makes Health Care More Affordable, While Ensuring Fair Reimbursement.

Centering the QPA also makes out-of-network costs more affordable by anchoring IDR results to locally negotiated market rates (absent credible information that the appropriate rate is materially different). Unlike billed charges—which are unilaterally set by providers—negotiated rates reflect competitive, fair market prices. And even these negotiated rates "may have been inflated due to the practice of surprise billing prior to the No Surprises Act." 86 Fed. Reg. at 55,996. The data bear this out. Cooper, *supra*, at 27. But the QPA negotiated rates—around which IDR is centered—are still substantially less than formerly-balance-billing providers' billed charges ("sticker" prices), which they demanded from patients before the Act.

Anchoring the IDR process to market rates determined through arms-length negotiation between health plans and providers, 86 Fed. Reg. at 55,996, helps to ensure premiums reflect reasonable negotiated rates, rather than unlimited billed charges. Without such structure, arbitration can result in out-of-network rates that are both volatile and excessive, thwarting the consumer-protection goals of the Act. In New Jersey, the median award is 5.7 times higher than the median in-network rate, and nearly a third of awards are more than 10 times higher than in-network rates. Chartock, *supra*, at 132. Predictability disappears, with awards reaching more than 25 times in-network rates, and 2-6% of awards distributed at each multiple from 3 to 13. *Id.* at 133. In Texas, awards were nearly 5 times the initial health plan payment in 2020, and although initial

payments increased in 2021, awards are still 3.4 times higher. Texas IDR Report, at 5.

Even though the Act bans surprise billing, Americans still pay the increased costs of an unpredictable dispute resolution process through higher premiums. *See* 86 Fed. Reg. at 55,996. Centering the QPA both stabilizes and reduces health care costs, as shown by the Congressional Budget Office's projection of premium savings—which hinged on the assumption that the QPA would anchor IDR. *See* Cong. Budget Office, Estimate for Divisions O Through FF, H.R. 133, at 2-3, https://tinyurl.com/3eec2a4n; Letter from Rep. Frank Pallone, Jr. & Sen. Patty Murray to Secretary Becerra (Jan. 7, 2022). Lower premiums benefit consumers directly and reduce government health care expenditures for premium tax credits. *See* 86 Fed. Reg. at 56,059.

Contrary to the assertions of Plaintiffs and their *amici*, greater predictability and affordability does not sacrifice fair reimbursement to providers. The QPA is a median negotiated rate that fairly reflects service characteristics that can increase costs, including medical specialty, geographic area, and patient acuity and case severity, all captured in different billing codes. *See* AHIP, Comment Letter, at 7, https://tinyurl.com/2crxsv52. The QPA is the product of rates negotiated and agreed to between plans and providers—not unilaterally dictated by health insurance providers. And additional credible information presented by either party must factor into the decision when that information demonstrates a material difference. 45 C.F.R. § 149.510(c)(4)(iii)(B)-(D). But centering of the IDR process around the fair and competitively negotiated QPA rates reduces the likelihood and costs of resolving disputes, furthers predictability and efficiency, and makes health coverage more affordable.

C.  **Predictable Out-of-Network Costs Foster, Rather than Impair, Patients' Access to Quality Networks.**

Plaintiffs' *amici* contend that more affordable out-of-network services will harm patients, theorizing that health insurance providers will cut providers from their networks if plans can count

13

on paying QPA rates for out-of-network services. *See, e.g.*, Amicus Br. of Action for Health, Dkt. 32, at 6-7; Amicus Br. of Emergency Dep't Practice Mgmt. Ass'n, Dkt. 41, at 14-15. But this contention rests on a fundamental misunderstanding of how such networks are built. In building networks, cost is *not* the only concern. Other key factors that health plans must consider to enhance their products' marketability include quality and proximity of needed services, breadth of choice, and market demand.

Legal requirements set a floor that restrict health insurance providers from simply slashing their networks on the theory that out-of-network payments will be lower. Depending on the plan type, the adequacy of a plan's provider networks must satisfy federal and/or state standards. *See, e.g.*, 42 U.S.C. § 18031(c)(1)(B) (discussing network-adequacy standards for certification as a "qualified health plan"); Nat'l Conf. of State Legislators, *Insurance Carriers and Access to Healthcare Providers: Network Adequacy* (Feb. 2018), https://tinyurl.com/ym824jvb (surveying state laws). These standards often require a certain ratio of providers to plan enrollees, or that patients need not travel farther than a certain distance or wait longer than a certain time for an appointment. Justin Giovanelli et al., *Implementing the Affordable Care Act: State Regulation of Marketplace Plan Provider Networks*, at 4, Commonwealth Fund (May 2015), https://tinyurl.com/pkwkybs2.

Because health insurance providers' product is their network, the breadth of most networks far exceeds these legal minimums. Employers' preferences are especially critical because they pay for health benefits on behalf of over 150 million Americans. "Health plans design their provider networks so that they have options that will be attractive to their employer clients." Gary Claxton, et al., *Employer strategies to reduce health costs and improve quality through network configuration*, Peterson-KFF Health System Tracker (Sept. 25, 2019),

14

https://tinyurl.com/ydzxn6ux. Employers, in turn, overwhelmingly favor broad networks, with only 5% of employers reporting in a 2019 survey that they offer their employees a narrow-network plan. *Id*. They do so because "employers still need to balance potential cost savings against the risk of worker dissatisfaction," especially in a "tight labor market," and they value employee access and convenience. *Id.* The preference for broader networks is so strong that large employers rate both network breadth and quality as more important than cost when choosing among networks, and small employers rate the three factors roughly equally. *Id.*

Health insurance providers thus have every incentive to move more providers into networks. If network agreements cannot be reached based on reasonable market rates, however, then structured decision-making—where competitive, negotiated rates like the QPA provide an anchor for resolving disputes—protects consumers from premium increases tied to skyrocketing out-of-network charges by ensuring more predictable out-of-network payments.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Dated: January 18, 2022         Respectfully Submitted,

/s/Hyland Hunt
Hyland Hunt (*pro hac vice*)
Ruthanne M. Deutsch (*pro hac vice*)
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 868-6915
Fax: (202) 609-8410
hhunt@deutschhunt.com

Counsel for *Amicus Curiae* America's Health Insurance Plans

15

## CERTIFICATE OF SERVICE

On January 18, 2022, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served counsel for all parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/Hyland Hunt
Hyland Hunt