**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

_____

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION and DR. ADAM CORLEY, | ) ) ) |
| *Plaintiffs* | ) ) |
| v. | ) ) ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, DEPARTMENT OF LABOR, DEPARTMENT OF THE TREASURY, OFFICE OF PERSONNEL MANAGEMENT, and the CURRENT HEADS OF THOSE AGENCIES IN THEIR OFFICIAL CAPACITIES, | ) ) ) ) ) ) ) ) ) |
| *Defendants.* | ) |

Case No.: 6:21-cv-00425-JDK

**BRIEF OF *AMICI CURIAE* HEALTH POLICY EXPERTS
IN SUPPORT OF DEFENDANTS**

Jamie Crooks
*Counsel of Record*
Fairmark Partners, LLP
1499 Massachusetts Ave., NW
Ste. 113A
Washington, DC 20005
*jamie@fairmarklaw.com*

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE     1

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 3

ARGUMENT ........................................................................................................ 6

I.    THE SEPTEMBER IFR'S GUIDANCE TO IDR ENTITIES ENSURES
      THAT THE NSA FUNCTIONS IN THE MANNER CONGRESS
      INTENDED ................................................................................................. 6

      A.    Anchoring IDR Outcomes to the QPA Will Reduce Insurance Premiums
            While Adequately Compensating Providers, as Lawmakers Expected ........................... 7

      B.    The Rule's Guidance to IDR Entities Ensures Decisions Are Predictable
            and Consistent, Encouraging Parties to Settle Without Resorting to IDR ...................... 9

II.   DELAYING THE IFR WOULD HAVE DEPRIVED PAYERS AND
      PROVIDERS OF INFORMATION NECESSARY TO NEGOTIATIONS ........................ 12

III.  SEVERAL OF THE PLAINTIFFS' CLAIMS ABOUT THE IFR'S
      EFFECTS ARE INACCURATE, SUBSTANTIALLY UNDERMINING
      THEIR LEGAL CLAIMS ............................................................................ 12

      A.    Contrary to Plaintiffs' Claim, the QPA Is Likely Higher Than the Price
            That Would Emerge in a Well-Functioning Market ....................................... 12

      B.    Contrary to Plaintiffs' Claim, the IFR Will Likely Increase Network
            Participation by Clarifying Expected IDR Outcomes .................................... 13

      C.    Contrary to Plaintiffs' Claim, There is Little Reason to Expect the IFR to
            Make it More Difficult for Patients to Access Care ..................................... 14

CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

## STATUTES

42 U.S.C. § 300gg-111(c)(1) ................................................................. 10

42 U.S.C. § 300gg-111(c)(5)(C)(i) ........................................................... 8

Ban Surprise Billing Act, H.R. 5800, 116th Congress (2020), *available at*
https://perma.cc/3C4T-MJ45 ........................................................ 7

Consumer Protections Against Surprise Medical Bills Act of 2020, H.R. 5826,
116th Congress (2020), *available at* https://perma.cc/R4VW-LZ7D ....................... 7

Lower Health Care Costs Act, S. 1895, 116th Congress (2019), *available at*
https://perma.cc/89SM-6XE8 ........................................................ 7

No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758-890
(2020) ................................................................................ 1

REACH Act, H.R. 2328, 116th Congress (2019), *available at*
https://www.congress.gov/bill/116th-congress/house-bill/2328 .............................. 7

## RULES

"Requirements Related to Surprise Billing; Part II," 86 Fed. Reg. 55,980 (Oct. 7, 2021) ........... 2

## LEGISLATIVE MATERIALS

H.R. Rep. No. 116-615 (2020) ............................................................. 10

## OTHER AUTHORITIES

Carl M. Stevens, *Is Compulsory Arbitration Compatible With Bargaining?*, Indus.
Relations (Feb. 1966), *available at* https://perma.cc/8FHK-JMGW ....................... 10

Chloe O'Connell et al., *Trends in Direct Hospital Payments to Anesthesia
Groups: A Retrospective Cohort Study of Nonacademic Hospitals in California*,
131 Anesthesiology 3 (sept. 2019), *available at* https://perma.cc/6L3Y-HNX5..................... 14

Christopher Garmon & Benjamin Chartock, *One in Five Inpatient Emergency Department Cases May Lead to Surprise Bills*, Health Affairs (Jan. 2017), *available at* https://perma.cc/4C8T-WHLC ................................................................. 4

Comm. Energy & Com., Markup of H.R. 3375 et. al. H.R. Comm. Rep. (July 17, 2019), *available at* https://perma.cc/5ANC-VJLL................................................. 9, 10

Daniel Arnold & Christopher Whaley, *Who Pays for Health Care Costs? The Effects of Health Care Prices on Wages, RAND Corporation* (2020), *available at* https://perma.cc/AVV8-HD33 ................................................................. 6

Dylan Scott, *Congress wants to stop surprise medical bills. But they have one big problem left to solve.*, Vox.com (May 23, 2019), *available at* https://perma.cc/BBA4-YLVL ................................................................. 7

Eric C. Sun et al., *Assessment of Out-of-Network Billing for Privately Insured Patients Receiving Care in In-Network Hospitals*, JAMA Internal Medicine (Aug. 12, 2019), *available at* https://perma.cc/LA88-TN2R ..................................... 4

Erin Duffy et al., *Prevalence And Characteristics Of Surprise Out-Of-Network Bills From Professionals In Ambulatory Surgery Centers*, 39 Health Affairs 5 (April 15, 2020), a*vailable at* https://perma.cc/9KTP-P5E9..................................... 4

Erin L. Duffy et al., *Policies to Address Surprise Billing Can Affect Health Insurance Premiums*, 26 Am. J. Managed Care 9 (Sept. 11, 2020), *available at* https://perma.cc/9UD7-FA4R ................................................................. 6

Erin Trish et al., *Physician Reimbursement in Medicare Advantage Compared With Traditional Medicare and Commercial Health Insurance*, JAMA (Sept. 2017), *available at* https://perma.cc/3WB9-JRAK .................................................. 6

Estimate for Divisions O through FF, H.R. 133, Consolidated Appropriations Act, 2021, Cong. Budg. Off. (Jan. 14, 2021), *available at* https://perma.cc/W4VG-PLJ3 ................................................................. 9

Frank Pallone Jr., Opening Statement, Hearing on "No More Surprises: Protecting Patients from Surprise Medical Bills," Comm. Energy and Commerce (June 12, 2019), *available at* https://perma.cc/564H-AR44 .................................................. 7

Ge Bai and Gerard Anderson, *Variation in the Ratio of Physician Charges to Medicare Payments by Specialty and Region*, JAMA (Jan. 17, 2017), *available at* https://perma.cc/manage/create?folder=145669 .................................................. 5

H.R. 2328, Reauthorizing and Extending America's Community Health Act, Cong. Budget Off. (Sept. 18, 2019), *available at* https://perma.cc/8VXK-EM8L .................... 8

H.R. 5800, the Ban Surprise Billing Act, as ordered reported by the House
Committee on Education and Labor on February 11, 2020, Cong. Budg. Off.
(Feb. 13, 2020), *available at* https://perma.cc/XA2A-6HT7 ...................................................... 8

H.R. 5826, the Consumer Protections Against Surprise Medical Bills Act of 2020,
as introduced on February 11, 2020, Cong. Budget Off. (Feb. 11, 2020),
*available at* https://perma.cc/US9F-A5W8 ............................................................................... 8

Health Servs. Research (Nov. 21, 2021), *available at* https://perma.cc/4BW8-
4XX9 ........................................................................................................................................... 15

Henry S. Farber & Harry C. Katz, *Interest Arbitration, Outcomes, and the
Incentive to Bargain*, 33 ILR Rev. (Oct. 1979), *available at*
https://perma.cc/9NQU-APV8 ................................................................................................... 10

Jane M. Zhu et al., *Private Equity Acquisitions of Physician Medical Groups
Across Specialties, 2013-2016*, JAMA (Feb. 18, 2020), *available* at
https://perma.cc/F4WC-9M9H.................................................................................................... 6

Jonathan T. Kolstad & Amanda E. Kowalski, *Mandate-based health reform and
the labor market: Evidence from the Massachusetts reform*, 47 J. Health Econ.
81 (May 2016), *available at* https://perma.cc/6ADQ-PNFG;...................................................... 6

Karan R. Chhabra et al., *Out-of-Network Bills for Privately Insured Patients
Undergoing Elective Surgery With In-Network Primary Surgeons and
Facilities*, JAMA (Feb. 11, 2020), *available at* https://perma.cc/PP9C-GSY3 ......................... 4

Karen Pollitz et al., *An examination of surprise medical bills and proposals to
protect consumers from them*, Health System Tracker (Feb. 10, 2020), *available
at* https://perma.cc/3T8F-STL3................................................................................................... 4

Katherine Baicker and Amitabh Chandra, *The Labor Market Effects of Rising
Health Insurance Premiums*, 24 J. Labor Econ. 3 (2006), *available at*
https://perma.cc/FCX5-W9DH ................................................................................................... 6

Kathleen Hannick & Loren Adler, *Provider charges relative to Medicare rates,
2012-2018*, USC-Brookings Schaeffer on Health Policy (May 3, 2021),
*available at* https://perma.cc/D5UG-6EWK ............................................................................... 5

Kevin Kennedy et al., *Surprise out-of-network medical bills during in-network
hospital admissions varied by state and medical specialty*, 2016, Health Care
Cost Institute (Mar. 28, 2019), *available at* https://perma.cc/BL3Y-R6E8 ............................... 4

Leif Murphy, *Re: Bi-Partisan Workgroup's Request for Data and Information on
Surprise Medical Billing* (March 13, 2019), *available at* https://perma.cc/Q457-
FND4........................................................................................................................................... 5

iv

Loren Adler et al., *California saw reduction in out-of-network care from affected specialties after 2017 surprise billing law*, Brookings (Sept. 26, 2019), *available at* https://perma.cc/8ZQP-3PL8 ................................................................. 13

Martin Gaynor, Kate Ho, & Robert Town*, The Industrial Organization of Health Care Markets,* J. of Econ. Literature, vol. 53, no. 2 (June 2015) ............................................. 15

Press Release, House Committee on Energy & Commerce, Congressional Committee Leaders Announce Surprise Billing Agreement (Dec. 11, 2020), *available at* https://perma.cc/362S-96SU ................................................... 9

Press Release, Ways & Means Committee, *Neal and Brady Release Legislative Text of Surprise Medical Billing Proposal* (Feb. 7, 2020), *available at* https://perma.cc/6FWA-42SR ........................................................ 9

Report to Accompany H.R. 5800 (Dec. 2, 2020) (submitted by Rep. Scott, D-VA), *available at* https://perma.cc/8JB4-H7EM ................................................. 7

S. 1895, Lower Health Care Costs Act, Cong. Budget Off. (July 16, 2019), *available at* https://perma.cc/LBR2-FUCM ................................................. 7

Zack Cooper & Fiona Scott Morton, *Out-of-Network Emergency-Physician Bills — An Unwelcome Surprise*, 375 N. England J. Med. 1915 (2016), *available at* https://perma.cc/2ATG-FSPP ....................................................... 4

Zack Cooper et al., *Out-Of-Network Billing And Negotiated Payments For Hospital-Based Physicians*, 39 Health Affairs 1 (Dec. 16, 2019), *available at* https://perma.cc/5K3Q-HHKD ..................................................... 6

Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. of Political Econ. 9 (Sept. 2020), *available at* https://perma.cc/5AHP-L6EK ...................................................... 5

**INTEREST OF AMICI CURIAE[1]**

*Amici curiae* are 24 scholars who conduct research in health care economics and health care policy, with a particular focus on surprise billing. The Appendix lists the titles and affiliations of each individual. This brief applies current research and economic principles, as well as their knowledge of the Congressional debate that led to the No Surprises Act, to address the issues before the Court in this case. Based on their expertise and other publicly available information discussed herein, *amici* believe that the implementing regulations will generate outcomes consistent with Congressional intent and with the law's text, structure, and purpose. They also believe that the plaintiffs' brief makes factual claims that are at odds with the best available evidence. Amici submit this brief to aid the Court's consideration of this important issue.[2]

**INTRODUCTION**

Before the No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758-890 (2020) ("NSA"), went into effect January 1, 2022, surprise billing—instances where patients are billed by out-of-network health care providers who they had no meaningful role in choosing—was a pervasive problem. Recognizing the burden this placed on patients, both directly when they received surprise bills and indirectly when providers exploited the leverage offered by the ability to surprise bill to demand higher prices that were then reflected in premiums, Congress passed the NSA. The NSA limits the amount of cost-sharing that payers can impose on patients for certain out-of-network services – emergency care, certain post-stabilization care, air ambulance services,

---

[1] *Amici* have not been retained by any party to this action. This brief was not authored in whole or in part by counsel for any party. No person other than *amici* and their counsel made a monetary contribution that was intended for the preparation or submission of this brief.

[2] Appendix A provides full list of *amici curiae* and their institutional affiliations. *Amici* make the arguments and observations herein solely in their capacity as individual experts and not on behalf of any institutions with which they are affiliated.

and non-emergency services provided by out-of-network providers at in-network facilities – to no more than the cost-sharing that would be imposed for in-network care.[3] It additionally limits providers from billing patients for more than this in-network cost-sharing.

The NSA establishes an independent dispute resolution ("IDR") process to resolve disputes between providers and payers over out-of-network payment. Each party proposes a payment to the IDR entity, which then selects one of the proposals. The IDR entity is directed to consider a historical median in-network rate for similar services—known as the qualifying payment amount ("QPA")—along with certain other information, including specific "additional circumstances" enumerated in the NSA and any other information submitted by the parties.

In this litigation, the plaintiffs challenge one of the interim final rules ("IFRs") that the three departments charged with implementing the NSA—Health and Human Services, Labor, and Treasury (the "Departments")—promulgated last year. In the challenged rule, entitled "Requirements Related to Surprise Billing; Part II," 86 Fed. Reg. 55,980 (Oct. 7, 2021) ("September IFR"), the Departments provided guidance regarding how IDR entities should apply the NSA's statutory framework in making payment determinations. As relevant here, the September IFR directs IDR entities to begin with a rebuttable presumption that the proposal closest to the QPA should be chosen, unless the parties' evidence demonstrates that a different amount is appropriate. Additionally, the IFR discusses each of several "additional circumstances" for consideration enumerated in the NSA, explaining variously what they refer to, how they could be measured in practice, and how they would be expected to affect the appropriate out-of-network rate in common circumstances.

---

[3] For the purposes of this brief, "payers" is defined to include both insurers and employers who bear some share of the cost of their employees' health care, such as through a self-funded plan.

In this brief, *amici curiae* survey the relevant economic evidence demonstrating that in creating a rebuttable presumption, the September IFR ensures the NSA has the effects Congress intended and implements the NSA consistent with the statute's text, structure, and purpose. Tying the IDR process to the QPA will help ensure that the premiums patients pay will remain steady or decline, one of Congress's express intentions when drafting the NSA. Moreover, the September IFR provides greater predictability as to the result of the IDR process, which in turn will encourage parties to settle without resorting to IDR as often and lessen the administrative costs borne by the system. And, contrary to plaintiffs' assertions, focusing primarily on the QPA will not result in providers receiving below-market payment for their services, nor will it reduce patients' access to in-network providers. Instead, the September IFR ensures that the NSA corrects the longstanding market inefficiencies that Congress sought to eliminate.

For these reasons, discussed in more detail below, *amici curiae* respectfully urge the Court to deny plaintiffs' motion for summary judgment.

## FACTUAL BACKGROUND

Patients generally seek medical care from providers that are part of their payers' contracted provider network because doing so is less costly. However, a patient can be unexpectedly treated by an out-of-network provider. This can happen when patients require emergency care, or when patients schedule surgery or childbirth with an in-network hospital and lead doctor but are also treated by another clinician—most commonly a facility-based specialist like an anesthesiologist, radiologist, pathologist, or assistant surgeon—who they did not choose.

When a patient receives out-of-network care in this manner, she may receive a "surprise" out-of-network bill. Normally, the payer pays some amount to the out-of-network provider, but the provider may bill the patient for the difference between the provider's charge (akin to a list

price) and what the payer paid—a practice known as balance billing. Prior to the NSA, surprise billing was rampant. Studies estimate that about one in five emergency room visits resulted in a potential surprise out-of-network bill.[4] For elective surgeries conducted at an in-network facility with an in-network primary surgeon, a similar one in five episodes of care are estimated to have included an out-of-network charge.[5] And an estimated one in six inpatient admissions at in-network facilities involved care from at least one out-of-network provider.[6] These bills could be quite large, and their average size appears to have grown substantially over time.[7] Between 2014 and 2017, one analysis estimates that the average potential surprise out-of-network bill from care received at an in-network ambulatory surgery center grew 81%, from $814 to $1,483.[8]

The prevalence of surprise out-of-network bills was the result of a market failure. Negotiations between payers and providers are typically driven by a price/volume trade-off. By and large, to attract sufficient volume, providers must join some insurance networks because few patients are willing to voluntarily pay for out-of-network treatment. In exchange for higher volume

---

[4] *See, e.g.*, Zack Cooper & Fiona Scott Morton, *Out-of-Network Emergency-Physician Bills — An Unwelcome Surprise*, 375 N. England J. Med. 1915 (2016), *available at* https://perma.cc/2ATG-FSPP; Christopher Garmon & Benjamin Chartock, *One in Five Inpatient Emergency Department Cases May Lead to Surprise Bills*, Health Affairs (Jan. 2017), *available at* https://perma.cc/4C8T-WHLC.

[5] Karan R. Chhabra et al., *Out-of-Network Bills for Privately Insured Patients Undergoing Elective Surgery With In-Network Primary Surgeons and Facilities*, JAMA (Feb. 11, 2020), *available at* https://perma.cc/PP9C-GSY3.

[6] *See, e.g.*, Karen Pollitz et al., *An examination of surprise medical bills and proposals to protect consumers from them*, Health System Tracker (Feb. 10, 2020), *available at* https://perma.cc/3T8F-STL3; Kevin Kennedy et al., *Surprise out-of-network medical bills during in-network hospital admissions varied by state and medical specialty*, 2016, Health Care Cost Institute (Mar. 28, 2019), *available at* https://perma.cc/BL3Y-R6E8.

[7] Eric C. Sun et al., *Assessment of Out-of-Network Billing for Privately Insured Patients Receiving Care in In-Network Hospitals*, JAMA Internal Medicine (Aug. 12, 2019), *available at* https://perma.cc/LA88-TN2R.

[8] Erin Duffy et al., *Prevalence And Characteristics Of Surprise Out-Of-Network Bills From Professionals In Ambulatory Surgery Centers*, 39 Health Affairs 5 (April 15, 2020), a*vailable at* https://perma.cc/9KTP-P5E9;

that comes from being in-network with the payer, providers agree to a lower price per service. But this standard market dynamic breaks down in the case of providers that patients do not choose. For emergency physicians and certain facility-based specialties, such as anesthesiology, patient volume is driven by the patient's choice of facility, or by the facility she is transported to in an emergency, and is largely insensitive to whether those specialists are in the patient's network. This created a potentially lucrative out-of-network billing option unavailable to other providers.

Many of these providers leveraged the out-of-network billing option by setting high charges, which providers generally set unilaterally. In 2018, for the specialties in which surprise billing is most common, charges averaged 505% of what Medicare would pay for the same services; the top 20% of anesthesia claims had charges in excess of 12 times the relevant Medicare price.[9] By contrast, other specialties charged an average of 270% of Medicare's prices.[10] Patients commonly bore the bulk of these inflated charges as out-of-pocket costs.

Emergency practices and certain facility-based specialties' ability to charge exorbitant rates without threatening their patient volume also gave them leverage to demand unusually high *in-network* rates from payers—leverage they would not have in a well-functioning market.[11] The CEO of TeamHealth, a physician staffing company employing many emergency and ancillary physicians, has described the ability to send balance bills as a "contract leveraging tool."[12]

---

[9] *See, e.g.*, Kathleen Hannick & Loren Adler, *Provider charges relative to Medicare rates, 2012-2018*, USC-Brookings Schaeffer on Health Policy (May 3, 2021), *available at* https://perma.cc/D5UG-6EWK; Ge Bai and Gerard Anderson, *Variation in the Ratio of Physician Charges to Medicare Payments by Specialty and Region*, JAMA (Jan. 17, 2017), *available at* https://perma.cc/manage/create?folder=145669.

[10] Hannick & Adler, *supra* note 9.

[11] Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. of Political Econ. 9 (Sept. 2020), *available at* https://perma.cc/5AHP-L6EK.

[12] Leif Murphy, *Re: Bi-Partisan Workgroup's Request for Data and Information on Surprise Medical Billing* (March 13, 2019), *available at* https://perma.cc/Q457-FND4.

Consequently, emergency medicine and facility-based specialties negotiated substantially higher in-network prices than other specialties, relative to Medicare payments.[13]

Investors took note of the high in- and out-of-network payments available in these specialties. From 2013-2016, private equity physician practice acquisitions concentrated in anesthesiology and emergency medicine, two specialties with the greatest scope to engage in surprise billing.[14]

Payers must set premiums to cover their claims spending, so the upward pressure on in-network prices created by the ability to surprise bill has historically translated into higher commercial insurance premiums.[15] Those higher premiums are ultimately borne by consumers, whether directly or indirectly via reductions in wages for people enrolled in employer-sponsored plans, as well as by the federal government, which subsidizes virtually all commercial insurance coverage.[16]

## ARGUMENT

## I.     THE SEPTEMBER IFR'S GUIDANCE TO IDR ENTITIES ENSURES THAT THE NSA FUNCTIONS IN THE MANNER CONGRESS INTENDED

---

[13] *See, e.g.*, Zack Cooper et al., *Out-Of-Network Billing And Negotiated Payments For Hospital-Based Physicians*, 39 Health Affairs 1 (Dec. 16, 2019), *available at* https://perma.cc/5K3Q-HHKD; Erin Trish et al., *Physician Reimbursement in Medicare Advantage Compared With Traditional Medicare and Commercial Health Insurance*, JAMA (Sept. 2017), *available at* https://perma.cc/3WB9-JRAK.

[14] Jane M. Zhu et al., *Private Equity Acquisitions of Physician Medical Groups Across Specialties, 2013-2016*, JAMA (Feb. 18, 2020), *available* at https://perma.cc/F4WC-9M9H.

[15] Erin L. Duffy et al., *Policies to Address Surprise Billing Can Affect Health Insurance Premiums*, 26 Am. J. Managed Care 9 (Sept. 11, 2020), *available at* https://perma.cc/9UD7-FA4R.

[16] *See, e.g.*, Katherine Baicker and Amitabh Chandra, *The Labor Market Effects of Rising Health Insurance Premiums*, 24 J. Labor Econ. 3 (2006), *available at* https://perma.cc/FCX5-W9DH; Daniel Arnold & Christopher Whaley, *Who Pays for Health Care Costs? The Effects of Health Care Prices on Wages*, RAND Corporation (2020), *available at* https://perma.cc/AVV8-HD33; Jonathan T. Kolstad & Amanda E. Kowalski, *Mandate-based health reform and the labor market: Evidence from the Massachusetts reform*, 47 J. Health Econ. 81 (May 2016), *available at* https://perma.cc/6ADQ-PNFG; 26 U.S.C. § 105, 106, 3121, 3306; 26 U.S.C. § 36B.

### A.    Anchoring IDR Outcomes to the QPA Will Reduce Insurance Premiums While Adequately Compensating Providers, as Lawmakers Expected

During the legislative debate, many Members of Congress stated that legislation to curtail surprise billing should reduce or, at least not increase, insurance premiums.[17] Every proposal advanced by House and Senate committees effected this objective by linking out-of-network payment to median contracted rates for relevant services. The proposal reported out by the Senate Committee on Health, Education, Labor, and Pensions linked out-of-network payment directly to median contracted rates.[18] Proposals reported out by the House Committee on Ways and Means, the House Committee on Energy and Commerce, and the House Committee on Education and Labor established arbitration processes to determine out-of-network payments similar to the NSA's in which a historical median contracted rate played a central role.[19]

The Congressional Budget Office ("CBO") published estimates indicating that all of the committee-reported proposals would reduce premiums. According to CBO, the reduction in premiums would in turn reduce the cost to the federal government of subsidizing insurance coverage, generating estimated federal savings over a ten-year period of between $18 billion and $25 billion, depending on the specific proposal.[20]

---

[17] Frank Pallone Jr., Opening Statement, Hearing on "No More Surprises: Protecting Patients from Surprise Medical Bills," Comm. Energy and Commerce (June 12, 2019), *available at* https://perma.cc/564H-AR44; Report to Accompany H.R. 5800 (Dec. 2, 2020) (submitted by Rep. Scott, D-VA), *available at* https://perma.cc/8JB4-H7EM; Dylan Scott, *Congress wants to stop surprise medical bills. But they have one big problem left to solve.*, Vox.com (May 23, 2019), *available at* https://perma.cc/BBA4-YLVL.

[18] Lower Health Care Costs Act, S. 1895, 116th Congress (2019), *available at* https://perma.cc/89SM-6XE8.

[19] Consumer Protections Against Surprise Medical Bills Act of 2020, H.R. 5826, 116th Congress (2020), *available at* https://perma.cc/R4VW-LZ7D; Ban Surprise Billing Act, H.R. 5800, 116th Congress (2020), *available at* https://perma.cc/3C4T-MJ45; REACH Act, H.R. 2328, 116th Congress (2019), *available at* https://www.congress.gov/bill/116th-congress/house-bill/2328.

[20] S. 1895, Lower Health Care Costs Act, Cong. Budget Off. (July 16, 2019), *available at* https://perma.cc/LBR2-FUCM; H.R. 2328, Reauthorizing and Extending America's Community

For the committee proposals relying on arbitration, the basis of CBO's conclusion was its belief that arbitration decisions would average close to the historical median contracted rate. This, in turn would drive out-of-network payments more broadly toward this rate because payers would refuse to pay much more than the price expected to emerge from arbitration, and providers would refuse to accept much less. For similar reasons, CBO also expected that in-network rates for many providers would converge toward the historical median contracted rate. CBO believed that this would reduce premiums because the historical median was not influenced by the very high prices negotiated by a minority of providers and, thus, was lower than the historical mean.

The NSA follows the template of the earlier proposals CBO analyzed; it creates an IDR process in which historical median contracted rates, referred to in the NSA as the QPA, receive considerable emphasis. When enumerating the factors IDR entities must consider, the NSA lists the QPA first and in its own subclause, while listing all other factors together in a single subclause.[21] As noted above, the NSA also provides detailed instructions on how to calculate the QPA, and establishes a detailed audit process.[22] By contrast, the NSA says nothing about how to measure or apply the other factors IDR entities are directed to consider. The NSA further emphasizes the central role of the QPA in the IDR process by directing that IDR results be expressed as a percentage of the QPA when those results are reported publicly.[23]

---

Health Act, Cong. Budget Off. (Sept. 18, 2019), *available at* https://perma.cc/8VXK-EM8L; H.R. 5826, the Consumer Protections Against Surprise Medical Bills Act of 2020, as introduced on February 11, 2020, Cong. Budget Off. (Feb. 11, 2020), *available at* https://perma.cc/US9F-A5W8; H.R. 5800, the Ban Surprise Billing Act, as ordered reported by the House Committee on Education and Labor on February 11, 2020, Cong. Budg. Off. (Feb. 13, 2020), *available at* https://perma.cc/XA2A-6HT7.

[21] 42 U.S.C. § 300gg-111(c)(5)(C)(i).

[22] *Id.* § 300gg-111(a)(2)(A).

[23] *Id*. § 300gg-111(c)(7)(B)(iv).

CBO's conclusions about how the NSA would affect payments to providers, insurance premiums, and the federal budget mirrored its assessments of earlier, similar committee proposals. In its final analysis of the NSA as enacted, CBO estimated that the statute would reduce the federal deficit by $17 billion over a ten-year period.[24] As in its prior analyses, CBO expected that the NSA would reduce aggregate payments to health care providers, thereby reducing insurance premiums. The committee chairs who announced the agreement on the NSA highlighted that the federal savings could be used to finance other health care provisions.[25]

The guidance the Departments offered in the September IFR, therefore, ensures that the NSA functions as Congress expected at enactment. By emphasizing that the QPA should play a central role in the IDR entities' decisions, the September IFR will ensure that typical IDR outcomes will be close to the QPA—exactly as CBO's analyses assumed. The resulting effects on what payers pay providers both in- and out-of-network will ensure that the NSA will reduce premiums, while most providers (half of whom were, by definition, historically at or below the median) experience little or no reduction in payments, and some see increases.

### B.    The Rule's Guidance to IDR Entities Ensures Decisions Are Predictable and Consistent, Encouraging Parties to Settle Without Resorting to IDR

During the debate over the NSA, lawmakers also expressed the view that it would be preferable for payers and providers to resolve disputes via negotiated settlements without turning to the IDR process.[26] Concerns about overuse of IDR often centered on the fact that the IDR

---

[24] Estimate for Divisions O through FF, H.R. 133, Consolidated Appropriations Act, 2021, Cong. Budg. Off. (Jan. 14, 2021), *available at* https://perma.cc/W4VG-PLJ3.

[25] Press Release, House Committee on Energy & Commerce, Congressional Committee Leaders Announce Surprise Billing Agreement (Dec. 11, 2020), *available at* https://perma.cc/362S-96SU.

[26] Press Release, Ways & Means Committee, *Neal and Brady Release Legislative Text of Surprise Medical Billing Proposal* (Feb. 7, 2020), *available at* https://perma.cc/6FWA-42SR; Comm. Energy & Com., Markup of H.R. 3375 et. al. H.R. Comm. Rep. (July 17, 2019), *available at* https://perma.cc/5ANC-VJLL.

process generates administrative costs, which will be borne by some combination of payers—who would ultimately pass those costs onto consumers—and providers.[27]

Lawmakers' desire to encourage negotiated settlements rather than reliance on the IDR process is clearly reflected in the NSA's text and structure. The statute requires a payer and provider to complete a 30-day "open negotiation" period before they are permitted to access the IDR process.[28] It further emphasizes that the parties may continue to negotiate even after initiating the IDR process.[29] If a dispute does proceed to IDR, the NSA requires the parties to pay a fee that covers the costs the federal government incurs to carry out the IDR process,[30] and the losing party is required to pay the fees imposed by the IDR entity. After an IDR entity renders a decision, the same provider and payer are barred from returning to the IDR process for 90 days.[31]

Economic research demonstrates that providers and payers are most likely to avoid resorting to arbitration processes akin to IDR when they share common expectations about the outcome.[32] Just as with litigation, proceeding to IDR imposes significant administrative costs on the parties, including the fees directly imposed by the NSA and the administrative costs associated with furnishing information to the IDR entity. If the parties have shared expectations about the outcome of the IDR process, they will both expect to benefit from reaching a settlement at a price close to what is expected to emerge from the IDR process and avoiding the costs of the process

---

[27] H.R. Rep. No. 116-615 (2020); Comm. Energy & Com., *supra* note 26.

[28] 42 U.S.C. § 300gg-111(c)(1).

[29] *Id.* § 300gg-111(c)(2)(B).

[30] *Id.* § 300gg-111(c)(8).

[31] *Id.* § 300gg-111(c)(5)(E)(ii).

[32] Carl M. Stevens, *Is Compulsory Arbitration Compatible With Bargaining?*, Indus. Relations (Feb. 1966), *available at* https://perma.cc/8FHK-JMGW; Henry S. Farber & Harry C. Katz, *Interest Arbitration, Outcomes, and the Incentive to Bargain*, 33 ILR Rev. (Oct. 1979), *available at* https://perma.cc/9NQU-APV8.

itself. By contrast, if the parties have divergent expectations about the likely outcomes of the IDR process, then reaching settlements will often be difficult or impossible.

Absent the September IFR's guidance, providers and payers would be much more likely to have divergent expectations about likely IDR outcomes. Although, as noted above, the text of the NSA offers considerable evidence that the QPA should play a central role in IDR entities' decisions, the NSA does not fully explain how IDR entities should integrate the QPA with the other pieces of information the statute requires them to consider in making final payment determinations. Additionally, in contrast to the detailed rules the NSA lays out governing calculation of the QPA, it does not explain how its enumerated "additional circumstances" should be defined or measured, much less when and how they should affect IDR entities' decisions. These omissions create ambiguity about what, precisely, the NSA directs IDR entities to do.

This ambiguity would have made it difficult for providers and payers to form sensible *a priori* expectations of how IDR entities are likely to behave. Providers and payers would have had to form expectations based on their own experience with the IDR process. However, absent clarifying guidance from the Departments, the statutory ambiguities would likely cause different IDR entities to interpret the statute's instructions in different ways and, thus, reach markedly different decisions even when presented with identical facts. Different providers and payers would then have formed meaningfully different beliefs about typical IDR outcomes based on the idiosyncratic set of cases they themselves had knowledge of, frustrating the NSA's clear preference for parties to resolve disputes without resorting to the IDR process.

The September IFR's guidance substantially reduces this ambiguity by clarifying how the QPA and non-QPA factors should be integrated in IDR entities' decision-making and clarifying

the meaning of the non-QPA factors. The guidance thus makes it far easier for parties to form meaningful expectations of IDR outcomes before observing actual cases and facilitates settlement.

## II.    DELAYING THE IFR WOULD HAVE DEPRIVED PAYERS AND PROVIDERS OF INFORMATION NECESSARY TO NEGOTIATIONS

The plaintiffs also challenge the Departments' decision to promulgate the September IFR without going through notice-and-comment rulemaking. They specifically argue that because the first cases are unlikely to reach IDR entities prior to March 2022, the guidance was unnecessary until several months after the IFR's publication, so the Departments could have undertaken a notice and comment process without causing any disruption.[33] This argument fundamentally misunderstands the purpose and practical effect of the Departments' guidance. As noted above, the September IFR's most important effect is not to change particular IDR outcomes, but to shape providers' and payers' *expectations* of likely IDR outcomes. The September IFR will thus have, and has already had, substantial effects on parties' decision-making well before the first claim formally enters IDR, including impacting negotiations over out-of-network payments for services covered by the NSA's provisions as well as negotiations over network agreements.

## III.   SEVERAL OF THE PLAINTIFFS' CLAIMS ABOUT THE IFR'S EFFECTS ARE INACCURATE, SUBSTANTIALLY UNDERMINING THEIR LEGAL CLAIMS

### A.    Contrary to Plaintiffs' Claim, the QPA Is Likely Higher Than the Price That Would Emerge in a Well-Functioning Market

The plaintiffs claim that "the QPA will often be lower than the fair market value of providers' services."[34] However, the evidence reviewed earlier indicates that the leverage providers derived from the threat of surprise billing inflated contracted rates for services where patients do not have a meaningful choice over their provider. That is, prices paid to providers with

---

[33] Compl. ¶ 89; Plaintiffs' Motion for Summary Judgment and Memorandum in Support Thereof, ECF 107, at 23 (Dec. 10, 2021) ("MSJ").
[34] Compl. ¶¶ 68-70; 71-72; *see also* MSJ, ECF 107, at 9 n.4.

the greatest scope for surprise billing were already higher than would have existed in a well-functioning market. Because the QPA is based on those prior contracted rates, it largely "locks in" those inflated rates. The fact that the QPA is a median, rather than a mean, may mitigate this to some degree by excluding the rates negotiated by the providers that most aggressively leveraged surprise billing, but the QPA is still most likely above an efficient market rate. *Supra* Section I.A.

**B.      Contrary to Plaintiffs' Claim, the IFR Will Likely Increase Network Participation by Clarifying Expected IDR Outcomes**

The plaintiffs also claim that the IFR's guidance to arbitrators will reduce network participation.[35] To the contrary, providing clear guidance to IDR entities about how to make decisions is likely to increase network participation. Administrative costs are likely to be lower with a network agreement than without one, so the parties will expect to benefit from reaching a network agreement at a price close to the price they expect to be paid without a network agreement—as long as they share common expectations about likely IDR outcomes. By contrast, without sufficiently similar expectations, agreements of this kind will often not be possible. Greater predictability of IDR decisions makes it more likely that the parties share common expectations about what payments will be made in the absence of a network agreement.

Notably, California's 2017 surprise billing law, which allows for arbitration but with guidance to rarely deviate from average in-network prices, appears to have resulted in high levels of network participation, both in absolute terms and in relation to network participation prior to the law's implementation. One study found that the share of services delivered out-of-network by affected specialties declined by 17 percent immediately after implementation of California's law.[36]

---

[35] Compl. ¶¶ 8, 73, 74.
[36] Adler et al., *California saw reduction in out-of-network care from affected specialties after 2017 surprise billing law*, Brookings (Sept. 26, 2019), *available at* https://perma.cc/8ZQP-3PL8.

C.     **Contrary to Plaintiffs' Claim, There is Little Reason to Expect the IFR to Make it More Difficult for Patients to Access Care**

Lastly, the plaintiffs argue that if IDR decisions are typically close to the QPA, then "some patients will lose access to their in-network physicians."[37] If the claim is simply that the IFR will reduce network participation, the previous section explains why the opposite is far more likely.

If, instead, the plaintiffs are arguing that the IFR will reduce access to care by causing providers to turn patients away or cease operating, economic logic suggests that this is unlikely. The QPA is a median of existing rates and thus greater than or equal to the rates specified in half of existing contracts; as noted above, it is also likely higher than the rates that would emerge in a well-functioning market. Thus, payment rates close to the QPA will generally be adequate to elicit continued supply of these services.

Additional factors further mitigate access concerns. Facilities have strong incentives to ensure adequate staffing of their facilities and would continue to have many tools to do so, including providing additional payments to clinicians where additional staffing is needed. Arrangements in which facilities "top up" payment to clinicians are already common today.[38]

Even if the NSA does increase facilities' payments to facility-based clinicians, it is unlikely to reduce *facilities'* willingness to deliver services. Economic theory implies that a facility can credibly demand prices at least high enough to cover its marginal cost of delivering care, including any needed payments to clinicians, in negotiations with payers. Because payers value access to the

---

[37] Compl. ¶ 74.

[38] Chloe O'Connell et al., *Trends in Direct Hospital Payments to Anesthesia Groups: A Retrospective Cohort Study of Nonacademic Hospitals in California*, 131 Anesthesiology 3 (sept. 2019), *available at* https://perma.cc/6L3Y-HNX5.

facility to allow them to attract enrollees, it follows that a facility will be able to secure rates adequate to allow them to finance any needed payments to clinicians.[39]

Additionally, the Emergency Medical Treatment and Labor Act (EMTALA) remains federal law and prevents facilities from curtailing access to their emergency services, the only services for which the NSA regulates payments to facilities (as opposed to clinicians). Moreover, it seems likely that the NSA will improve hospital financial stability (and, thus, hospitals' ability to remain open) on balance by allowing the half of facilities that were previously paid prices at or below the QPA to secure prices closer to the QPA, as evidence indicates that facilities that receive lower prices from commercial payers tend to have lower margins than other facilities.[40]

## CONCLUSION

Because the September IFR comports with the statute's text, Congress's intent and expectations, and the economic logic underlying the NSA, *amici curiae* urge the Court to reject plaintiffs' challenge to the regulation.

Dated: January 18, 2022

/s/ Jamie Crooks
Jamie Crooks
Fairmark Partners, LLP
1499 Massachusetts Ave., NW
Ste. 113A
jamie@fairmarklaw.com

*Counsel for Amici Curiae*

---

[39] *See generally* Martin Gaynor, Kate Ho, & Robert Town, *The Industrial Organization of Health Care Markets,* J. of Econ. Literature, vol. 53, no. 2 (June 2015)*.*

[40] *See, e.g.*, Yang Wang & Gerard Anderson, *Hospital resource allocation decisions when market prices exceed Medicare prices*, Health Servs. Research (Nov. 21, 2021), *available at* https://perma.cc/4BW8-4XX9.

**APPENDIX A**
**List of *Amici Curiae* and Relevant Affiliations**

**Loren Adler**
  Associate Director, USC-Brookings Schaeffer Initiative for Health Policy

**Gerard Anderson**
  Professor, Johns Hopkins University

**Erin Fuse Brown**
  Catherine C. Henson Professor and Director, Center for Law, Health & Society at
  Georgia State University College of Law

**Karan R. Chhabra**
  Clinical Fellow in Surgery, Harvard Medical School
  House Officer, Department of Surgery, Brigham and Women's Hospital

**Kao-Ping Chua**
  Assistant Professor of Economics, University of Michigan Medical School

**Rena Conti**
  Associate Professor, Questrom School of Business Boston University

**Zack Cooper**
  Professor, Yale University

**Sabrina Corlette**
  Research Professor, Georgetown University McCourt School of Public Policy
  Co-Director, Center on Health Insurance Reforms

**Erin Duffy**
  Research Scientist, USC Schaeffer Center for Health Policy & Economics

**Matthew Eisenberg**
  Associate Professor, Johns Hopkins Bloomberg School of Public Health

**Matthew Fiedler**
  Fellow, USC-Brookings Schaeffer Initiative for Health Policy

**Paul B. Ginsburg**
  Professor of the Practice of Health Policy and Management, USC Schaeffer Center for
  Health Policy & Economics

**Mark A. Hall**
  Professor of Law and Public Health, Wake Forest University

**Jack Hoadley**
>    Research Professor Emeritus, Georgetown McCourt School of Public Policy

**Benedic Ippolito**
>    Senior Fellow, American Enterprise Institute

**Maanasa Kona**
>    Assistant Research Professor, Georgetown McCourt School of Public Policy

**Kevin Lucia**
>    Research Professor, Georgetown McCourt School of Public Policy
>    Co-Director, Center on Health Insurance Reforms

**Michelle Moniz**
>    Assistant Professor of Obstetrics and Gynecology, University of Michigan Medical
>    School

**Fiona Scott Morton**
>    Theodore Nierenberg Professor of Economics, Yale University School of Management

**Barak Richman**
>    Professor of Law, Duke University

**Avik Roy**
>    President, The Foundation for Research on Equal Opportunity

**Andrew M. Ryan**
>    UnitedHealth Professor of Health Management and Policy, University of Michigan
>    School of Public Health

**Erin Trish**
>    Co-Director, USC Schaeffer Center for Health Policy & Economics

**Gail Wilensky**
>    Nonresident Senior Fellow, USC Schaeffer Center for Health Policy & Economics