# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

|  |  |
|---|---|
| TEXAS MEDICAL ASSOCIATION and DR. ADAM CORLEY, <br><br>        *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, DEPARTMENT OF LABOR, DEPARTMENT OF THE TREASURY, OFFICE OF PERSONNEL MANAGEMENT, and the CURRENT HEADS OF THOSE AGENCIES IN THEIR OFFICIAL CAPACITIES, <br><br>        *Defendants*. | Civil Action No. 6:21-cv-00425-JDK |

## BRIEF OF *AMICUS CURIAE* BLUE CROSS BLUE SHIELD ASSOCIATION IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION

K. Lee Blalack, II (*pro hac vice*)
Washington, D.C. Bar No. 452372
Zhao Liu (*pro hac vice*)
Washington, D.C. Bar No. 1022940
Andrew R. Hellman (*pro hac vice*)
Washington, D.C. Bar No. 1723887
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
(202) 383-5300
lblalack@omm.com
zliu@omm.com
andrewhellman@omm.com

**Counsel for *Amicus Curiae***
**Blue Cross Blue Shield Association**

**TABLE OF CONTENTS**

**Page**

INTERESTS OF AMICUS CURIAE ......................................................................... 1

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 3

I. The IFR Prioritizes a Payment Metric That Reflects the Reasonable Value of Healthcare Services. ................................................................. 3

II. The IFR Curbs Further Distortions in the Market for Healthcare Services and Will Help Restrain Healthcare Costs for Patients. .......................................... 6

A. Surprise Billers have commanded above-market rates by exploiting the inability of their patients to choose alternative providers, and this minority of providers in specialties covered by the Act has had an outsized impact on the payment rates for those services. .................... 6

B. The QPA's function in the IDR process will help restrain rising healthcare costs for patients while fairly compensating out-of-network providers. .................................................................................. 8

III. The Use of the QPA as the Primary Reference Point in the IDR Process Will Not Lead to Unduly Narrow Provider Networks or Impede Access to Care. .................................................................................................... 10

A. The IFR incentivizes healthcare providers to participate in payor networks. .................................................................................... …11

B. Payors continue to have market incentives to maintain broad provider networks, which benefit both health plans and patients. ........... 11

C. Because of the many benefits associated with provider networks, payors remain incentivized to contract with even high-cost healthcare providers. .................................................................... 12

D. State and federal network adequacy requirements ensure that payors will not offer unduly narrow provider networks for patients. ...... 13

E. Empirical evidence suggests that the IFR will not lead to unreasonably narrow provider networks or impede patient access to care, as plaintiffs claim. .................................................................. 14

CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*FTC v. ProMedica Health Sys., Inc.*,
  2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ...................................................12

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
  910 F.3d 927 (7th Cir. 2018) ................................................................................6

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
  2016 WL 5817176 (C.D. Ill. Sept. 30, 2016) ...................................................11

*New Eng. Deaconess Hosp. v. Sebelius*,
  942 F. Supp. 2d 56 (D.D.C. 2013) .......................................................................4

**Statutes**

5 U.S.C. § 553 ................................................................................................................3

42 U.S.C. § 300gg-111 .............................................................................................4, 10

42 U.S.C. § 300gg-131 ..................................................................................................2

42 U.S.C. § 300gg-132 ..................................................................................................2

42 U.S.C. § 18031 ........................................................................................................14

**Regulations**

42 C.F.R. § 413.134 .......................................................................................................4

45 C.F.R. § 149.510 ..................................................................................................3, 10

45 C.F.R. § 156.230 .....................................................................................................14

*Requirements Related to Surprise Billing: Part II*, 86 Fed. Reg. 55,980
  (Oct. 7, 2021) ..................................................................................................4, 5

**Legislative Materials**

Cong. Budget Office, *Estimate for Divisions O Through FF H.R. 133,
  Consolidated Appropriations Act, 2021, Public Law 116-260 Enacted on
  December 27, 2020* (Jan. 14, 2021), https://perma.cc/XYR2-9ZUB......................9

H.R. 2328, 116th Cong. (2019).......................................................................................5

H.R. 5800, 116th Cong. (2020).......................................................................................5

H.R. 5826, 116th Cong. (2020).......................................................................................5

H.R. Rep. No. 116-615 (Dec. 2, 2020) ................................................................ *passim*

S. 1895, 116th Cong. (2019)...........................................................................................5

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Other Authorities**

AHIP Ctr. for Pol'y & Rsch., *Charges Billed by Out-of-Network Providers:*
*Implications for Affordability* (Sept. 2015), https://perma.cc/XMZ7-BVM4 ............................7

Benjamin L. Chartock et al., *Arbitration Over Out-of-Network Medical Bills:*
*Evidence from New Jersey Payment Disputes*, 40(1) Health Affairs 130 (Jan.
2021), https://perma.cc/6569-N2Y5 .................................................................9

Bill Johnson et al., *Comparing Commercial and Medicare Professional Services*
*Prices*, Health Care Cost Inst. (Aug. 13, 2020), https://perma.cc/483G-7YY7 ......................14

Caitlin Owens, *TeamHealth Sent Thousands of Surprise Medical Bills in 2017*,
Axios (Dec. 5, 2019), https://perma.cc/PJ8D-PUSN ..............................................8

Christen Linke Young et al., *The Relationship Between Network Adequacy and*
*Surprise Billing*, USC-Brookings Schaeffer Initiative for Health Pol'y (May
10, 2019), https://perma.cc/6EV8-5M8P ...........................................................13

Coleman Drake, *What Are Consumers Willing to Pay for a Broad Network Health*
*Plan? Evidence from Covered California*, 65 J. Health Econ. 63 (2019),
https://perma.cc/S75C-47WA ......................................................................12

Conn. Ins. Dep't, Market Conduct Report on Aetna Health Inc., 2014 CT Market
Conduct LEXIS 25 (June 6, 2017)...................................................................14

Erin Duffy et al., *Surprise Medical Bills Increase Costs for Everyone, Not Just for*
*the People Who Get Them*, USC-Brookings Schaeffer Initiative for Health
Pol'y (Oct. 2, 2020), https://perma.cc/87TX-KT9K ............................................8, 9

Erin L. Duffy et al., *Policies to Address Surprise Billing Can Affect Health*
*Insurance Premiums*, 26(9) Am. J. Managed Care 401 (Sept. 11, 2020),
https://perma.cc/AJ2G-WFLC .....................................................................9, 11

Fla. Off. of Ins. Reg., Target Market Conduct Final Examination Report of
Humana Medical Plan, 2014 FL Market Conduct LEXIS 17 (Oct. 30, 2015) ......................14

Jane B. Wishner & Jeremy Marks, *Ensuring Compliance with Network Adequacy*
*Standards: Lessons from Four States*, Urban Inst. (Mar. 2017),
https://perma.cc/6ZT6-WANB .....................................................................14

Jean Fuglesten Biniek et al., *How Often Do Providers Bill Out of Network?*,
Health Care Cost Inst. (May 28, 2020), https://perma.cc/3X75-CMN7 ...................................4

Jeanette Thornton, AHIP, *Can We Stop Surprise Medical Bills AND Strengthen*
*Provider Networks? California Did*, Am. J. Managed Care (Aug. 22, 2019),
https://perma.cc/64C5-8GQ .......................................................................15

Katherine Baicker & Amitabh Chandra, *The Labor Market Effects of Rising*
*Health Insurance Premiums*, 24 J. Labor Econ. 609 (2006) .........................................8

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Kevin Kennedy et al., *Surprise Out-of-Network Medical Bills During In-Network Hospital Admissions Varied by State and Medical Specialty, 2016*, Health Care Cost Inst. (Mar. 28, 2019), https://perma.cc/K4L8-4VGC ...............................................4

Letter from Sen. Patty Murray & Rep. Frank Pallone, Jr. to Sec'y Xavier Becerra (Jan. 7, 2022)......................................................................................................5, 9

Letter from TeamHealth Holdings, Chief Executive Officer, to U.S. Senate Bi-Partisan Workgroup on Surprise Medical Billing (Mar. 13, 2019), https://perma.cc/D468-YCQ3 ..............................................................................8

Liz Hamel et al., *Kaiser Health Tracking Poll:  February 2014*, KFF (Feb. 26, 2014), https://perma.cc/TF35-YW2B ...................................................................12

Loren Adler et al., *Breaking Down the Bipartisan Senate Group's New Proposal to Address Surprise Billing*, USC-Brookings Schaeffer Initiative for Health Pol'y (May 21, 2019), https://perma.cc/383W-58A9 ...............................................7

Loren Adler et al., *California Saw Reduction in Out-of-Network Care from Affected Specialties After 2017 Surprise Billing Law*, USC-Brookings Schaeffer Initiative for Health Pol'y (Sept. 26, 2019), https://perma.cc/8BSS-AH9S..............................................................................................................14, 15

Loren Adler et al., *State Approaches to Mitigating Surprise Out-of-Network Billing*, USC-Brookings Schaeffer Initiative for Health Pol'y (Feb. 2019), https://perma.cc/DMS6-8K6V ....................................................................6, 7, 11

Loren Adler, *Experience with New York's Arbitration Process for Surprise Out-of-Network Bills*, USC-Brookings Schaeffer Initiative for Health Pol'y (Oct. 24, 2019), https://perma.cc/ZVP8-HX7R ..............................................................9

Mark A. Hall & Paul B. Ginsburg, *A Better Approach to Regulating Provider Network Adequacy*, USC-Brookings Schaeffer Initiative for Health Pol'y (Sept. 2017), https://perma.cc/B3RG-J9T6 ...........................................................12

Matthew Fiedler et al., *Recommendations for Implementing the No Surprises Act*, USC-Brookings Schaeffer Inst. on Health Pol'y (Mar. 16, 2021), https://perma.cc/YUY8-C7ZV ............................................................................10

McKinsey Ctr. for U.S. Health Sys. Reform, *Hospital Networks:  Evolution of the Configurations on the 2015 Exchanges* (Apr. 2015), https://perma.cc/XQR5-P2ER ................................................................................................................12

Nisha Kurani, et al., *Price Transparency and Variation in U.S. Health Services*, Peterson-KFF Health Sys. Tracker (Jan. 13, 2021), https://perma.cc/869A-2GNG ..................................................................................................................5

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Paul B. Ginsburg, *Wide Variation in Hospital and Physician Payment Rates Evidence of Provider Market Power*, Ctr. for Studying Health Sys. Change, Research Br. No. 16 (Nov. 2010), https://perma.cc/2EPQ-WUPS ............................................ 5

Peter R. Kongstvedt, *Essentials of Managed Care* (6th ed. 2013) ................................ 13

Sarah L. Barber et al., *Price Setting and Price Regulation in Health Care*, World Health Org. (2019), https://perma.cc/N9JG-8K8 ........................................................ 5

Tim Xu et al., *Variation in Emergency Department vs. Internal Medicine Excess Charges in the United States*, 177(8) JAMA Internal Medicine 1139 (Aug. 1, 2017), https://perma.cc/2NAC-5CVR ........................................................................ 7

## INTERESTS OF *AMICUS CURIAE*

The Blue Cross Blue Shield Association ("BCBSA") is the non-profit association that promotes the national interests of thirty-five independent, community-based, and locally operated Blue Cross Blue Shield health insurance companies ("Blue Plans").  Together, the Blue Plans provide health insurance for over 111 million people—one third of all Americans—in every zip code in all fifty states, the District of Columbia, and Puerto Rico.  Blue Plans offer a variety of insurance products to all segments of the population, including federal employees, large employer groups, small businesses, and individuals.  As leaders in the healthcare community for more than eighty years, Blue Plans seek to expand access to quality healthcare for all Americans and have extensive knowledge of and experience with the health insurance marketplace.  BCBSA has an interest in advising the Court regarding the manner in which the interim final rule ("IFR"), which is the subject of this suit, will help remedy distortions in the market for healthcare services and restrain costs for patients, including those enrolled in Blue Plans.

## INTRODUCTION

The IFR specifies the process by which arbitrators should select the appropriate payment under the No Surprises Act ("Act") for services rendered to patients by certain healthcare providers who do not participate in the provider networks offered by the patients' health insurers or health plans ("out-of-network providers").  The IFR reflects the Departments'[1] diligent efforts to faithfully implement the intent of Congress when it sought to end so-called "surprise billing," which occurs "when a consumer covered by a health plan is unexpectedly treated by an out-of-network provider and is required to pay the difference between what the plan pays and the

---

[1] The "Departments" collectively refers to the institutional defendants in this action:  the U.S. Department of Health and Human Services ("HHS"), the U.S. Department of Labor, the U.S. Department of the Treasury, and the Office of Personnel Management.

provider's charge," often amounting "to thousands of dollars of unforeseen medical costs." H.R. Rep. No. 116-615, pt. I, at 47 (Dec. 2, 2020). The Act applies 1) when patients receive emergency care from out-of-network providers; and 2) when patients receive medical care from out-of-network providers of ancillary services but at a facility, such as a hospital, that participates in the provider network of the patients' health plan. *See* 42 U.S.C. §§ 300gg-131, 300gg-132.

Congress recognized that surprise billing was becoming an increasingly common practice in the healthcare market and that *all* patients were paying the price. *See* H.R. Rep. No. 116-615, pt. I, at 53-55. A minority of hospital-based providers ("Surprise Billers") have unfairly leveraged their patients' inability to choose which providers render care in these settings to charge exorbitant rates. Indeed, data shows that many Surprise Billers charge grossly inflated rates, in some instances demanding more than 1,000% of the payments made by the Medicare program for the exact same services. In the Act, Congress carefully considered the interests of healthcare providers, payors, and, above all, patients. It balanced those interests in designing an independent dispute resolution ("IDR") process pegged to the qualifying payment amount ("QPA"), which reflects the median rate allowed by the payor for the same service to its network of contracted providers ("median contracted rate"). The IFR implements Congress's considered judgment that the QPA represents the presumptively reasonable value for healthcare services covered by the Act.

The plaintiffs here complain that the primary role of the QPA in the IDR process will affect the market landscape for healthcare services. But this argument misses the point. Congress fully understood that the status quo is a market highly susceptible to distortion by the inability of patients to choose their providers based on cost, and that Surprise Billers have exploited that opportunity in a manner that has inflated healthcare costs for patients. Congress rejected that status quo, and the IFR ensures that patients will enjoy the benefits that Congress intended.

Plaintiffs also contend that the IFR will prompt payors to sharply narrow their provider networks, which will harm patients' access to needed care.  But market-based incentives and network adequacy requirements codified in state and federal laws ensure that provider networks will remain sufficiently broad to meet patients' needs—and the empirical evidence from states that have implemented similar measures confirms that plaintiffs' conjecture is baseless.  The adverse effects predicted by plaintiffs and their *amici* have no factual basis.  Thus, the Court should reject plaintiffs' motion for summary judgment and grant the Departments' cross-motion.[2]

## ARGUMENT

I.   **The IFR Prioritizes a Payment Metric That Reflects the Reasonable Value of Healthcare Services.**

The Departments promulgated the IFR in September 2021 pursuant to Congress's directive to establish regulations that govern the "baseball-style" arbitrations between payors and healthcare providers to resolve payment disputes under the Act.  *See* Defs.' Mem., Dkt. 62, at 7-14.  Plaintiffs challenge provisions of the IFR that direct an arbitrator to "select the [party] offer closest to the [QPA] unless [the arbitrator] determines that credible information submitted by either party … clearly demonstrates that the [QPA] is materially different from the appropriate out-of-network rate."  45 C.F.R. § 149.510(c)(4)(ii)(A).  Under the Act, the QPA reflects "the median of the contracted rates recognized by the plan or issuer … for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in

---

[2] Plaintiffs' procedural challenges to the IFR fail along with their substantive challenges.  Even if Congress had not expressly authorized the Departments to promulgate interim final rules, the need of regulated parties for advance guidance about arbitrations under the Act amounts to good cause for forgoing notice-and-comment rulemaking under the Administrative Procedure Act, *see* 5 U.S.C. § 553(b)(B).  Health insurers in particular must know how the IDR process will be structured so they can prepare for those arbitrations to begin.  Insurers must design, for example, policies and procedures for initiating IDR processes, and for using the IDR portal to prepare and submit the offers and materials arbitrators will consider by the deadline Congress directed.

which the item or service is furnished"—in other words, the median contracted rate.  42 U.S.C. § 300gg-111(a)(3)(E).  The QPA must be calculated as of January 31, 2019, using a methodology that Congress directed the Departments to establish, and then adjusted over time for inflation.  *Id.* As the Departments have explained, the IFR requires arbitrators to "look first to the QPA" because the QPA, in Congress's judgment, "represents a reasonable market-based payment for relevant items and services" rendered to patients.  *Requirements Related to Surprise Billing: Part II*, 86 Fed. Reg. 55,980, 55,996 (Oct. 7, 2021).  Indeed, the median contracted rates reflected in the QPA represent the best evidence of true "market" prices for healthcare services, and thus, as "the statute contemplates," "typically the QPA will be a reasonable out-of-network rate."  *Id.*

The reasonable market value of a good or service "is 'the price that [it] would bring by bona fide bargaining between well-informed buyers and sellers,'"—that is, "the price [it] would sell for in an arm's length, open-market transaction."  *New Eng. Deaconess Hosp. v. Sebelius*, 942 F. Supp. 2d 56, 59 (D.D.C. 2013) (quoting 42 C.F.R. § 413.134(b)(2)).  Median contracted rates typically represent reasonable market values because they "are established through arms-length negotiations between providers and facilities and plans and issuers (or their service providers)." 86 Fed. Reg. at 55,996.  Contracted rates account for the vast majority of transactions in the private healthcare market:  most patients receive care from providers who participate in a payor's network rather than on an out-of-network basis, even among healthcare specialties in which providers are most likely to practice out of network.[3]  Congress understood that median contracted rates reflect reasonable market values.  *Each* of the congressional committees that reported bills that ultimately

---

[3] *See* Jean Fuglesten Biniek et al., *How Often Do Providers Bill Out of Network?*, Health Care Cost Inst. (May 28, 2020), https://perma.cc/3X75-CMN7; Kevin Kennedy et al., *Surprise Out-of-Network Medical Bills During In-Network Hospital Admissions Varied by State and Medical Specialty, 2016*, Health Care Cost Inst. (Mar. 28, 2019), https://perma.cc/K4L8-4VGC.

resulted in the passage of the Act "determined the QPA to be a reasonable, market-based rate" and "included the QPA as the primary rate that IDR entities should consider when making decisions."[4] The Departments applied this congressional judgment, declaring that "the QPA should reflect standard market rates arrived at through typical contract negotiations and should therefore be a reasonable out-of-network rate under most circumstances."  86 Fed. Reg. at 55,996.

Contracted rates are *not* unilaterally dictated by payors, as plaintiffs and their *amici* suggest.  *See, e.g.*, Pls.' Mot. Summ. J., Dkt. 25, at 17; Amicus Curiae Br. by Physicians Advocacy Inst. et al., Dkt. 34, at 9-10.   Robust empirical evidence shows that contracted rates vary significantly across and within geographic markets and medical specialties, both absolutely and relative to the rates paid by Medicare.  The mean contracted rate for a hip replacement in the New York metropolitan area, for example, is more than twice as much as the mean contracted rate for the same procedure in the Baltimore area, and contracted rates for office-based lower back MRIs vary drastically *within* the Miami area, with rates of under $200 at the 25th percentile and more than $1,400 at the 75th percentile.[5]  The ratio of average private contracted rates to Medicare rates likewise varies significantly between and within geographic areas and medical specialties.[6]  This substantial variance in average contracted rates dispels any argument that health insurers set those rates by fiat, as the plaintiffs and their *amici* suggest, because such variations occur when prices are determined through individual negotiations rather than unilateral price setting.[7]  Payors *and*

---

[4] Letter from Sen. Patty Murray & Rep. Frank Pallone, Jr. to Sec'y Xavier Becerra (Jan. 7, 2022), at 4; *see* H.R. 2328, 116th Cong. (2019); S. 1895, 116th Cong. (2019); H.R. 5800, 116th Cong. (2020); H.R. 5826, 116th Cong. (2020).

[5] Nisha Kurani, et al., *Price Transparency and Variation in U.S. Health Services*, Peterson-KFF Health Sys. Tracker (Jan. 13, 2021), https://perma.cc/869A-2GNG.

[6] *See generally* Paul B. Ginsburg, *Wide Variation in Hospital and Physician Payment Rates Evidence of Provider Market Power*, Ctr. for Studying Health Sys. Change, Research Br. No. 16 (Nov. 2010), https://perma.cc/2EPQ-WUPS.

[7] *See, e.g.*, Sarah L. Barber et al., *Price Setting and Price Regulation in Health Care*, World Health

*providers* negotiate contracted rates, and ample evidence shows that median contracted rates are the best available measure of the reasonable value of healthcare services for patients.

## II. The IFR Curbs Further Distortions in the Market for Healthcare Services and Will Help Restrain Healthcare Costs for Patients.

Because the QPA is tied to the median contract rates from 2019 and then adjusted for inflation, the market distortions caused by surprise billing—and the inflated payment rates that have resulted—are already baked into the IDR process established by the Act. The IFR merely furthers Congress's goal of preventing future market distortions and restraining costs for patients.

### A. Surprise Billers have commanded above-market rates by exploiting the inability of their patients to choose alternative providers, and this minority of providers in specialties covered by the Act has had an outsized impact on the payment rates for those services.

Congress passed the No Surprises Act to correct an increasingly worrying "failure in the health care market." H.R. Rep. No. 116-615, pt. I, at 53. Most doctors negotiate contracted rates with health plans and provide their services to members of those plans at the negotiated rates.[8] But market distortions have caused some "providers—particularly in certain specialties—to have little or no incentive to contract to join a health plan's network." *Id.* Some hospital-based providers "face highly inelastic demands for their services because patients lack the ability to meaningfully choose or refuse care"[9]: patients rarely ask if a doctor has contracted with their health plans before receiving urgent care in the emergency room, or when treated by ancillary hospital-based providers, like radiologists and anesthesiologists, that patients seldom choose themselves. *Id.* In

---

Org. (2019), at 29-30, https://perma.cc/N9JG-8K8N.

[8] *See, e.g.*, Loren Adler et al., *State Approaches to Mitigating Surprise Out-of-Network Billing*, USC-Brookings Schaeffer Initiative for Health Pol'y (Feb. 2019), at 4, https://perma.cc/DMS6-8K6V.

[9] Inelastic demand is present when higher prices for a good or service do not deter buyers from purchasing the good or service, such as when buyers lack meaningful options between sellers. *See, e.g.*, *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 931 (7th Cir. 2018).

the years before Congress passed the Act, growing numbers of Surprise Billers began exploiting their patients' lack of choice to increase their own charges and payment rates.  *See* Defs.' Mem., Dkt. 62, at 4-7 (surveying developments).  While Surprise Billers represent a minority of providers, their outsized impact on the market has led to "highly inflated payment rates" in these specialties; Congress found that "the median billed charge for emergency medicine is 465 percent of the Medicare rate," for example, while the median billed charges for diagnostic radiology and anesthesiology are 402% and 551% of Medicare rates, respectively.  H.R. Rep. No. 116-615, pt. I, at 53.  Average billed charges in these specialties exceed Medicare rates by a far greater margin than average billed charges in other specialties.[10]  Even the *average* billed charges for certain procedures have run as much as *1,000%* of Medicare rates.[11]

The inelastic demand for emergency and hospital-based services, in short, allows Surprise Billers "to bill out-of-network patients at basically whatever rate they choose, which in turn allows them to negotiate very high rates when they do come in-network," leading to higher average contracted rates across the specialties most associated with surprise billing.[12]  While average contracted rates for all physicians represented 128% of original Medicare rates in 2018, the average rates within these specialties represented significantly higher multiples of the Medicare rate:  200% for radiologists, 306% for emergency physicians, and 344% for anesthesiologists.[13]  The

---

[10] *See* Adler et al., *supra* n.8, at 7, https://perma.cc/DMS6-8K6V; *see also* Tim Xu et al., *Variation in Emergency Department vs. Internal Medicine Excess Charges in the United States*, 177(8) JAMA Internal Medicine 1139 (Aug. 1, 2017), https://perma.cc/2NAC-5CVR (finding that some emergency medicine providers charge as high as 12.6 times Medicare rates).

[11] *See* AHIP Ctr. for Pol'y & Rsch., *Charges Billed by Out-of-Network Providers:  Implications for Affordability* (Sept. 2015), at 4, https://perma.cc/XMZ7-BVM4.

[12] Loren Adler et al., *Breaking Down the Bipartisan Senate Group's New Proposal to Address Surprise Billing*, USC-Brookings Schaeffer Initiative for Health Pol'y (May 21, 2019), https://perma.cc/383W-58A9.

[13] *Id.*

comparatively higher contracted rates in these specialties are rooted in the ability of Surprise Billers to balance bill their patients in the out-of-network setting[14]—and some Surprise Billers have openly embraced that they rely on the threat of "balance billing" as a "source of contract negotiating leverage" with health insurers.[15]  Congress passed the Act fully aware of evidence that Surprise Billers use the threat of balance billing to charge "highly inflated payment rates," which "are, in turn, reflected in the cost of in-network care."[16]  H.R. Rep. No. 116-615, pt. I, at 53.

### B.    The QPA's function in the IDR process will help restrain rising healthcare costs for patients while fairly compensating out-of-network providers.

By challenging the IFR, plaintiffs seek to protect the inflated charges and the market distortions that surprise billing perpetuates at the expense of patients.  Patients ultimately bear the burden of higher healthcare costs in the form of higher premiums and patient responsibility, such as co-insurance.[17]  Accordingly, while surprise billing takes a particularly grave toll on patients facing unexpected liabilities to out-of-network hospital-based providers, they are not the only consumers harmed by surprise billing; the market distortions caused by surprise billing have

---

[14] Erin Duffy et al., *Surprise Medical Bills Increase Costs for Everyone, Not Just for the People Who Get Them*, USC-Brookings Schaeffer Initiative for Health Pol'y (Oct. 2, 2020), https://perma.cc/87TX-KT9K.

[15] Letter from TeamHealth Holdings, Chief Executive Officer, to U.S. Senate Bi-Partisan Workgroup on Surprise Medical Billing (Mar. 13, 2019), at 1, https://perma.cc/D468-YCQ3; *see also* Caitlin Owens, *TeamHealth Sent Thousands of Surprise Medical Bills in 2017*, Axios (Dec. 5, 2019), https://perma.cc/PJ8D-PUSN.

[16] Plaintiffs' *amici* ignore this market reality when they point to a letter from BlueCross BlueShield of North Carolina ("BCBS-NC") as an example of abusive market conduct by health insurers resulting from the IFR.  *See Amicus Curiae* Br. of Action for Health, Inc., Dkt. 32, at 6 & n.21; Amicus Curiae Br. by Physicians Advocacy Inst. et al., Dkt. 34, at 11 & n.16; Brief of Amici Curiae the Med. Ass'n of Ga. et al., Dkt. 36, at 15.  BCBS-NC, a single-state, not-for-profit insurer, sent the letter to less than 0.001% of healthcare providers in its network—54 in total, out of well over 15,000 providers in the network.  This small minority of providers maintained legacy contracted rates that BCBS-NC sought to renegotiate based on reasonable market rates.

[17] Katherine Baicker & Amitabh Chandra, *The Labor Market Effects of Rising Health Insurance Premiums*, 24 J. Labor Econ. 609, 631 (2006) (finding that "the cost of increasing health insurance premiums is borne primarily by workers in the form of decreased wages for workers with [employer health insurance]—so that they bear the full cost of the premium increase.").

increased the overall cost of healthcare services, and "those costs are passed on to enrollees through higher premiums."[18]

Relying on the QPA as a primary consideration in the IDR process helps to curb future market distortions by limiting inflated costs and thus restraining rising premiums, benefitting all patients.[19]  The Congressional Budget Office's analysis of the Act confirms that use of the QPA as the primary payment measure for covered out-of-network services will prompt healthcare providers whose rates are outliers—well surpassing the median—to adjust their rates toward the median, which "would reduce premiums by between 0.5 percent and 1 percent."[20]  Studies reflect that prioritizing the QPA in the IDR process is necessary to realize these lower costs for patients. Data from New York, which enacted a statute similar to the No Surprises Act but tied its IDR process to the 80th percentile of a billed charges database, suggests that an IDR process based on providers' "rack rates" results in increased costs that are ultimately passed on to patients.[21]  Data from New Jersey, which enacted a comparable statute, suggests the same.[22]  Empirical evidence thus confirms the reasoning behind the Act, which the Departments affirmed in the IFR:  giving the QPA a primary role in the IDR process "will generally slow the rapid growth of health care

---

[18] Duffy et al., *supra* n.14, https://perma.cc/87TX-KT9K.

[19] *See id.*; Erin L. Duffy et al., *Policies to Address Surprise Billing Can Affect Health Insurance Premiums*, 26(9) Am. J. Managed Care 401 (Sept. 11, 2020), https://perma.cc/AJ2G-WFLC.

[20] Cong. Budget Office, *Estimate for Divisions O Through FF H.R. 133, Consolidated Appropriations Act, 2021, Public Law 116-260 Enacted on December 27, 2020* (Jan. 14, 2021), https://perma.cc/XYR2-9ZUB.  In fact, as discussed, *all* of the bills considered by relevant congressional committees designated the QPA as the primary factor for IDR entities to consider, *see supra* at 4-5 & n.4, and Congressional Budget Office analyses of *each* of these bills specifically found that prioritizing the role of the QPA would reduce health insurance premiums.  *See* Letter from Sen. Murray & Rep. Pallone, *supra* n.4, at 4 (collecting and quoting analyses).

[21] Loren Adler, *Experience with New York's Arbitration Process for Surprise Out-of-Network Bills*, USC-Brookings Schaeffer Initiative for Health Pol'y (Oct. 24, 2019), https://perma.cc/ZVP8-HX7R.

[22] Benjamin L. Chartock et al., *Arbitration Over Out-of-Network Medical Bills:  Evidence from New Jersey Payment Disputes*, 40(1) Health Affairs 130 (Jan. 2021), https://perma.cc/6569-N2Y5.

costs, both by lowering costs in the near term relative to the status quo and by slowing the rate of health care cost inflation in future years."  H.R. Rep. No. 116-615, pt. I, at 57-58.

The IFR also implements a fair process that will not "undermine providers' ability to obtain adequate reimbursement for the services," as the plaintiffs allege.  Compl., Dkt. 1, ¶ 7.  First, by tying the QPA to median contracted rates from 2019, the Act defines the QPA to reflect healthcare market dynamics as they stood before the Act was passed.  *See* 42 U.S.C. § 300gg-111(a)(3)(E). The QPA thus locks in contracted rates that payors and providers negotiated in the market environment distorted by surprise billing—in fact, some critics of the Act have argued that its definition of the QPA codifies payment rates "inflated by the threat of surprise billing" and does not do enough to remedy the market distortions caused by surprise billing.[23]  Second, though plaintiffs seem to treat the QPA as dispositive, the IFR plainly does not.  The IFR instructs arbitrators to use the QPA as a starting point, but it also requires them to "tak[e] into account" the other statutory criteria enumerated in the Act.  45 C.F.R. § 149.510(c)(4)(ii)(A).  The IFR allows healthcare providers and payors to submit other information to the arbitrators for consideration and the IFR gives arbitrators flexibility to depart from the QPA as circumstances require.

III.   **The Use of the QPA as the Primary Reference Point in the IDR Process Will Not Lead to Unduly Narrow Provider Networks or Impede Access to Care.**

There is no evidentiary basis to find that the IFR will cause payors to shrink their provider networks to inadequate levels that impact patients' access to care.  This is true, in part, because payors have other market and regulatory incentives to maintain robust provider networks.

---

[23] Matthew Fiedler et al., *Recommendations for Implementing the No Surprises Act*, USC-Brookings Schaeffer Inst. on Health Pol'y (Mar. 16, 2021), https://perma.cc/YUY8-C7ZV.  Tying the QPA to 2019 median contracted rates, as the Act does, also rebuts any notion that payors will be able to artificially depress the QPA through future contracting practices.

A. **The IFR incentivizes healthcare providers to participate in payor networks.**

Some healthcare providers, particularly hospital-based providers, have historically had little to no incentive to enter health plan networks. *See supra* at 6. While "for most physicians in most geographic areas, it is not possible to maintain a practice without entering some insurer networks because few patients are willing to bear the higher costs associated with seeing an out-of-network physician," "that basic dynamic does not apply" for hospital-based providers.[24] Because "patients generally are not able to choose these emergency and ancillary providers," they "can often remain out of network without significantly reducing their patient volume."[25] This market dysfunction has proven lucrative for Surprise Billers and incentivizes them to remain out-of-network and saddle patients with the associated expense of balance billing. The IFR will likely incent broader networks, as Surprise Billers who previously refused to join a network because they could exact excessive out-of-network charges directly from their patients will now have more incentives to contract at reasonable network rates.

B. **Payors continue to have market incentives to maintain broad provider networks, which benefit both health plans and patients.**

Plaintiffs and their *amici* argue that the IFR will encourage payers to severely restrict their networks to the cheapest available healthcare providers. *See, e.g.*, Compl., Dkt. 1, ¶ 74; Amicus Curiae Br. by Physicians Advocacy Inst. et al., Dkt. 34, at 11-14. But they fail to acknowledge the market forces that encourage broad provider networks. Many health insurers sell broader networks as a benefit of their health plans, "because their customers value flexibility when making decisions regarding healthcare." *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, at *2 (C.D. Ill. Sept. 30, 2016). "Large employers," in particular, "tend to require broad

---

[24] Adler et al., *supra* n.8, at 4, https://perma.cc/DMS6-8K6V.
[25] Duffy et al., *supra* n.19, https://perma.cc/AJ2G-WFLC.

networks to satisfy the preferences of diverse work forces with a single or small number of insurance plans," leading insurers to "contract with the majority of hospitals and physicians in a market, in order to best compete for the large employer groups that compose the bulk of the market."[26]  Market forces, in other words, discourage health insurers from unduly narrowing their provider networks, because "plans that do not have sufficient geographic coverage in a market will have difficulty marketing their insurance products to employers and their employees."  *FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281, at \*7 (N.D. Ohio Mar. 29, 2011).

While some health insurers offer more narrow provider networks, many consumers prefer plans with broader networks, and this preference is especially pronounced among those enrolled in employer-sponsored health plans,[27] which can be a competitive advantage for employers in the labor market.  Thus, there remain strong competitive and market forces that incentivize health insurers to maintain sufficiently broad networks, and there is no reason to believe that the IFR will alter these longstanding market incentives.

### C.   Because of the many benefits associated with provider networks, payors remain incentivized to contract with even high-cost healthcare providers.

Aside from the market forces that incentivize payors to maintain broad provider networks, there are other administrative and operational reasons why payors prefer to contract with healthcare providers.  Contracting with hospital-based providers allows payors to better facilitate disease management and care coordination for patients, including those with chronic conditions.

---

[26] Mark A. Hall & Paul B. Ginsburg, *A Better Approach to Regulating Provider Network Adequacy*, USC-Brookings Schaeffer Initiative for Health Pol'y (Sept. 2017), at 1, https://perma.cc/B3RG-J9T6.

[27] *See* Liz Hamel et al., *Kaiser Health Tracking Poll:  February 2014*, KFF (Feb. 26, 2014), https://perma.cc/TF35-YW2B; *see also* Coleman Drake, *What Are Consumers Willing to Pay for a Broad Network Health Plan? Evidence from Covered California*, 65 J. Health Econ. 63 (2019), https://perma.cc/S75C-47WA; McKinsey Ctr. for U.S. Health Sys. Reform, *Hospital Networks: Evolution of the Configurations on the 2015 Exchanges* (Apr. 2015), https://perma.cc/XQR5-P2ER.

For example, network providers are often included in a payor's utilization and quality management programs.[28]  In addition, network contracts allow payors to facilitate the referral of their members to other network providers where possible, thus improving continuity of care.[29]  These efforts help to prevent readmissions and offer more integrated and higher quality care to patients, which in turn reduces costs to payors.

Moreover, because network contracts typically set forth the payment rates that a payor will remit to the healthcare provider for specific services, they afford the payor certainty on reimbursement rates, which in turn reduces administrative costs attendant to provider appeals, litigation, and arbitrations.[30]  Thus, quite apart from market forces that encourage broader networks, there are many economic incentives for payors to maintain adequate provider networks that will not be impacted at all by the Act or the IFR.

### D.     State and federal network adequacy requirements ensure that payors will not offer unduly narrow provider networks for patients.

State and federal laws offer an additional backstop to the market-based incentives for health insurers to maintain sufficiently broad provider networks.  Since the mid-1990s, most states have adopted "network adequacy standards that require[] each network plan to demonstrate that it ha[s] contracted with sufficient providers throughout its service area."[31]  "Today, network adequacy standards are in place in all states for most insured products."[32]  Federal law has also imposed

---

[28] *See* Peter R. Kongstvedt, *Essentials of Managed Care* (6th ed. 2013), ch. 4 (explaining that a health plan can require a healthcare provider to agree to cooperate with the plan's utilization management program and quality management program, and to agree to the plan's right to audit clinical and billing data for care provided to plan members).

[29] *See id.*

[30] *See id.*

[31] Christen Linke Young et al., *The Relationship Between Network Adequacy and Surprise Billing*, USC-Brookings Schaeffer Initiative for Health Pol'y (May 10, 2019), https://perma.cc/6EV8-5M8P.

[32] *Id.*

network adequacy standards on qualified health plans since 2012.[33]  Health plans take network adequacy laws seriously, as do state regulators.[34]  State insurance regulators conduct market conduct examinations that scrutinize whether health plans offer provider networks sufficient to serve their patients' needs.[35]  Statutory and regulatory network adequacy requirements are thus designed to ensure that health plans maintain sufficiently robust provider networks.

### E.    Empirical evidence suggests that the IFR will not lead to unreasonably narrow provider networks or impede patient access to care, as plaintiffs claim.

Empirical evidence suggests that the IFR will not prompt health insurers to narrow their provider networks to levels that impede patients' access to care.  State surprise billing laws that were enacted before the No Surprises Act offer valuable evidence on this question.

In 2017, for instance, California enacted a surprise billing law that "requires fully-insured plans to pay out-of-network physicians at in-network hospitals the greater of the insurer's local average contracted rate or 125% of the Medicare reimbursement rate."[36]  Contracted rates for *all* physicians' services in California equated to 128% of Medicare rates on average.[37]  If plaintiffs' hypothesis were correct, California would have experienced a substantial narrowing of provider

---

[33] *See* 42 U.S.C. § 18031(c)(1) (Affordable Care Act provision requiring HHS to "establish criteria for the certification of health plans as qualified health plans"); 45 C.F.R. § 156.230.

[34] *See, e.g.*, Jane B. Wishner & Jeremy Marks, *Ensuring Compliance with Network Adequacy Standards: Lessons from Four States*, Urban Inst. (Mar. 2017), at 8, https://perma.cc/6ZT6-WANB ("Regulator respondents in all four study states reported that upon receipt of initial network filings, they had instructed an insurer to alter a proposed network or offer 'alternative access accommodations' to ensure the adequacy of a proposed provider network.").

[35] *See, e.g.*, Fla. Off. of Ins. Reg., Target Market Conduct Final Examination Report of Humana Medical Plan, 2014 FL Market Conduct LEXIS 17, at *15-16 (Oct. 30, 2015) (reporting on plan's addition of oncologists to satisfy network adequacy standards); Conn. Ins. Dep't, Market Conduct Report on Aetna Health Inc., 2014 CT Market Conduct LEXIS 25, at *35-38 (June 6, 2017) (examining compliance with network adequacy requirements).

[36] Loren Adler et al., *California Saw Reduction in Out-of-Network Care from Affected Specialties After 2017 Surprise Billing Law*, USC-Brookings Schaeffer Initiative for Health Pol'y (Sept. 26, 2019), https://perma.cc/8BSS-AH9S.

[37] Bill Johnson et al., *Comparing Commercial and Medicare Professional Services Prices*, Health Care Cost Inst. (Aug. 13, 2020), https://perma.cc/483G-7YY7.

networks after passage of this law; indeed, more substantial than they imagine under the IFR, which allows IDR entities to consider provider-submitted information that the California law excludes.  The data does not bear out that theory, however.  One study concluded that "on average, in-network specialty doctors either remained flat, or increased by as much as 26%."[38]  Another study found "a modest shift toward claims from in-network service providers across all the affected specialties timed to the law's implementation," but did not find "similar changes for emergency medicine, which was unaffected by the law," a finding that flatly "contradicts … claim[s] of widespread diminishing network breadth."[39]  Plaintiffs and their *amici* have cited *no* empirical evidence that the California law—which, again, offers the arbitrator less flexibility than the IFR— resulted in material narrowing of provider networks.[40]  The available evidence offers no support for their allegations of disastrous consequences for patient access to network providers.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion for summary judgment and grant defendants' cross-motion for summary judgment.

---

[38] Jeanette Thornton, AHIP, *Can We Stop Surprise Medical Bills AND Strengthen Provider Networks? California Did*, Am. J. Managed Care (Aug. 22, 2019), https://perma.cc/64C5-8GQ7.
[39] Adler et al., *supra* n.36, https://perma.cc/8BSS-AH9S.
[40] Plaintiffs' *amici* reference a letter from the California Medical Association, but that letter "does not cite empirical research supporting any of the[] assertions" that plaintiffs' *amici* trumpet.  *Id.*

Dated:  January 18, 2022

Respectfully submitted,

/s/ K. Lee Blalack, II

K. Lee Blalack, II (*pro hac vice*)
Washington, D.C. Bar No. 452372
Zhao Liu (*pro hac vice*)
Washington, D.C. Bar No. 1022940
Andrew R. Hellman (*pro hac vice*)
Washington, D.C. Bar No. 1723887
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
(202) 383-5300
lblalack@omm.com
zliu@omm.com
andrewhellman@omm.com

**Counsel for *Amicus Curiae***
**Blue Cross Blue Shield Association**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was filed electronically on

January 18, 2022, in compliance with Local Rule CV-5(a).  As such, this notice was served on

all counsel of record who have consented to electronic service as this district requires in

accordance with Local Rule CV-5(a)(3)(A).


<u>/s/ K. Lee Blalack, II</u>
K. Lee Blalack, II